UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————— x

HERBERT SILVERBERG, Individually and
on Behalf of All Others Similarly Situated,

                       Plaintiff,

      vs.

DRYSHIPS INC., GEORGE ECONOMOU,
ANTHONY KANDYLIDIS, KALANI
INVESTMENTS LIMITED, MURCHINSON
LTD. and MARC BISTRICER,

                  Defendants.

—————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by DryShips Inc. ("DryShips" or the "Company"), as well as media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of DryShips common stock between June 8, 2016 and July 14, 2017 (the "Class Period"), against DryShips, certain of the Company's officers and/or directors and Kalani Investments Limited ("Kalani") seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§9, 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78i, 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act. The acts and transactions giving rise to the violations of law complained of occurred in part in this District. DryShip common stock is listed on the NASDAQ Stock Market LLC ("NASDAQ"). The false and misleading statements were disseminated in this District, and therefore the manipulative conduct was carried out in part in this District.

**PARTIES**

4.      Plaintiff Herbert Silverberg purchased DryShips common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

5.      Defendant DryShips is a dry bulk shipping company.  During the Class Period, shares of DryShips common stock traded in an efficient market on the NASDAQ under the ticker "DRYS."

6.      Defendant George Economou ("Economou") is the Chief Executive Officer ("CEO") and Chairman of DryShips.

7.      Defendant Anthony Kandylidis ("Kandylidis") has served as the President and Chief Financial Officer ("CFO") of DryShips since December 2016, prior to which he served as the Company's Executive Vice President.  Kandylidis assumed the duties of interim CFO on August 8, 2016.  He is the nephew of defendant Economou.

8.      Defendants Economou and Kandylidis are referred to herein as the "DryShips Officer Defendants."

9.      Defendant Kalani Investments Limited ("Kalani") is an entity organized under the laws of the British Virgin Islands and served as the underwriter and distributer of multiple offerings of DryShips common stock during the Class Period as described herein.

10.     Defendant Murchinson Ltd. ("Murchinson") is reportedly a Toronto-based hedge fund behind Kalani.

11.     Defendant Marc Bistricer ("Bistricer") is reportedly the head of Murchinson and, therefore, controls Kalani.

12.     Defendants Kalani, Murchinson and Bistricer are referred to herein as the "Kalani Defendants."

- 2 -

13.     During the Class Period, the DryShips Officer Defendants ran the Company as hands-on managers overseeing DryShips' operations and finances and made the materially false and misleading statements described herein.  The DryShips Officer Defendants had intimate knowledge about core aspects of DryShips' financial and business operations, including its major contracts and revenue sources.  They were also intimately involved in deciding which disclosures would be made by DryShips, as well as the decision to conduct manipulative stock offerings and reverse stock splits.  Similarly, Bistricer controlled and oversaw Kalani and Murchinson and was directly involved in the decision to conduct manipulative stock offerings and reverse stock splits.

## BACKGROUND

14.     Defendant DryShips is a dry bulk shipping company based in Athens, Greece and organized under the laws of the Marshall Islands.  The Company primarily owns and operates drybulk carriers and offshore support vessels. As of March 31, 2016, DryShips owned a fleet of 20 Panamax drybulk carriers and six offshore supply vessels, comprising two platform supply and four oil spill recovery vessels.

15.     The Company is run by Economou, the Company's CEO and Chairman, who also owns a number of private companies that provide services to DryShips and engage in material commercial business dealings with the Company.  The following graphic depicts the relationship between various Economou-controlled companies and DryShips:



16.     Defendant Economou derives significant financial benefits from these relationships. For example, Economou owns and controls TMS Bulkers Ltd. ("TMS Bulkers"), which provided management services to the Company's fleet in exchange for a fixed management fee of about $1.7 thousand per drybulk vessel per day in fiscal 2015 (using Euro/USD exchange rate as of December 31, 2015). TMS Bulkers also received additional fees for supervising ship construction, sale and purchase commissions and chartering commissions from the Company. Total charges to DryShips from TMS Bulkers amounted to $28.4 million for fiscal 2015.

17.      As set forth in the chart above, DryShips has entered into similar services agreements with entities owned and controlled by Economou for DryShips' drilling units, tankers, offshore support vessels and other aspects of the Company's business, as well as agreements for consulting and other services.

18.      Prior to the Class Period, Economou caused DryShips and certain of his related companies to engage in transactions which enabled Economou to cement his control over the Company.  Through these series of transactions, Economou was able to gain control of DryShips' equity (he already controlled its debt).

19.      On October 21, 2015, the Company entered into a secured revolving credit facility of up to $60 million (including a November 2015 amendment) with Sifnos Shareholders Inc. ("Sifnos"), an entity controlled by Economou.  The Sifnos credit facility also gave the Company and Economou certain share conversion rights.

20.      On December 29, 2015, the Company announced that it would be holding a special meeting of the Company's shareholders on February 19, 2016, at DryShips' corporate offices in Athens.

21.      The next day, on December 30, 2015, the DryShips Board of Directors (the "Board") elected to convert $10 million of the outstanding principal of the loan under the Sifnos credit facility owned by Economou into 100 million shares of DryShips Series B Preferred Stock.  Each share of Series B Preferred Stock was entitled to five votes and was to be mandatorily converted into common shares of the Company on a one-to-one basis no later than March 30, 2016.  This maneuver gave Economou effective voting control over the Company when combined with his beneficial ownership of DryShips common shares, providing him with approximately 52.7% of the voting power of the common shares and the Class B Preferred Stock prior to their conversion.

22.     In early 2016, as doubts rose about the Company's ability to continue to operate as a going concern following a market downturn in the dry bulk segment, the price of DryShips stock declined to less than the $1 per share minimum necessary to keep the Company's shares listed on the NASDAQ.  On February 19, 2016, under Economou's influence and control, a special meeting of shareholders approved a proposal to allow the Company to conduct reverse stock splits in order to keep DryShips' share price above the $1 per share minimum.  A reverse stock split is a process by which shares of corporate stock are effectively merged to form a smaller number of proportionally more valuable shares.

23.     On February 26, 2016, DryShips announced that it would effect a 25-for-1 reverse stock split of the Company's common shares.  This reduced the number of DryShips' outstanding common shares from approximately 672 million shares to approximately 26.9 million shares, which began trading on a split-adjusted basis on March 11, 2016.

24.     On March 28, 2016, DryShips announced that it had agreed to increase the maximum available amount under the Sifnos credit facility to $70 million, extend the maturity of the facility by 12 months, and to cancel Sifnos' option to convert the loan principal into DryShips common stock. The Series B Preferred Stock held by Sifnos, which was to convert to Company common shares on March 30, 2016, was exchanged with DryShips for an $8.75 million cash payment by the Company.

25.     On April 5, 2016, the Company sold three of its vessels and associated bank debt to entities controlled by Economou.  The sale reduced the Company's total outstanding bank debt by $102.1 million to $213.7 million.  That same day, the Company also agreed to sell all of its remaining shares in Ocean Rig UDW Inc. – an oil rig and drill ship operator that had been previously spun off from DryShips – for $49.9 million, which proceeds were used in part to reduce the outstanding balance of the Sifnos credit facility.

## DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF CONDUCT

26.     As detailed herein, Economou caused DryShips to engage in a series of manipulative share issuance/sales transactions with Kalani and related entities.  The manipulative scheme (hereinafter referred to as the "Reverse Split Share Issuance Scheme") worked as follows: Through his control of DryShips, Economou caused DryShips to sell shares to Kalani at a discount and to file a registration statement so that Kalani could resell the shares into the market.  When Kalani's sales of DryShips stock caused the price of DryShips stock to decline, DryShips would reverse split the stock, thereby raising the price of DryShips stock.  Then, DryShips would again sell stock to Kalani and the same pattern of transactions would ensue.  The following chart details the scope and magnitude of the Reverse Spilt Share Issuance Scheme:



27.     At the same time that DryShips was engaging in these transactions, defendants failed to disclose the true purpose of the transactions and related stock issuances and reverses – to provide DryShips with financing to purchase new vessels, purchases that primarily benefited Economou and his related companies.  In other words, unbeknownst to investors, the transactions and related stock issuances and reversals – the Reverse Spilt Share Issuance Scheme – were nothing more than a manipulative financing scheme designed to further enrich Economou, Kalani and their associates.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
MARKET MANIPULATION DURING THE CLASS PERIOD**

28.     The Class Period begins on June 8, 2016.  On that date, the Company announced that it had entered into a Securities Purchase Agreement with an undisclosed institutional investor for the sale of 5,000 newly designated Series C Convertible Preferred Shares, warrants to purchase 5,000 Series C Convertible Preferred Shares and 148,998 common shares.  The Company stated that the offering would generate between $5 million and $10 million in gross proceeds.

29.     That same day, the Company filed a prospectus supplement for the offering on Form 424B5.  The prospectus supplement, and the registration statement of which it formed a part (collectively, the "June 2016 Registration Statement"), contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation.  For example, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(1) ("Item 303") required the June 2016 Registration Statement to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Defendants failed to disclose their fraudulent scheme to manipulate the price of DryShips common stock through a series of share offerings and reverse stock splits in order to enrich themselves at shareholders' expenses.  Moreover, the scheme needed to be disclosed under Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503") in the "'Risk factors'" section of the June 2016 Registration Statement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky."   Indeed, the scheme would ultimately result in shareholders losing more than 99.99% of the value of the shares purchased in the offering in a matter of months.

30.     On August 1, 2016, DryShips announced that it would effect a 4-for-1 reverse stock split of the Company's common shares.  This reduced the number of DryShips' outstanding common shares from approximately 39.7 million shares to approximately 9.9 million shares, which began trading on a split-adjusted basis on August 15, 2016.

31.     On September 6, 2016, the Company announced that it would be holding its annual general meeting of shareholders on October 26, 2016 at DryShips' corporate offices in Athens.

32.     On September 14, 2016, the Company announced that it had reached an agreement with Sifnos to convert $8.75 million of the outstanding principal under the Sifnos credit facility to 3.5 million preferred shares.  Each preferred share had 100,000 votes, once again giving Economou voting control of the Company soon before an upcoming shareholder meeting.  Moreover, Economou had been reducing his beneficial ownership of Company common shares, which would ultimately leave him with less than 1% of DryShips' common shares outstanding.  As a result, Economou sought voting control of the Company, but sought to limit and eventually eliminate his exposure to declines in the price of the Company's common shares.

33.     In a press release announcing the share conversion, Kandylidis stated: "'***We are pleased to see our founding shareholder actively supporting the company in a way that is not dilutive to the rest of our shareholders***.'"  This statement was false and misleading when made, because, as defendants knew or were reckless in not knowing but failed to disclose, Economou had taken control of the Company in order to embark on a vastly dilutive and manipulative series of stock offerings and reverse stock splits that would eviscerate the value of the Company's outside common shareholders while enriching Economou, Kalani and their associates.

34.     On September 23, 2016, the Company filed a shareholder proxy (dated September 20, 2016) for its upcoming annual general meeting of shareholders on Form 6-K and signed by

Economou.  The proxy sought shareholder approval for a proposal to amend and restate DryShips'
articles of incorporation in order to allow the Company to effect one or more reverse stock splits.
The proxy stated that the Board believed the proposal was in the "***best interests***" of the Company
and that the reverse stock splits would "***only be effected, if at all, upon a determination by the
Board that a reverse stock split is in the Company's and the shareholders' best interests***."   The
proxy also stated that the "***purpose***" of the reverse stock splits would be "***to increase the market
price of each Common Share***" in order to "***improve the marketability and liquidity of the Common
Shares and . . . encourage interest and trading in the Common Shares***."  These statements were
materially false and misleading when made because, as defendants knew or were reckless in not
knowing but failed to disclose, the true purpose of the proxy proposal was to further defendants'
Reverse Spilt Share Issuance Scheme and enable DryShips to finance the purchase of additional
vessels that the Company did not need given the worldwide over-capacity of such shipping vessels.
In addition, defendants knew but failed to disclose that defendants intended to repeatedly engage in
stock issuances and related reverse splits thereby manipulating the market for DryShips stock.

      35.     On October 27, 2016, the results of the Company's annual meeting of shareholders
were announced.  Under Economou's influence and control, shareholders had approved a proposal to
allow the Company to conduct additional reverse stock splits of up to 1000-for-1.  In addition, the
Company announced that it would effect a 15-for-1 reverse stock split.  This reduced the number of
DryShips' outstanding common shares from approximately 17 million to approximately 1.1 million
shares, which began trading on a split-adjusted basis on November 1, 2016.

      36.     On October 31, 2016, the Company announced that it had sold two vessels, along
with their associated debt, to entities controlled by Economou and three additional ships to
unaffiliated buyers.  In addition, the Company announced that the Sifnos credit facility was amended

to increase the maximum available amount to $75 million and to give DryShips an option to convert $7.5 million of the outstanding balance to DryShips common stock within 365 days.

37.    The multiple reverse stock splits effectuated in 2016 by the Company under Economou's control resulted in a dramatic reduction in the number of shares of DryShips common stock available to trade in the market by the beginning of November 2016.  The number of shares outstanding had been reduced from approximately 672 million shares to approximately 1.1 million shares in a span of less than nine months.  Consequently, shares of DryShips common stock were subject to extreme volatility and price swings if there was an event that impacted their price.

38.    On November 9, 2016, DryShips reported its financial results for the nine-month period ended September 30, 2016.  For this period, the Company reported total revenues of $42.3 million, compared to total revenues of $946 million during the same period the prior year.

39.    Then, that same day, DryShips' stock began experiencing a sudden and extreme increase in price.  Over a period of five trading days, the stock price increased from a close of $4.56 per share (on an unadjusted basis) on November 8, 2016 to $73 per share (on an unadjusted basis) by November 15, 2016, an increase of over 1,500%.  In response to the unexplained jump in share price, the NASDAQ temporarily halted trading of DryShips common stock.

40.    The NASDAQ's temporary halt in trading was lifted on November 17, 2016.  That same day, DryShips announced that it had entered into an agreement with Kalani, a mysterious investor organized under the laws of the British Virgin Islands, to sell to Kalani 20,000 Series E-1 Convertible Preferred Shares, preferred warrants to purchase 30,000 Series E-1 Convertible Preferred Shares, preferred warrants to purchase 50,000 newly designated Series E-2 Convertible Preferred Shares, prepaid warrants to initially purchase an aggregate of 372,874 common shares (with the number of common shares issuable subject to adjustment), and 100 common shares for up

to $100 million if all of the preferred warrants were exercised.  The E-1 and E-2 Preferred Shares were convertible at a fixed conversion price of $30 per common share or an alternative price if the volume weighted average price of the shares was below $30 equal to the higher of: (i) 77.5% or 85%, respectively, of the lowest daily volume average on any trading day during the 14-day or 21-day trading period, respectively, on the trading day immediately prior to the conversion date; or (ii) $1.50 per share, which acted as a share price minimum.  In addition, the Company agreed to issue to Kalani additional shares of common stock under a series of F-1 and F-2 common warrants.  On full conversion and exercise, the convoluted issuance scheme entitled Kalani to receive between approximately 3.6 million and 72.1 million common shares of DryShips common stock, depending on their market price.

41.     Also on November 17, 2016, DryShips filed a prospectus supplement for the share offering on Form 424B5.  The prospectus supplement, and the registration statement of which it formed a part (collectively, the "November 2016 Registration Statement"), contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation.  For example, Item 303 required the November 2016 Registration Statement to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."  Defendants failed to disclose their fraudulent scheme to manipulate the price of DryShips common stock through a series of share offerings and reverse stock splits in order to enrich themselves at shareholders' expenses.  Moreover, the scheme needed to be disclosed under Item 503 in the "'Risk factors'" section of the November 2016 Registration Statement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky."  Indeed, the scheme would ultimately result in

- 13 -

shareholders losing more than 99.99% of the value of the shares purchased in the offering in a matter of months.

42.     As the issuance represented potentially more than 7,000% of the amount of shares then-currently outstanding, the offering was extremely dilutive to the Company's existing stock holders.  Further, the stock was to be issued at a significant discount of at least more than 50% below the last closing trading price in DryShips common stock, and as much as 98% below that trading price at the $1.50 price minimum.  After this announcement, the price of DryShips common stock plummeted, closing at $11 per share (on an unadjusted basis) on November 17, 2016, an 85% drop from the prior close of $73 per share before the trading suspension on November 15, 2016.

43.     On December 1, 2016, DryShips announced that an entity controlled by Economou had purchased $85.1 million of the Company's outstanding bank debt.  Following the transaction, entities controlled by Economou controlled the vast majority of DryShips' outstanding debt with a total aggregate principal amount of $154.5 million.  The Company also announced that it was in discussions to reach an amicable settlement with the remaining $16.5 million of Company debt associated with third-party commercial lenders.

44.     On December 12, 2016, DryShips announced that it had completed its $100 million share issuance to Kalani, thereby indicating that Kalani had fully exercised its conversion rights.  After the offering, DryShips had approximately 33.8 million shares outstanding, a share increase of approximately 2,900% from before the offering.  Kalani, in turn, sold its newly acquired shares to the investing public thereby acting as an underwriter and distributor of the shares sold in the offering and further diluting the interests of DryShips' common stock holders and causing a decline in the price of DryShips common stock.  By December 12, 2016, the price of DryShips common stock

closed at $4.02 per share (on an unadjusted basis), a decline of 63% from the closing price on November 17, 2016 when the share offering was first announced.

45.     On December 15, 2016, DryShips announced that it had reached an agreement with Sifnos to refinance the majority of its outstanding debt through a new secured revolving facility. The new agreement provided a loan of up to $200 million to DryShips secured by all of the Company's present and future assets except for a single vessel, the MV Raraka, which would continue to be financed by its existing commercial lender.  The loan carried an interest of Libor plus 5.5%, was non-amortizing, had a tenor of three years, had no financial covenants and would be arranged at a cost of 2%.  In addition, the agreement entitled Sifnos to receive realized asset value increases of the Company's collateral base of 30%.  As a result, Economou received beneficial ownership of substantially all of the Company's debt, including interest and arrangement fees, as well as an entitlement to as much as 30% of any increases in DryShips' collateral asset value, for example from the sale of Company vessels.

46.     In the same release, the Company announced that it had entered into new management agreements with TMS Bulkers and TMS Offshore Services Ltd. ("TMS Offshores," together with TMS Bulkers, the "TMS Entities") to provide DryShips' fleet with management services at a minimum cost of $1,644 per vessel per day, basis a minimum of 20 vessels.  The new agreement also entitled the TMS Entities to an aggregate performance bonus for 2016 amounting to $6.0 million, as well as a one-time setup fee of $2.0 million.  Under each respective agreement, the TMS Entities were also entitled to: (i) a discretionary performance fee; (ii) a commission of 1.25% on charter hire agreements arranged by the TMS Entities; (iii) a commission of 1% of the purchase price on sales or purchases of vessels in DryShips' fleet arranged by the TMS Entities; (iv) a financing and advisory commission of 0.50%; and (v) reimbursement of out-of-pocket and travel

- 15 -

expenses.  Thus, Economou retained a substantial personal financial interest in increasing DryShips'
vessel acquisitions and servicing DryShips' fleet.

47.     On December 23, 2016, DryShips entered into a common stock purchase agreement
with Kalani to sell it up to $200 million of DryShips common shares.  In consideration for entering
into the purchase agreement, Kalani was provided with an additional $1.5 million of DryShips
common stock.  Over the next several weeks, Kalani, in turn, sold its newly acquired shares to the
investing public thereby acting as an underwriter and distributor of the shares sold in the offering
and further diluting the interests of DryShips common stock holders and causing a decline in the
price of DryShips common stock.  By January 20, 2017, as Kalani was selling millions of newly
acquired shares into the market, the price of DryShips' common stock closed at $1.01 per share, an
82% decline from the date the share purchase agreement was entered into and a 99% decline from
the mid-November share price high.

48.     On January 5, 2017, DryShips announced that it had entered into an agreement with
entities controlled by Economou for the option to purchase up to four gas carriers under construction
for an aggregate purchase price of $334 million.  The gas carrier market was a new segment for the
Company.  The Company stated that it would use its cash on hand to fund the acquisitions – cash
which DryShips had recently accumulated through the dilutive stock offerings.  In addition to
receiving cash from the sale of the vessels, Economou would also receive a personal financial
benefit in the operation of the vessels, as they would be managed by TMS Cardiff Gas, a company
Economou controlled, on terms similar to the TMS Bulkers and TMS Offshore management
agreements.

49.     On January 19, 2017, as the price of DryShips common stock approached $1 per
share as a result of defendants' dilutive stock offerings, DryShips announced that it would affect an

8-for-1 reverse stock split of the Company's common shares.  This reduced the number of DryShips' outstanding common shares from approximately 69.4 million shares to approximately 8.7 million shares, which began trading on a split-adjusted basis on January 23, 2017.  The reverse stock split resulted in a temporary increase in the unadjusted share price of DryShips common stock from a close of $1.01 per share on January 20, 2017 to a close of $5.40 per share on January 23, 2017, the next trading day.  However, this increase did not offset the loss in value to shareholders of having their shares merged, and the price of the shares actually declined over 33% on an adjusted basis.

50.     On January 31, 2017, the Company announced that it had completed the previously announced $200 million stock offering through Kalani.  The Company stated that it had sold to Kalani an aggregate 31.8 million shares of common stock (adjusted for the 8-for-1 split).  These shares were then sold to the general public.  After the offering, DryShips had approximately 36.2 million shares outstanding, meaning that the offering had resulted in more than seven times the number of shares outstanding being introduced into the market, resulting in significant share dilution and price declines for the Company's existing common stock holders.

51.     On February 17, 2017, DryShips announced that it had entered into another common stock purchase agreement with Kalani to sell it up to $200 million of its common shares.  In consideration for entering into the purchase agreement, Kalani was provided with an additional $1.5 million of DryShips common stock.  Over the next several weeks, Kalani, in turn, sold its newly acquired shares to the investing public thereby acting as an underwriter and distributor of the shares sold in the offering and further diluting the interests of DryShips' common stock holders and causing a decline in the price of DryShips common stock.  Within ten days, the price of DryShips common stock declined from a close of $4.47 per share (on an unadjusted basis) on February 17, 2017, to a close of $1.87 per share (on an unadjusted basis) on February 27, 2017, a decline of over 58%.

52.     On February 21, 2017, DryShips announced that it had agreed to acquire two tanker vessels for a total gross price of $102.5 million.  The cash to fund these acquisitions was derived primarily from the Company's recent dilutive stock offerings.  Furthermore, as the primary owner of the Company's debt which could be used to fund the transactions, an up to 30% interest in any increase in value of the vessels if used as collateral, and the beneficial ownership of lucrative contracts to manage and service the vessels, Economou stood to potentially receive millions of dollars from the acquisitions.

53.     On March 13, 2017, the Company filed its annual report of a foreign issuer for the fiscal year ended December 31, 2016 on Form 20-F.  The annual report stated that the total revenues of the Company had declined from $969.8 million in fiscal 2015, to $51.9 million in fiscal 2016.

54.     On March 17, 2017, the Company announced that it had completed the previously announced $200 million stock offering through Kalani.  The Company stated that it had sold to Kalani an aggregate 114.9 million shares of common stock.  These shares were then sold to the general public.  After the offering, DryShips had approximately 152 million shares outstanding, meaning that the offering had resulted in more than three times the number of shares outstanding being introduced into the market, resulting in significant share dilution and price declines for the Company's existing common stock holders.

55.     On March 27, 2017, DryShips announced that it had entered into agreements to acquire four bulk carriers for a gross purchase price of approximately $124 million.  The Company stated that it would use its cash on hand to fund the acquisitions – cash which DryShips had recently accumulated through the dilutive stock offerings.  Economou once again received a personal financial benefit in the purchase and operation of the vessels through the Company's agreements with entities Economou controlled.

56.     On April 3, 2017, DryShips announced that it had entered into yet another common stock purchase agreement with Kalani to sell it up to $226.4 million of DryShips' common shares. In consideration for entering into the purchase agreement, Kalani was provided with an additional $1.5 million of DryShips common stock.  Over the next several weeks, Kalani, in turn, sold its newly acquired shares to the investing public thereby acting as an underwriter and distributor of the shares sold in the offering and further diluting the interests of DryShips' common stock holders and causing a decline in the price of DryShips common stock.  The price of DryShips common stock declined from a close of $1.65 per share (on an unadjusted basis) on March 31, 2017, the last trading before the share offering was announced, to a close of $0.62 per share (on an unadjusted basis) on April 10, 2017, a decline of over 62% just ten days later.

57.     Also on April 3, 2017, DryShips announced that it had entered into agreements to acquire six vessels for a total gross price of $268 million, including two gas carriers that would be acquired from entities affiliated with Economou.  The acquisitions were funded in part by cash on hand from the recent dilutive share offerings, as well as available liquidity under the Sifnos credit facility beneficially owned by Economou.  Economou also received additional personal financial benefits in the purchase and operation of the vessels through the Company's agreements with entities Economou controlled.

58.     On April 6, 2017, as the price of the Company's common stock once again fell below $1 per share as a result of the dilutive and manipulative conduct of defendants and their affiliates, DryShips announced that it would effect a 4-for-1 reverse stock split of the Company's common shares.  This reduced the number of DryShips' outstanding common shares from approximately 188 million shares (following the sale of 35.7 million shares to Kalani in the offering announced on April 3, 2017) to approximately 47 million shares, which began trading on a split-adjusted basis on April

11, 2017.  The reverse stock split resulted in a temporary increase in the unadjusted share price of DryShips common stock from a close of $0.62 per share on April 10, 2017 to a close of $1.74 per share on April 11, 2017, the next trading day.  However, this increase did not offset the loss in value to shareholders of having their shares merged, and the price of the shares actually declined nearly 30% on an adjusted basis.

59.     On April 19, 2017, DryShips announced that it had acquired three drybulk carriers for a total gross purchase price of $68 million.  The acquisitions were funded by cash on hand from the recent dilutive share offerings.  Economou received personal financial benefits in the purchase and operation of the vessels through the Company's agreements with entities Economou controlled.

60.     On April 28, 2017, DryShips announced that it had acquired another drybulk carrier for a gross purchase price of $24 million.  The acquisition was funded by cash on hand from the recent dilutive share offerings.  Economou received personal financial benefits in the purchase and operation of the vessels through the Company's agreements with Economou's TMS Entities.

61.     Between April 3, 2017 and April 28, 2017, DryShips sold to Kalani an aggregate 27.3 million shares (adjusted for the 1-for-4 reverse stock split) for an aggregate gross purchase price of approximately $67.2 million through the share purchase agreement announced on April 3, 2017. Afterwards, as of April 28, 2017, DryShips had 65.6 million shares of common stock outstanding, meaning that the April 3, 2017 purchase and sale agreement with Kalani had increased the total number of shares of DryShips common stock outstanding by more than 70%.  In addition, up to $159.2 million worth of shares remained to be sold by the Company through Kalani pursuant to the purchase and sale agreement, which would allow Kalani and the Company to cause further significant share dilution and declines in the price of DryShips common stock.

62.     On May 2, 2017, the Company held an annual general meeting of shareholders. Under Economou's influence and control, shareholders approved a proposal to allow the Company to conduct additional reverse stock splits of up to 1000-for-1.  In addition, the Company announced that it would effect a 7-for-1 reverse stock split as the price of the Company's common stock once again fell below $1 per share, closing at $0.74 per share on May 3, 2017 (on an unadjusted basis). This reduced the number of DryShips' outstanding common shares from approximately 67.4 million shares to approximately 9.6 million shares, which began trading on a split-adjusted basis on May 11, 2017.  The reverse stock split resulted in a temporary increase in the unadjusted share price of DryShips common stock from a close of $0.96 per share on May 10, 2017 to a close of $5.33 per share on May 11, 2017, the next trading day.  However, this increase did not offset the loss in value to shareholders of having their shares merged, and the price of the shares actually declined over 20% on an adjusted basis.

63.     On May 10, 2017, DryShips announced that it had entered into an agreement with entities controlled by Economou to acquire a tanker under construction for $64 million.  The acquisition was funded by cash on hand from the recent dilutive share offerings.  Economou received personal financial benefits in the purchase and operation of the vessel through the Company's agreements with entities Economou controlled.

64.     On June 9, 2017, DryShips filed a report on Form 6-K disclosing that it had sold nearly 15 million shares (accounting for the previously announced 4-for-1 and 7-for-1 reverse stock splits) to Kalani between April 3, 2017 and June 9, 2017 for over $97 million in gross proceeds.

65.     On June 19, 2017, DryShips announced that it would effect a 5-for-1 reverse stock split of the Company's common shares.  This reduced the number of DryShips' outstanding common shares from approximately 28.3 million shares (following the sale of additional shares to Kalani in

the offering announced on April 3, 2017) to approximately 5.7 million shares, which began trading on a split-adjusted basis on June 22, 2017. The reverse stock split resulted in a temporary increase in the unadjusted share price of DryShips common stock from a close of $0.85 per share on June 21, 2017 to a close of $2.83 per share on June 22, 2017, the next trading day. However, this increase did not offset the loss in value to shareholders of having their shares merged, and the price of the shares actually declined over 33% on an adjusted basis.

66.     On July 13, 2017, *The Wall Street Journal* published an article entitled "A Shipping Company's Bizarre Stock Maneuvers Create High Seas Intrigue."[1] The article described in detail how defendants' Reverse Split Share Issuance Scheme had wreaked "carnage" on the Company's investors. The article also quoted legal experts who stated that Kalani appeared to be acting as an unregistered underwriter in violation of securities laws.

67.     On July 14, 2017, DryShips filed a report on Form 6-K disclosing that it had sold over 34 million shares (accounting for the previously announced 4-for-1, 7-for-1 and 5-for-1 reverse stock splits) to Kalani between April 3, 2017 and July 14, 2017 for over $151 million in gross proceeds.

68.     By the next trading day, July 17, 2017, as a result of defendants' dilutive and manipulative conduct, the price of DryShips common stock had declined to close at $0.89 per share. At this share price, DryShips only had a market capitalization of ***$31.8 million*** (based on the number of Company shares outstanding as of July 14, 2017), ***despite having raised over $650 million from investors*** since mid-November 2016. This shocking erosion in shareholder value was the direct result of defendants' fraudulent scheme to manipulate the price of DryShips common stock and

---

[1]     Spencer Jakab, *A Shipping Company's Bizarre Stock Maneuvers Creates High Seas* (July 13, 2017, 12:21 p.m.), https://www.wsj.com/articles/a-shipping-companys-bizarre-stock-maneuvers-create-high-seas-intrigue-1499960367.

induce purchases through the series of dilutive and manipulative stock offerings and reverse stock splits detailed herein.

69.     The above-referenced *The Wall Street Journal* article published on July 13, 2017 provided the following example, which illustrates the extent to which defendants' conduct has manipulated the market for DryShips common shares:  If a shareholder held ***1.68 million*** shares of DryShips common stock as of January 1, 2016 – before the series of reverse stock splits began – this same shareholder, if it engaged in no other transactions, would own ***a single share*** following the June 22, 2017 5-for-1 reverse stock split, ***a decline of more than 99.999%***.  Similarly, on an adjusted basis, the price of DryShips common stock rose to over $70,000 per share during the Class Period – stock which was worth ***only $0.89 per share*** as of July 17, 2017 – meaning shareholders have been almost completely wiped out.  The following chart, provided in another *Wall Street Journal* article regarding events at DryShips entitled "How a CEO Made Millions from a Sinking Ship," illustrates the stunning sequence of events:[2]

---

[2]     Spencer Jakab, *How a CEO Made Millions from a Sinking Ship* (Apr. 27, 2017, 11:59 p.m.), https://www.wsj.com/articles/how-dryshipss-founder-could-profit-from-stocks-wild-ride-1493297774.



70.     While shareholders have lost hundreds of millions of dollars, Economou, the Kalani Defendants and their affiliates have been enriched.  Economou has earned tens of millions of dollars through brazen self-dealing, as offering proceeds have been used by the Company to acquire hundreds of millions of dollars of vessels, at times in deals directly involving entities controlled by Economou.  He has also profited through his ownership of Sifnos, the TMS Entities, and other entities that he controls, entitling him to proceeds and benefits in the financing, purchase, sale and maintenance of Company vessels.  Similarly, Kalani has made millions of dollars in commission fees and profits from its resale of the DryShips common stock purchased in the offerings to the investing public.

## NO SAFE HARBOR

71.     DryShips' "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  Because most of the false and misleading statements related to existing facts or conditions,

the Safe Harbor has no applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

72.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of DryShips who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

73.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and actions intended to manipulate the market price of DryShips common stock as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding DryShips, their control over, and/or receipt or modification of DryShips' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning DryShips, participated in the fraudulent scheme alleged herein.

- 25 -

74.     Moreover, defendants' fraudulent scheme and course of conduct to manipulate the market price of DryShips common stock enriched defendants and their associates.  Economou, through entities he owned and controlled, received tens of millions of dollars from the purchase, financing, sale, servicing and other aspects of the Company's acquisition of numerous vessels during the Class Period with the hundreds of millions of dollars in proceeds raised from investors in the stock offerings.  Similarly, Kalani earned millions of dollars in commissions and underwriting fees and profits from the resale of DryShips common stock to the investing public in connection with the stock offerings.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

75.     At all relevant times, the market for DryShips common stock was an efficient market for the following reasons, among others:

(a)     DryShips stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     according to the Company's Form 6-K filed on April 28, 2017, the Company had approximately 35.7 million shares outstanding as of the date of the filing, demonstrating a very active and broad market for DryShips common stock;

(c)     DryShips was qualified to file a less comprehensive Form F-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized foreign issuers for whom less scrutiny is required;

(d)     as a regulated issuer, DryShips filed periodic public reports with the SEC;

(e)     DryShips regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the

- 26 -

national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(f)      unexpected material news about DryShips was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

76.      As a result of the foregoing, the market for DryShips common stock promptly digested current information regarding DryShips from publicly available sources and reflected such information in DryShips stock price.   Under these circumstances, all purchasers of DryShips common stock during the Class Period suffered similar injury through their purchase of DryShips common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

77.      During the Class Period, as detailed herein, defendants made false and misleading statements and omitted material information concerning DryShips' business and prospects and engaged in a scheme to deceive the market and manipulate the market price of DryShips common stock.  By artificially inflating and manipulating the price of DryShips stock, defendants deceived plaintiff and the Class and caused them losses when the truth was revealed.  When defendants' prior misrepresentations and fraudulent conduct became apparent to the market, this caused DryShips' stock price to fall precipitously as the prior artificial inflation came out of the stock price.  As a result of their purchases of DryShips stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

78.      This is a class action on behalf of all purchasers of DryShips common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and

their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

79.     Common questions of law and fact predominate and include: (a) whether defendants violated the Exchange Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants knew or recklessly disregarded that their statements were false; (d) whether defendants' manipulated the market price of DryShips common stock; (e) whether the price of DryShips common stock was artificially inflated during the Class Period; and (f) the extent of and appropriate measure of damages.

80.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

81.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

82.     During the Class Period, defendants carried out a plan which was intended to, and did: (a) deceive the investing public, including plaintiff and the Class; and (b) artificially manipulate the price of DryShips common stock.

83.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of DryShips common stock in violation of §10(b) of the Exchange Act

and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

84.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

85.     Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of DryShips common stock, were privy to and participated in the creation of the offering documents for the stock offerings, including the registration statements and prospectuses for the stock offerings, and were aware of the dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.  Further, Kalani's conduct itself as an underwriter was deceptive.

86.     Defendants had actual knowledge of the misrepresentations, omissions and deceptive conduct alleged herein, or acted with reckless disregard for the truth.  Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and to artificially manipulate the market price of DryShips common stock.

87.     By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

88.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of DryShips common stock during the Class Period.

## COUNT II

### For Violation of §9 of the Exchange Act
### Against All Defendants

89.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

90.     Defendants violated §9 of the Exchange Act in that they conspired to engage and did engage in a scheme to manipulate the price of DryShips common stock and induce the purchase of DryShips common stock by others.

91.     Further, through their dissemination of false and misleading statements during the Class Period, defendants misled investors concerning the nature of their actions and its effect on DryShips common stock.

92.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of DryShips common stock during the Class Period.

## COUNT III

**For Violation of §20(a) of the Exchange Act**
**Against the DryShips Officer Defendants and Defendants Bistricer and Murchinson**

93.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

94.     The DryShips Officer Defendants had control over DryShips and made the materially false and misleading statements and omissions on behalf of DryShips within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their share ownership, executive and board positions and stock ownership, and their culpable participation, as alleged above, the DryShips Officer Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which plaintiff contends were false and misleading and the dilutive and manipulative stock offerings and reverse stock splits as detailed herein.  The DryShips Officer Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to or shortly

after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

95.     In particular, the DryShips Officer Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.  Economou also held voting control of the Company through his 100% ownership of DryShips' Series D Preferred Stock, and thus had control over the Company and its actions.

96.     Bistricer and Murchinson had control over Kalani and therefore directly participated in the Reverse Split Share Issuance Scheme and in the manipulative and deceptive conduct within the meaning of §20(a) of the Exchange Act as alleged herein.  Bistricer oversaw the day-to-day operations of Murchinson, an investment partnership reportedly behind Kalani, and, through Murchinson, the day-to-day operations and investment decisions of Kalani.  Bistricer and Murchinson are therefore presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.  Bistricer and Murchinson conspired with the DryShips Officer Defendants to perpetrate the Reverse Split Share Issuance Scheme, and through their culpable participation, as alleged above, had the power to influence and control and did, directly or indirectly, influence and control the decision making of Kalani, including the decision to effectuate the dilutive and manipulative stock offerings and reverse stock splits as detailed herein and had the ability to prevent the Reverse Split Share Issuance Scheme from occurring.

97.     By reason of such wrongful conduct, the DryShips Officer Defendants and defendants Bistricer and Murchinson are liable pursuant to §20(a) of the Exchange Act.  As a direct and

proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 2, 2017                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         SAMUEL H. RUDMAN


                                         _____
                                              /s/ Samuel H. Rudman
                                         SAMUEL H. RUDMAN

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)

- 32 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ABRAHAM, FRUCHTER & TWERSKY, LLP
JEFFREY S. ABRAHAM
One Pennsylvania Plaza, Suite 2805
New York, NY  10119
Telephone:  212/279-5050
212/279-3655 (fax)

Attorneys for Plaintiff

J:\NY Cases\Dryships\Pleadings\CPT DryShip.docx

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

Herbert Silverberg., hereby certifies under penalties of perjury that the following is true and correct to the best of my knowledge, information and belief:

1.    I have reviewed the attached Class Action Complaint For Violations of the Federal Securities Laws and have authorized counsel to file the complaint.

2.    I did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this private action.

3.    I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    To the best of my knowledge, the transactions in the stock of DryShips, Inc. are set forth in Exhibit A attached hereto.

5.    I have sought to serve as a class representative in the following cases brought under a provision of the federal securities laws within the last three years: *Silverberg v. Aerohive Networks, Inc. et al.*, Case No. CIV 534505 (San Mateo Sup.Ct.).

6.    I  will not accept any payment for serving as class representative on behalf of the class beyond my pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

Dated: July 19, 2017

_____
Herbert Silverberg.

# EXHIBIT A

## Equity Transaction list for Schwab account:
## XXXX-1825

**List Created on:** 7/18/2017

Charles Schwab Co., Inc. Member SIPC

| Date | Type | Symbol | Quantity | Description | | Transaction $ Amount |
|---|---|---|---|---|---|---|
| 6/14/2016 | Sell | | (1,200.00) | DRYSHIPS INC | XXX | 1,167.38 |
| 12/1/2016 | Buy | | 200.00 | DRYSHIPS INC | XXX | (1,016.95) |
| 12/1/2016 | Buy | | 400.00 | DRYSHIPS INC | XXX | (2,428.95) |
| 12/1/2016 | Sell | | (400.00) | DRYSHIPS INC | XXX | 2,251.00 |
| 12/2/2016 | Buy | | 400.00 | DRYSHIPS INC | XXX | (1,972.95) |
| 12/2/2016 | Buy | | 200.00 | DRYSHIPS INC | XXX | (916.95) |
| 12/5/2016 | Buy | | 55.00 | DRYSHIPS INC | XXX | (253.26) |
| 12/5/2016 | Buy | | 145.00 | DRYSHIPS INC | XXX | (667.69) |
| 12/9/2016 | Buy | | 600.00 | DRYSHIPS INC | XXX | (2,420.95) |
| 1/4/2017 | Buy | | 400.00 | DRYSHIPS INC | XXX | (1,412.95) |
| 1/5/2017 | Buy | | 400.00 | DRYSHIPS INC | XXX | (1,216.95) |
| 1/10/2017 | Buy | | 400.00 | DRYSHIPS INC | XXX | (952.95) |
| 1/12/2017 | Buy | | 400.00 | DRYSHIPS INC | XXX | (812.95) |
| 1/23/2017 | Buy | | 100.00 | DRYSHIPS INC | XXX | (662.95) |
| 1/23/2017 | Reverse Split | | (3,200.00) | DRYSHIPS INC | XXX | 0.00 |
| 1/23/2017 | Reverse Split | | 400.00 | DRYSHIPS INC | XXX | 0.00 |
| 1/24/2017 | Buy | | 100.00 | DRYSHIPS INC | XXX | (460.95) |
| 1/24/2017 | Buy | | 100.00 | DRYSHIPS INC | XXX | (515.95) |
| 2/1/2017 | Journal | | (700.00) | DRYSHIPS INC | XXX | 0.00 |
| 3/3/2017 | Journal | | 700.00 | DRYSHIPS INC | XXX | 0.00 |
| 3/8/2017 | Buy | | 300.00 | DRYSHIPS INC | XXX | (421.95) |
| 3/29/2017 | Buy | | 600.00 | DRYSHIPS INC | XXX | (1,006.95) |
| 4/4/2017 | Buy | | 800.00 | DRYSHIPS INC | XXX | (1,004.87) |
| 4/4/2017 | Buy | | 600.00 | DRYSHIPS INC | XXX | (772.89) |
| 4/6/2017 | Sell | | (1,000.00) | DRYSHIPS INC | XXX | 925.03 |
| 4/7/2017 | Journal | | (1,600.00) | DRYSHIPS INC | XXX | 0.00 |
| 4/10/2017 | Journal | | (400.00) | DRYSHIPS INC | XXX | 0.00 |
| 4/12/2017 | Journal | | 500.00 | DRYSHIPS INC | XXX | 0.00 |
| 4/19/2017 | Buy | | 500.00 | DRYSHIPS INC | XXX | (879.95) |

Charles Schwab Co., Inc. Member SIPC

charles SCHWAB

| Date | Type | Symbol | Quantity | Description | Transaction $ Amount |
|---|---|---|---|---|---|
| 4/21/2017 | Journal | | (500.00) | DRYSHIPS INC   XXX | 0.00 |
| 4/25/2017 | Buy | | 500.00 | DRYSHIPS INC   XXX | (677.45) |
| 4/25/2017 | Journal | | 500.00 | DRYSHIPS INC   XXX | 0.00 |
| 5/4/2017 | Buy | | 1,300.00 | DRYSHIPS INC   XXX | (980.08) |
| 5/11/2017 | Buy | | 100.00 | DRYSHIPS INC   XXX | (544.95) |
| 5/11/2017 | Reverse Split | | (2,800.00) | DRYSHIPS INC   XXX | 0.00 |
| 5/11/2017 | Reverse Split | | 400.00 | DRYSHIPS INC   XXX | 0.00 |
| 5/19/2017 | Journal | | (500.00) | DRYSHIPS INC   XXX | 0.00 |
| 5/26/2017 | Buy | | 100.00 | DRYSHIPS INC   XXX | (288.94) |
| 5/30/2017 | Buy | | 100.00 | DRYSHIPS INC   XXX | (266.95) |
| 6/2/2017 | Buy | | 100.00 | DRYSHIPS INC   XXX | (247.95) |
| 6/2/2017 | Journal | | (100.00) | DRYSHIPS INC   XXX | 0.00 |
| 6/7/2017 | Buy | | 100.00 | DRYSHIPS INC   XXX | (198.74) |
| 6/13/2017 | Journal | | 600.00 | DRYSHIPS INC   XXX | 0.00 |
| 6/15/2017 | Buy | | 100.00 | DRYSHIPS INC   XXX | (167.95) |
| 6/22/2017 | Buy | | 100.00 | DRYSHIPS INC   F | (305.95) |
| 6/22/2017 | Buy | | 100.00 | DRYSHIPS INC   F | (356.95) |
| 6/22/2017 | Reverse Split | DRYS | 200.00 | DRYSHIPS INC   F | 0.00 |
| 6/22/2017 | Reverse Split | | (1,000.00) | DRYSHIPS INC   F | 0.00 |
| 6/27/2017 | Journal | | (200.00) | DRYSHIPS INC   XXX | 0.00 |
| 6/28/2017 | Buy | | 100.00 | DRYSHIPS INC   F | (230.95) |
| 6/29/2017 | Journal | | (200.00) | DRYSHIPS INC   F | 0.00 |
| 6/30/2017 | Buy | | 100.00 | DRYSHIPS INC   F | (155.95) |
| 7/7/2017 | Journal | | (100.00) | DRYSHIPS INC   F | 0.00 |
| 7/7/2017 | Journal | | (100.00) | DRYSHIPS INC   F | 0.00 |
| 7/12/2017 | Journal | | 600.00 | DRYSHIPS INC   F | 0.00 |
| 7/14/2017 | Buy | DRYS | 100.00 | DRYSHIPS INC   F | (107.95) |