UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERBERT SILVERBERG, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> vs.<br><br>DRYSHIPS INC., GEORGE ECONOMOU, ANTHONY KANDYLIDIS, HARRY KERAMES, KALANI INVESTMENTS LIMITED, MURCHINSON LTD., MARC BISTRICER, and DOES 1-10,<br><br>     Defendants. | Civil Action No. 2:17-cv-04547-SJF-ARL<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

SUMMARY OF THE ACTION ...................................................................................................1

JURISDICTION AND VENUE .................................................................................................4

PARTIES .....................................................................................................................................5

BACKGROUND REGARDING DEFENDANTS......................................................................6

    A.    George Economou and DryShips........................................................................6

    B.    DryShips Transactions with Economou's Other Companies.................................8

    C.    Marc Bistricer and Kalani ...................................................................................13

CHRONOLOGY OF DEFENDANTS' FRAUDULENT SCHEME ..........................................16

    A.    Early 2016: Events Leading to the Class Period...................................................19

    B.    June 2016: Beginnings of the Kalani-DryShips Dilutive Financing Scheme........21

    C.    September 2016: Economou Cements Voting Control Over DryShips to
          Ensure Shareholder Approval of Unlimited Reverse Splits .................................23

    D.    November 2016: Kalani's Financing Activities Are Partially Revealed,
          Simultaneously with Highly Suspect Spike in DryShips' Stock Price .................26

    E.    December 2016: The Scheme Continues with More Dilutive Stock Sales,
          Reverse Splits, and Opaque Related Party Transactions ......................................30

    F.    May 2017: The Scheme Continues as Economou Falsely Claims it has
          Ended ...................................................................................................................39

    G.    August 2017: SEC Subpoenas DryShips; Economou Parts with Kalani and
          Regains Ownership of DryShips' Common Stock .................................................43

    H.    Present Day: Ongoing SEC Investigation and End to the Dilution Scheme..........45

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................................46

ADDITIONAL SCIENTER ALLEGATIONS...........................................................................50

ADDITIONAL LOSS CAUSATION ALLEGATIONS ............................................................54

INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ...................................................54

AND THE BESPEAKS CAUTION DOCTRINE.........................................................................54

CLASS ACTION ALLEGATIONS ............................................................................................55

COUNT I ....................................................................................................................................57

COUNT II ...................................................................................................................................58

COUNT III..................................................................................................................................59

COUNT IV..................................................................................................................................60

PRAYER FOR RELIEF .............................................................................................................61

JURY DEMAND.........................................................................................................................62

Lead Plaintiff Jeff Mamera, individually and on behalf of all others similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and his own acts and upon information and belief as to all other matters based on the investigation conducted by his attorneys, which included, *inter alia*, a review of U.S. Securities and Exchange Commission ("SEC") filings by DryShips Inc. ("DryShips" or the "Company"), analyst reports, financial data, media reports, and other publicly available information. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This action is brought on behalf all persons (the "Class") who purchased or otherwise acquired DryShips common stock between June 8, 2016 and August 29, 2017 both dates inclusive (the "Class Period").

2.      This action is brought against DryShips, its CEO George Economou and CFO Anthony Kandylidis. This action is also brought against DryShips' partner in the fraudulent financing scheme at the heart of this complaint, Kalani Investments Limited, and its controlling persons Murchinson Ltd. ("Murchinson") and Marc Bistricer.

3.      This federal securities class action alleges that defendants violated Sections 10(b), 9, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Lead Plaintiff seeks to recover damages caused by these violations and seeks other available remedies.  The SEC is currently investigating Defendants for the same conduct at issue herein.

4.      DryShips owns ocean going cargo shipping vessels operating worldwide, is headquartered in Athens, Greece, and is incorporated in the Marshall Islands, a jurisdiction with so little financial infrastructure that "the only homegrown bank can't issue credit cards, doesn't

have any ATMs and sends well-worn dollar bills between its island branches by boat." *See* Julie Wernau, *Unbanked: What Happens When a Country is Financially Cut Off?*, Wall Street Journal (June 25, 2018), available at https://www.wsj.com/articles/unbanked-marshall-islands-gets-further-cut-off-from-the-worlds-money-1529665201?mod=hp_major_pos19. DryShips stock trades on the NASDAQ under the ticker symbol "DRYS." The mastermind behind DryShips is George Economou, its billionaire founder, controlling shareholder, CEO and Chairman.

5.      In a series of transactions beginning on or about June 8, 2016 and ending on or about August 29, 2017, defendants raised over $700 million for DryShips through sales of common stock to the public, in large part sold to retail investors.

6.      During this period DryShips' common stock lost over 99.999% of its value. This was due to the numerous, massive, dilutive stock issuances carried out by defendants with the undisclosed true purpose of siphoning off for their personal enrichment much of the newly raised capital through various opaque related party transactions with DryShips and of repurchasing the company's stock with the very funds stolen from its investors.

7.      In September 2016, defendant Economou cemented his control over DryShips by creating and issuing to himself a large block of super-voting shares which would guarantee his control over DryShips even as the dilution scheme reduced his common stock ownership to a fraction of 1% of outstanding shares. Throughout the Class Period, Economou refrained from purchasing common shares because he knew that the ongoing dilution scheme would quickly destroy their value.

8.      At the end of the Class Period in August 2017, after DryShips had raised $700 million from the public and after DryShips common stock had lost 99.999% of its value, the SEC subpoenaed DryShips concerning the scheme, which appears to have caused Defendants to end

the share issuances before they had intended, with DryShips terminating the agreement with Kalani before DryShips issued to Kalani the full number of shares authorized by the most recent agreement.  Around the same time, Economou acquired a majority interest in DryShips' common stock in a cashless transaction ostensibly valued at $100 million.

9.      During the Class Period DryShips, Economou and Kandylidis made false statements calculated to mislead shareholders into believing (i) that the dilutive stock issuance scheme was in shareholders' and the Company's best interests, (ii) that DryShips would seek non-dilutive financing, and (iii) that the dilutive financing scheme would soon come to an end. In fact defendants continued the dilutive financing scheme for a prolonged period until the SEC began its investigation, when it was opportune for Economou to cheaply regain a majority interest.

10.      The many dilutive stock issuances were facilitated by Kalani and its controlling persons, Murchinson and Bistricer. The pattern of the issuances was for Kalani to purchase large amounts of DryShips common stock (or other securities convertible into common stock) from the Company at substantial discounts to its public trading price, and then to resell the newly created stock into the public market.

11.      Although Kalani was acting as an underwriter in this capacity and required to register as a securities dealer under Section 15(a)(1) of the Exchange Act (15 U.S.C. §78o(a)(1)) it failed to do so. Certain SEC disclosures filed in connection with the stock issuance scheme falsely stated that Kalani was not acting as an underwriter, although this would be admitted in later disclosures. With these false statements and omissions regarding Kalani's true role, defendants at first misled shareholders to believe that Kalani was a sophisticated institutional investor committing large amounts of its own funds to the Company – a significant vote of

confidence if true. In fact, Kalani always intended to promptly resell its new securities to the public for a quick profit, and itself retained little exposure to DryShips' common stock price for any significant period of time.

12.     During the Class Period defendants caused to be made numerous false and misleading statements and omissions such as those discussed above. First and foremost among these, defendants omitted to disclose to the public their calculated scheme (i) seeking to raise vast amounts of capital from unsuspecting retail investors in numerous dilutive offerings over many months, (ii) the concealed, true purpose of which was to misappropriate the freshly raised capital from DryShips for the benefit of Economou and Bistricer, and (iii) that was designed to ultimately return ownership of DryShips' common stock to Economou for minimal consideration after having made the Company much wealthier yet decimating its publicly traded stock price.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein arise pursuant to §§ 9, 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78i, 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.     Venue is proper in this District pursuant to § 27 of the Exchange Act and pursuant to 28 U.S.C. §1391(b). Defendants' false and misleading statements and omissions were disseminated in this judicial district. DryShips common stock is listed on the NASDAQ Stock Market, a national securities exchange. Therefore the alleged illegal conduct was carried out in part in this judicial district.

## PARTIES

15.     Lead Plaintiff Jeff Mamera purchased DryShips common stock during the Class Period and suffered damages as set forth in his certification filed with the Court on September 12, 2017. The Court appointed Mamera as Lead Plaintiff by order dated April 30, 2018.

16.     Defendant George Economou is the founder, controlling shareholder, Chairman, and Chief Executive Officer of DryShips.

17.     Defendant Anthony Kandylidis is George Economou's nephew. Kandylidis is also DryShips' President and Chief Financial Officer. Before December 2016 Kandylidis was DryShips' Executive Vice President. He was appointed to DryShips' board of directors in July 2017.

18.     Defendant Harry Kerames was appointed to DryShips' board of directors in July 2009.  He signed DryShips' SEC filings relevant to the scheme alleged herein, including, inter alia, registration statements for the share issuances made pursuant to the scheme.

19.     Defendant DryShips Inc. is a Marshall Islands corporation primarily engaged in ownership of ocean going cargo vessels. Its principal executive offices are located at 109 Kifissias Avenue and Sina Street, 151 24, Marousi, Athens, Greece. The Company's ships operate worldwide. DryShips' common stock trades on the NASDAQ under the ticker symbol "DRYS".

20.     Defendant Marc Bistricer is a Toronto based investor. He controls defendants Murchinson and Kalani.

21.     Defendant Murchinson Ltd. is a Toronto based investment partnership controlled by defendant Bistricer. Together with defendant Bistricer, Murchinson controls Kalani.

22.     Defendant Kalani Investments Limited is a company organized under the laws of the British Virgin Islands. Kalani is a vehicle established by defendants Bistricer and Murchinson for financial transactions with the shipping industry. Kalani acted as an underwriter selling DryShips' newly created shares to the public during the Class Period.

23.     Defendants Does 1 through 10 are alleged to have participated in suspected manipulation of the price of DryShips' publicly traded common stock from on or about November 10, 2016 to on or about November 15, 2016. The identities of Does 1 through 10 are presently unknown to Lead Plaintiff. Based on information and belief, discovery will reveal the identities of Does 1 through 10, and Plaintiff will seek leave to amend this Complaint when such names are ascertained.

## BACKGROUND REGARDING DEFENDANTS

### A.     George Economou and DryShips

24.     Defendant Economou is a Greek billionaire ship owner. He was born in Athens in 1953 and has over 40 years of experience in the maritime industry. In addition to serving as Chairman and CEO of DryShips he owns, controls, and serves as a director and/or officer of numerous other companies operating in the shipping industry, many of which have complex and opaque transactions with each other.

25.     Economou was placed number 707 on the 2008 Forbes Magazine list of the world's billionaires, with an estimated net worth of $1.7 billion. According to a lawsuit filed by his former live-in girlfriend Angela Ismailos, Economou owned (either himself or jointly with Ismailos) luxury assets worth hundreds of millions of dollars including multiple yachts, a $300 million art collection (reportedly including works by Pablo Picasso, Andy Warhol, and Diego

Rivera, among others), and real estate in New York, Athens, London, Paris, St. Tropez, and St.
Barts.

26.     Economou has served as DryShips' founder, Chairman, CEO, and overall
mastermind since its incorporation in 2004. Economou was instrumental in conducting
DryShips' initial public offering in February 2005. At most times since DryShips' inception,
Economou has been its controlling shareholder, either through majority ownership of its
common stock, or through his ownership of super-voting preferred shares.

27.     Economou has a history of obtaining large investments on favorable terms for
himself that turn out very poorly for his investors.

28.     According to a February 2005 analyst report, during a roadshow lunch in support
of DryShips' IPO, Economou made a revealing admission, according to a senior banker present
at the time: "It was surreal. When someone asked why he was doing the deal, here–now, he
actually said, basically, 'Because Americans are the dumbest investors around, and there's lots of
liquidity in this market.'" According to the 2005 analyst report Economou had raised $175
million for Alpha Shipping Plc in 1998 by selling junk bonds, which were defaulted within one
year of issuance leaving a number of Wall Street institutions with large losses. Economou then
acquired most of Alpha Shipping's fleet by paying 37 cents on the dollar to owners of its
defaulted debt.

29.     Similarly, a recent article in the Seatrade Maritime News about Economou refers
to Economou as "the smartest guy in the room," and goes on to state, "For going on two decades,
non-shipping investors typically of the retail variety, have been on the losing side of one deal
after another, when it comes to Dryships or predecessor companies."

30.     In fact, in a 2018 presentation at an international shipping conference, an investment banker who has worked closely with DryShips from its 2005 IPO through the present, Anthony Argyropoulos, obliquely referred to the suspicion of Economou prevailing in industry circles. Noting the wide disparity between the price of DryShips' common stock and the reported value of its assets, Argyropoulos referred to this as the "famous George Economou discount."

31.     Closely related to the George Economou discount is the fact that DryShips has at all times been completely dominated by Economou, despite having a majority of ostensibly independent board members. Since 2016 Wells Fargo Securities equity analyst Michael Webber has periodically produced scorecards ranking publicly owned shipping companies on their corporate governance, taking into account factors such as board independence and related party transactions. DryShips routinely occupies last place out of approximately 40-50 companies.

**B.      DryShips Transactions with Economou's Other Companies**

32.     According to a shipping industry publication, in an article discussing Webber's governance scorecard, "Deals between public and private interests have been . . . taken to a dizzying level by the likes of Greek owner George Economou."

33.     DryShips' Form 20-F for the year ended December 31, 2016, filed March 3, 2013, under the heading "Business Overview" states "We are a diversified owner of ocean going cargo vessels," owning a fleet of 22 vessels as of March 10, 2017. At all relevant times DryShips has operated primarily as an owner of vessels, the management and operation of which were contracted out to other entities, many or most of which are under the control of Economou.

34.     As of December 31, 2016 DryShips had only 12 employees. However, certain related parties controlled by Economou, and which are responsible for the management and operation of DryShips' vessels, had upwards of 281 employees in the aggregate.

35.     DryShips also routinely enters into transactions for the purchase or sale of vessels with Economou and/or other companies under his control. For example, DryShips' Form 20-F for the year ended December 31, 2016 identifies 10 vessels sold in 2016, six of which were sold to Economou or companies under his control.

36.     In addition to contracting with Economou-related entities for the management or sale of its vessels, many of DryShips' numerous and complicated financing transactions are made with Economou or companies under Economou's control.

37.     DryShips' Form 20-F for the year ended December 31, 2016 includes 8 pages of densely worded disclosure under the heading "Related Party Transactions," including the following description of Economou's control of DryShips and certain other companies:

> Mr. George Economou, our Chairman and Chief Executive Officer, controls the Foundation, which owns 100.0% of the issued and outstanding capital stock of TMS Bulkers, TMS Tankers, TMS Offshore Services, TMS Cardiff Gas and Cardiff. Mr. Economou, and, under the guidance of our board of directors, manages our business, including our administrative functions, and we monitor the performance of the TMS Entities under our management agreements.

38.     By way of summary, DryShips' Form 20-F for the year ended December 31, 2016 includes the following descriptions of related party transactions, among others:

a.      "Since January 1, 2011, we have outsourced all of our technical and commercial functions relating to the operation and employment of our drybulk carrier vessels to TMS Bulkers." "During the year[] ended December 31, 2016 . . . total charges from TMS Bulkers under the management agreements amounted to $19.0 million."

b.       "Our offshore support service vessel-owning subsidiaries have management agreements with TMS Offshore Services . . . pursuant to which TMS Offshore Services provides overall technical and crew management of our platform supply and oil spill Recovery vessels." "For the year ended December 31, 2016, total charges from TMS Offshore Services under the management agreements amounted to $4.6 million."

c.       "Since January 1, 2011 and until the sale of our tanker fleet during 2015, TMS Tankers provided the commercial and technical management functions of our tankers."

d.       With respect to DryShips' VLGCs (very large gas carriers), "We expect to enter into new service agreements with TMS Cardiff Gas on similar terms as the service agreements contemplated by the New TMS Agreement with TMS Bulkers and TMS Offshore Services."

e.       "Effective January 1, 2013, Ocean Rig Management Inc. . . ., a wholly-owned subsidiary of our affiliate Ocean Rig, entered into a Global Services Agreement with Cardiff Drilling Inc. . . . a company controlled by Mr. George Economou."

f.       "Under charter agreements for all of our tankers, Cardiff Tankers Inc. . . ., a related party entity incorporated in the Republic of the Marshall Islands, was entitled to a 1.25% commission on the charter hire earned by those tankers."

g.       "On January 2, 2014, we entered into an agreement with certain clients of Cardiff Marine Inc, a company controlled by Mr. George Economou . . . for the grant of seven rights of first refusal to acquire seven Newcastlemax newbuildings."

h.       "Under the consultancy agreement effective from September 1, 2010 between the Company and Vivid Finance, a company controlled by our Chairman and Chief Executive Officer, Mr. George Economou, Vivid provided us with financing-related services."

i.      "On November 18, 2014, we entered into a $120.0 million Exchangeable Promissory Note . . . with our former subsidiary Ocean Rig." "On March 29, 2016, we entered into 60 day time charter agreements for the offshore support vessels *Crescendo* and *Jubilee* with a subsidiary of Ocean Rig to assist with the stacking of Ocean Rig's drilling units in Las Palmas."

j.      "On October 21, 2015, as amended on November 11, 2015, we entered into the Revolving Credit Facility of up to $60.0 million with Sifnos, an entity controlled by Mr. George Economou, for general working purposes." "On December 30, 2016, Sifnos entered into the New Revolving Facility for up to $200 million, which refinanced the majority of our outstanding debt."

k.      "On April 30, 2015, we through our subsidiaries, entered into ten Memoranda of Agreements with entities controlled by Mr. George Economou for the sale of four Suezmax tankers and six Aframax tankers. On September 9, 2015, we entered into sales agreements with entities controlled by Mr. George Economou for the sale of 14 vessel owning companies (owners of ten Capesize and four Panamax carriers) and three Capesize bulk carriers."

l.      "On March 24, 2016, we concluded a new sales agreement with entities controlled by Mr. George Economou, our Chairman and Chief Executive officer, for the sale of our Capesize vessels (*Rangiroa, Negonego, Fakarava*), along with the associated debt, which had an outstanding balance of $102.1 million at March 24, 2016."

m.      "On September 16, 2016 and October 26, 2016, we also entered into sales agreements with entities controlled by Mr. George Economou for the sale of the shares of the

owning companies of the Panamax vessel *Oregon* and the Panamax vessels *Amalfi* and *Samatan,* respectively."

n.     "On January 12, 2017, we entered into the LPG Option Agreement with companies controlled by our Chairman and Chief Executive Officer, Mr. George Economou, to purchase up to four high specifications VLGCs capable of carrying LPG that are currently under construction."

39.    Similarly, incorporated by reference into the related party transactions section of the Form 20-F are disclosures regarding services of DryShips' officers, including defendants Economou and Kandylidis among others, provided through their related companies:

a.     "On October 22, 2008, we entered into a consultancy agreement with Fabiana, a Marshall Islands entity beneficially owned by our Chief Executive Officer, Mr. George Economou, with an effective date of February 3, 2008, as amended. Under the agreement, Fabiana provided the services of our Chief Executive Officer."

b.     "Under the consultancy agreement effective from January 1, 2015, between the Company and Basset Holdings, a related party entity incorporated in the Republic of Marshall Islands, Basset provides consultancy services relating to the services of Mr. Anthony Kandylidis in his capacity as our President and Chief Financial Officer."

40.    In the aggregate, all of these related party transactions come at substantial cost to DryShips. For the year ended December 31, 2016 DryShips' financial statements reflect $32 million of "General and administrative expenses," and a $22 million loss "from sale of vessel owning companies," among the multiple categories of costs attributable to related party transactions.

41.     DryShips has incurred similar losses and expenses in related party transactions in most other years as well. DryShips' 2015 financial statements reflect $50 million of "General and administrative expenses," and $8 million in "Commissions for assets sold," among the costs attributable to related party transactions. DryShips' 2017 financial statements reflect $23 million of "General and administrative expenses," $13 million in "Interest and finance costs," and a $7 million "Loss on Private Placement," again among the costs attributable to related party transactions.

42.     Through these and other of DryShips' numerous, complex related party transactions Economou and his affiliates are able to siphon millions of dollars from DryShips each year at the expense of common shareholders.

**C.     Marc Bistricer and Kalani**

43.     In November 2016, DryShips announced that it had entered into various financing transactions with Kalani Investments Limited. At that time Kalani was a complete mystery to the public, because Defendant Marc Bistricer had taken steps to hide his control of the company. Just about the only fact known about Kalani was that it is organized in an offshore secrecy jurisdiction, the British Virgin Islands. Kalani's only agents identified in SEC filings were members of a law firm based in another offshore secrecy jurisdiction, Gibraltar.

44.     Investigative reporting based on interviews with shipping executives later revealed that the persons ultimately controlling Kalani were Bistricer and his firm Murchinson Ltd.

45.     Little is publicly known about Bistricer or Murchinson. They are based in Toronto, and Bistricer is a member of a wealthy New York family that is prominent in the real

estate industry. Murchinson has been described as a "hedge fund or family-office type of operation."

46.     According to one source, Bistricer and Murchinson "have made a lot of investments in other industries like technology under different names and Kalani is just the vehicle they have created to enter shipping."

47.     According to the Wall Street Journal, based on interviews with three Greek shipping executives including defendant Kandylidis, Kalani began approaching shipping companies in early 2016 to pitch its financing scheme, "Kalani's idea was that it would buy newly issued shares directly from the shipping companies at a discount to the stock-market price, thus injecting cash into the companies."

48.     Bistricer's relationship with DryShips dates to at least June 2016 and likely earlier. In or before June 2016 defendant Kandylidis met with Bistricer in New York to discuss how DryShips could raise capital. On June 8, 2016, DryShips and Kalani completed the first of many financing transactions. DryShips sold Kalani securities convertible into $5 million worth of new DryShips common shares, which Kalani later sold into the public markets. However, the offering documents associated with these stock sales did not name Kalani or Bistricer. Rather, the disclosures filed by DryShips referred to an anonymous "institutional investor."  Defendants' later filings also refer obliquely to another Virgin Islands entity called Herrick Ventures Limited, which was represented by the same Gibraltar-based lawyers as represented Kalani. The precise role Herrick played in the manipulative scheme is known only to Defendants.

49.     In general, Kalani's financing scheme with DryShips followed this simple pattern, repeated several times over the Class Period. The pattern was for Kalani to purchase large amounts of DryShips common stock (or securities convertible into common stock) from the

Company at substantial discounts to its public trading price, and then to resell this newly created stock into the public market. After the inevitable crash in DryShips' stock price as the market was flooded with supply, DryShips would execute a reverse stock split to reduce the number of shares outstanding and increase its share price. Then DryShips and Kalani would repeat the pattern.

50.     Although Kalani was acting as an underwriter in connection with DryShips' share issuances and was required to register as a securities dealer under Section 15(a)(1) of the Exchange Act, it did not. Certain SEC disclosures filed by DryShips in connection with the stock issuance scheme falsely stated that Kalani was not acting as an underwriter, although this would be admitted in later disclosures.  According to the Wall Street Journal, Kalani's failure to register was noted as problematic by securities law professors.

51.     DryShips was not the only company to sign up to Kalani's scheme. At least two other shipping companies, Diana Containerships Inc. ("Diana Containerships") and Top Ships Inc. ("Top Ships"), both engaged in similar schemes featuring (i) large securities issuances by the companies to Kalani at a substantial discount to market prices, (ii) Kalani promptly reselling the new common shares into public markets, and (iii) rapid stock price declines followed by reverse stock splits.

52.     Other similarities exist between Kalani's financing schemes for DryShips, Top Ships, and Diana Containerships. All three have resulted in shareholder lawsuits against Kalani and the companies.  And Top Ships' scheme also triggered an SEC investigation.  On September 29, 2017, Top Ships disclosed for the first time that it had "received a subpoena from the [SEC] requesting certain documents and information from the Company in connection with offerings made by the Company between February 2017 and August 2017," *i.e.* the offerings made in

conjunction with Kalani. Top Ships later disclosed that it had received this subpoena on August 1, 2017.

53.     Similarly, on August 30, 2017, DryShips disclosed for the first time that it had received a subpoena from the SEC "requesting certain documents and information from the Company in connection with offerings made by the Company between June 2016 and July 2017," *i.e.* the offerings made in conjunction with Kalani. The precise date on which DryShips received the SEC subpoena has not been disclosed. Based on information and belief, DryShips is likely to have received this subpoena on or about August 1, 2017, when Top Ships received its SEC subpoena. Based on DryShips' most recent public disclosures as of the date of this Amended Complaint, the SEC's investigation appears to be ongoing.

54.     DryShips announced the abrupt termination of its then-current share purchase agreement with Kalani on August 11, 2017. Based on information and belief, the termination of DryShips' relationship with Kalani came shortly after DryShips received the SEC's subpoena. Based on DryShips' most recent public disclosures as of the date of this Amended Complaint, it appears that all of DryShips' dealings with Kalani also ceased at that time and have not since been resumed.

## CHRONOLOGY OF DEFENDANTS' FRAUDULENT SCHEME

55.     To summarize the remarkable events occurring at DryShips over the Class Period of June 8, 2016 to August 29, 2017:

        a.     Prior to the Class Period DryShips common stock had a market capitalization of approximately $60 million. During the Class Period DryShips and Kalani entered five agreements for the sale of DryShips securities, raising over $700 million for the Company.

b.      During the Class Period DryShips executed 7 reverse stock splits, such that one share at the end of the Class Period would be equivalent to 470,400 shares at the beginning of the Class Period.

c.      Prior to the Class Period DryShips had approximately 26.9 million common shares outstanding. By the end of the Class Period DryShips had approximately 67.9 million shares outstanding, however, due to the repeated reverse stock splits, this represented almost 32 trillion pre-Class Period shares on a split adjusted basis. DryShips and Kalani had sold vast amounts of DryShips common stock to the public causing unprecedented dilution.

d.      Over the Class Period, DryShips' common stock lost over 99.999% of its value. Prior to the Class Period DryShips common stock traded around $2.50 per share. By the end of the Class Period DryShips common stock traded around $3.50 per share, however, this price consistency was merely an illusion created by the reverse stock splits. At the prices prevailing at the end of the Class Period, one pre-Class Period share would be worth a tiny fraction of $0.01.

e.      Over the Class Period Economou used the freshly raised funds to cause DryShips to engage in numerous related party transactions (including vessel sales, vessel management fees, and financing) with him and entities under his control, siphoning hundreds of millions of dollars out of the Company.

f.      Prior to the Class Period Economou owned, directly or through various companies, 4.7 million common shares or 17.6% of DryShips common stock. Over the course of the Class Period Economou's ownership of common stock was diluted to approximately 10 shares, a small fraction of 1% of the total outstanding. At the end of the Class Period Economou acquired 53.5% of DryShips' common stock in a cashless transaction ostensibly valued at $100

million. Economou then used cash from the fraudulent scheme to conduct share buy-backs, increasing his ownership share of the common stock.

g.     Over a one week period in November 2016 DryShips' publicly traded stock price shot up by more than 1,500% at precisely the same time as the Company was preparing to announce a large financing transaction with Kalani for the issuance of multiple classes of complex, newly created convertible securities. Following this spike NASDAQ halted the stock's trading pending receipt of information from DryShips, and after trading resumed the stock immediately crashed to pre-spike levels. There was no natural explanation for the spike. To the contrary, the company had just announced that it was in such poor financial shape that it was suspending interest and principal payments to its lenders. Due to the absence of any natural explanation for this extraordinary price spike, and its importance in catalyzing retail investor interest in subsequent share issuances, Plaintiffs allege on information and belief that DOES 1-10, acting in concert or for the benefit of other Defendants, took actions to manipulate DryShips' stock price.

h.     During the Class Period, defendants made several false statements and omissions regarding the purpose, duration, and mechanics of the dilutive financing scheme.

56.    Certain of these key Class Period events are summarized in graphic form in the following image from Wall Street Journal reporting on the Company:



Spencer Jakab, WALL STREET JOURNAL, *A Shipping Company's Bizarre Stock Maneuvers Create High Seas Intrigue* (July 13, 2017)

## A.    Early 2016: Events Leading to the Class Period

57.    In early 2016, Kalani began approaching shipping companies to pitch its financing scheme. According to the Wall Street Journal, "Kalani's idea was that it would buy newly issued shares directly from the shipping companies at a discount to the stock-market price, thus injecting cash into the companies."

58.    On February 19, 2016, DryShips announced the results from a Special Meeting of Shareholders, at which a proposal was adopted to amend the Company's articles of incorporation

to permit one or more reverse stock splits of DryShips common stock at a ratio of not more than one-for-100.

59.     On March 11, 2016, DryShips executed a one-for-25 reverse stock split. This reduced the number of outstanding common shares from 672,046,321 shares to approximately 26.9 million shares.

60.     On March 29, 2016, DryShips announced that pursuant to a financing agreement with Sifnos Shareholders Inc. ("Sifnos"), a financing company controlled by Economou, Sifnos would exchange all of its DryShips Series B Preferred Shares for $8.75 million of debt. Following this transaction, DryShips' only outstanding class of stock was its common stock. Under the terms of the financing agreement, DryShips had the right to convert $8.75 million of its debt to Sifnos into 3.5 million DryShips preferred shares. Each preferred share would have five times the voting power of a common share. If DryShips elected to convert its debt to preferred shares, the preferred shares would mandatorily convert into common stock on a one to one basis within three months after such conversion. Given the 26.9 million common shares outstanding at the time, such a conversion would have the effect of giving Sifnos roughly 40% of DryShips' total voting power for a period of three months, after which its voting power would be reduced to 12%.

61.     On April 5, 2016, DryShips announced that it had sold three vessels, the Fakarava, Rangiroa and Negonego, to entities controlled by Economou for undisclosed consideration. This sale resulted in a charge of $23 million for "loss from sale of vessels and vessel owning companies" to the Company's statement of operations for the year ended December 31, 2016.

62.     On April 27, 2016, DryShips filed its annual report for the year ended December 31, 2015. The annual report disclosed that as of March 31, 2016 Economou owned 4.7 million common shares, or 17.6% of the 26.9 million common shares outstanding. Apart from Economou no other 5% shareholders were disclosed, and no DryShips director or officer was reported to own more than 1%.

63.     On May 19, 2016, an industry publication reported that DryShips had stopped paying interest on loans for which it had already halted principal repayments.

**B.      June 2016: Beginnings of the Kalani-DryShips Dilutive Financing Scheme**

64.     In or before June 2016, defendant Kandylidis, acting on behalf of DryShips, met with defendant Bistricer, acting on behalf of Kalani, in New York to discuss how DryShips could raise capital.

65.     On June 8, 2016, DryShips announced that it had entered into a Securities Purchase Agreement with an anonymous "institutional investor," later revealed to be Kalani, for the sale of 5,000 newly designated Series C Convertible Preferred Shares, warrants to purchase 5,000 Series C Convertible Preferred Shares and 148,998 common shares, for proceeds of $5 million, or up to $10 million in total if all warrants were exercised.

66.     By their terms, the Series C shares were convertible into common shares according to a formula: "The number of shares of Common Stock issuable upon conversion of any Preferred Share pursuant to Section 3(a) shall be determined by dividing (x) the Conversion Amount of such Preferred Share by (y) the Conversion Price." The Conversion Amount was generally the Series C shares' stated value of $1,000 each, subject to adjustment. The Conversion Price was generally $2.75 per share, which would be adjusted downward according to a formula in the event that the common shares traded below $2.75 per share. Therefore, assuming no

adjustments to the $1,000 Conversion Amount or the $2.75 Conversion Price, each Series C share was convertible into 363.6 common shares.

67.     The securities were issued pursuant to a registration statement that became effective on May 7, 2015. Also on June 8, DryShips filed with the SEC a prospectus supplement, which became part of that registration statement. Neither the June 8 prospectus supplement, nor any other disclosure filed by DryShips identified the anonymous institutional investor as Kalani. The prospectus supplement stated that "There is no underwriter or placement agent in connection with the sale of the offered securities."

68.     On June 15, 2016, DryShips announced that the offering previously announced on June 8 had closed, with $5 million of gross proceeds raised.

69.     On August 1, 2016, DryShips announced that it had received a notification from NASDAQ that the Company was not in compliance with listing rules because the closing bid price for its shares remained below $1.00 per share. DryShips also announced its intention to conduct a reverse stock split to regain compliance with listing rules.

70.     On August 8, 2016, defendant Kandylidis assumed the duties of interim CFO of DryShips.

71.     On August 9, 2016, DryShips filed a Form 6-K containing its financial results for the second quarter of 2016. In this report, DryShips disclosed that as of August 7, 2016, 4,635 of the 5,000 Series C Convertible Preferred shares had been converted to 12,719,431 common shares.

72.     Although 12.7 million shares represented well over 5% of the common shares outstanding, Kalani did not file a beneficial ownership report with the SEC as would be required

of a 5% shareholder. Therefore, Kalani appears to have promptly sold the converted common shares.

73.     On August 15, 2016, DryShips executed a one-for-four reverse stock split. This reduced the number of outstanding common shares from 39,750,275 shares to approximately 9.9 million shares. Following this split one share of DryShips common stock was equivalent to 4 shares immediately prior to the beginning of the Class Period.

## C.     September 2016: Economou Cements Voting Control Over DryShips to Ensure Shareholder Approval of Unlimited Reverse Splits

74.     On September 14, 2016, DryShips disclosed that pursuant to its financing arrangements with the Economou-controlled Sifnos, DryShips had elected to convert its $8.75 million debt to Sifnos into 3.5 million DryShips Class D preferred shares.

75.     As per the terms of the Sifnos-DryShips facility as amended on March 24, 2016, each share of preferred stock should have voting rights at a ratio of 5:1 as compared to DryShips common shares. However, while that arrangement gave Economou voting control at the time, it would not convey sufficient votes to control the company if there were a series of dilutive offerings in which Economou did not participate in proportion to his pre-offering ownership percentage.  Thus, on September 9, 2016 DryShips and Sifnos amended their agreement to allow each preferred share to vote at a ratio of 100,000:1 as compared to DryShips common shares. The amendment to the preferred shares' voting rights gave Economou and Sifnos 350 billion votes, representing well over 99.9% of the Company's voting power after accounting for the roughly 15.7 million common shares outstanding at the time, and enough to provide Economou voting control even in the event of extensive dilutive issuances. In addition, in the September 9 agreement DryShips and Sifnos removed the previously agreed provision that required mandatory conversion of the preferred shares into common stock on a one to one basis within

three months after issuance of the preferred shares. This allowed Sifnos and Economou to retain their over 99.9% voting power indefinitely, not limited to the previously contemplated three month period.

76.     DryShips' public disclosures provide no rationale for why the Company would agree to multiply the preferred shares' voting rights by 20,000, or for why the Company would waive the three month mandatory conversion feature, effectively giving away permanent voting control of the Company for no disclosed consideration, let alone for consideration sufficient to justify giving away permanent voting control. As subsequent events would reveal, the motivation appears to have been a desire to ensure that Economou could single-handedly (no matter how much opposition was encountered from public owners of common shares) approve amendments to DryShips' articles of incorporation that would allow for limitless reverse stock splits in furtherance of the defendants' dilutive financing scheme.

77.     Also on September 14, 2016, DryShips published a press release regarding the recent transaction with Sifnos, and which quoted defendant Kandylidis as commenting, "We are pleased to see our founding shareholder actively supporting the company in a way that is not dilutive to the rest of our shareholders."

78.     On September 16, 2016, Economou filed an amended Schedule 13D reporting his ownership of DryShips stock as of September 13, 2016. This schedule reflected Economou's beneficial ownership of 1.2 million common shares, or 7.5% of the total outstanding. This represented a substantial decrease, due to dilution, from the 17.6% last publicly reported as of March 31, 2016.

79.     On September 22, 2016, DryShips announced that it had sold a vessel, the MV Oregon, to an entity controlled by Economou. At the time of sale that vessel had associated debt

of $12.5 million. Under the terms of the sale, the Economou-controlled entity paid DryShips $4.7 million, and DryShips paid the Economou controlled entity $7.8 million (the difference between the purchase price and the outstanding debt).

80. On September 23, 2016, DryShips filed a Form 6-K including the Company's Notice of Annual General Meeting and Proxy Statement for the Company's Annual General Meeting of Shareholders, to be held on October 26, 2016. The shareholder proxy was signed by Economou and dated September 20, 2016. It sought shareholder approval to amend DryShips' articles of incorporation to allow for one or more reverse stock splits at ratios of up to one-for-1000. The prior one-for-four and one-for-25 reverse splits had exhausted the previously approved limit of one-for-100. In the proxy statement Economou and DryShips stated, "The Board believes that" the reverse split proposal "is in the best interest of the Company and the shareholders," and that "a reverse stock split will only be effected, if at all, upon a determination by the Board that a reverse stock split is in the Company's and the shareholders' best interests."

81. On October 28, 2016, DryShips announced the results from the shareholders meeting, at which the proposal to allow reverse splits of up to one-for-1000 was approved.  Since Economou directly or indirectly held over 99.9% of the Company's voting power, he could enact the split even every unaffiliated shareholder opposed it.  In fact, because a quorum of shareholders representing at least one-third of the company's issued and outstanding shares was required for a vote, an unaffiliated shareholder voting "no" could only have the effect of supporting contrary Economou's "yes" vote.

82. On November 1, 2016, DryShips executed a one-for-15 reverse stock split. This reduced the number of outstanding common shares from 17,025,140 shares to approximately 1.1

million shares. Following this split one share of DryShips common stock was equivalent to 60 shares immediately prior to the beginning of the Class Period.

83.     Also on November 1, 2016, DryShips announced that it had sold two additional vessels, the Amalfi and the Samatan, to entities controlled by Economou. At the time of sale the vessels had associated debt of $63.6 million. Under the terms of the sale, the Economou-controlled entity paid DryShips $15 million, and DryShips paid the Economou-controlled entity $58.6 million (the difference between the purchase price and the outstanding debt).

**D.     November 2016: Kalani's Financing Activities Are Partially Revealed, Simultaneously with Highly Suspect Spike in DryShips' Stock Price**

84.     Following the November 1, 2016 reverse stock split, DryShips common stock traded in a range of about $4.00-$5.00 per share, with a price of $5.10 per share at the close of trading on November 9. On Thursday, November 10, DryShips stock price inexplicably more than doubled on unusually high trading volume to close at $11.90. DryShips stock continued its unexplained rise on Friday, November 11, again on unusually high volume, to close at $13.60. On Monday, November 14, the stock more than tripled in price, on exceptionally high trading volume, to close at $42.86. On Tuesday, November 15, DryShips again shot up on exceptionally heavy volume to close at $73.00 after having reached a substantially greater intra-day high. The November 15 closing price represented an increase of more than 1400% over the closing price just five trading days earlier on November 9. The stock traded as high as $119.97 per share in pre-market trading on Wednesday, November 16.

85.     This rapid, unexplained price increase raised the suspicion of traders, analysts, and regulators. One professional trader, Joe Saluzzi, co-manager of trading at Themis Trading, was quoted in a November 16 article as saying, "It's going on for days . . . If there is something illegal going on here, where are the regulators?"

86.     In fact, on Wednesday November 16 before the markets opened, NASDAQ issued the following press release:

> NEW YORK, Nov. 16, 2016 (GLOBE NEWSWIRE) -- The Nasdaq Stock Market® (Nasdaq:NDAQ) announced that trading was halted today in DryShips Inc. (Nasdaq:DRYS) at 08:49:11 Eastern Time for "additional information requested" from the company at a last price of $73.00.
>
> Trading will remain halted until DryShips Inc. has fully satisfied Nasdaq's request for additional information.

87.     According to a November 23 analyst report, "Trading in Dryships was halted on several trading days because of bid-offer imbalances, more than a 20 fold price increase and an extreme increase in daily trading volumes which worried regulators that these irregularities might be due to market manipulation."

88.     The following chart shows, in red, DryShips' stock price, and in black, the volume of shares traded daily, expressed as a percentage of the equity float in the company.  The price spike coincided with extremely elevated level of trading—multiples of the outstanding equity float trading in a single day—followed by even more elevated trading volume.  An analyst had noted earlier in the year in connection with DryShips' reverse splits that "[i]f you are conspiracy-minded, fewer shares outstanding could exacerbate volatility – but that's hypothetical."  As the chart demonstrates, in November 2016, that exacerbation of volatility was no longer hypothetical.



89.     NASDAQ allowed trading in DryShips stock to resume on the morning of

Thursday, November 17. DryShips' stock price promptly crashed back to its pre-November 10

levels. The stock closed at $11.00 per share on November 17, and had returned to its prior $4.00-

$5.00 range by November 28.

90.     On November 17, 2016, DryShips published a press release describing a new

financing transaction with Kalani, and stating that apart from that transaction, "the Company is

not aware of any other news that would result in the increased trading activity of its stock or a

fluctuation of its stock price." According to the Wall Street Journal, DryShips' planning for the

Kalani financing transaction announced on November 17 had begun by September or earlier.

91.     DryShips' November 17, 2016, press release announced that it had entered into a

Securities Purchase Agreement with Kalani for the sale of 20,000 newly designated Series E-1

Convertible Preferred Shares, preferred warrants to purchase 30,000 Series E-1 Convertible

Preferred Shares, preferred warrants to purchase 50,000 newly designated Series E-2 Convertible Preferred Shares, prepaid warrants to initially purchase an aggregate 372,874 common shares (subject to adjustment), and 100 common shares, for proceeds of $20 million, or up to $100 million in total if all warrants were exercised.

92.     By their terms, the Series E-1 shares were convertible into common shares according to a formula, "The number of shares of Common Stock issuable upon conversion of any Series E-1 Preferred Share pursuant to Section 4(a) shall be determined by dividing (x) the Conversion Amount of such Series E-1 Preferred Share by (y) the Conversion Price." The Conversion Amount was generally the Series E-1 shares' stated value of $1,000 each, subject to adjustment. The Conversion Price was generally $30.00 per share, which would be adjusted downward according to a formula in the event that the common shares traded below $30.00 per share. Therefore, assuming no adjustments to the $1,000 Conversion Amount or the $30.00 Conversion Price, each Series E-1 share was convertible into 33.3 common shares.

93.     The terms of the Series E-2 shares were substantially similar to the terms of the Series E-1 shares.

94.     DryShips disclosed that anywhere between 3.6 million and 72.1 million common shares would be issuable in satisfaction of the securities, depending on market prices for DryShips common stock.

95.     The securities were issued pursuant to a registration statement that became effective on May 7, 2015. Also on November 17, DryShips filed with the SEC a prospectus supplement, which became part of that registration statement. The prospectus supplement stated that "There is no underwriter or placement agent in connection with the sale of the offered securities."

96.     On November 22, 2016, DryShips announced that the offering previously announced on November 17 had closed, raising gross proceeds of $20 million.

97.     On November 25, 2016, Economou filed an amended Schedule 13D reporting his ownership of DryShips stock as of November 18, 2016. This schedule reflected Economou's beneficial ownership of 78,708 common shares, or 4.2% of the total outstanding. This represented a substantial decrease, due to dilution, from the 7.5% last publicly reported as of September 13, 2016. The schedule also reflected Economou's continued beneficial ownership (through Sifnos) of the super-voting Series D Preferred Stock that allowed him to control over 99.9% of DryShips' voting power.

### E.     December 2016: The Scheme Continues with More Dilutive Stock Sales, Reverse Splits, and Opaque Related Party Transactions

98.     On December 2, 2016, DryShips announced that a company controlled by Economou became the lender of record under an $85.1 million syndicated loan previously held by a third-party, following which entities affiliated with Economou then controlled over 90% of DryShips' outstanding debt.

99.     On December 13, 2016, DryShips announced that the offering previously announced on November 17 had completed, with $100 million of gross proceeds raised. Following the completion of the offering DryShips had 33.8 million common shares outstanding.

100.    On December 16, 2016, DryShips announced an agreement with the Economou-controlled Sifnos to refinance the majority of the Company's outstanding debt. Sifnos would extend a new loan of up to $200 million secured by almost all of the company's assets, in exchange for interest of Libor plus 5.5% and an arrangement fee of 2% (*i.e.*, an upfront payment of $4 million from DryShips). In addition, Sifnos would obtain the benefit of 30% of any

increase in DryShips' realized asset value (*i.e.*, if DryShips sold a vessel for a gain, DryShips would have to pay Sifnos 30% of the gain).

101.    Also on December 16, 2016, DryShips announced that it expected to enter into new agreements under which it would pay fees to various Economou-controlled entities for the management of certain of DryShips' vessels.

102.    Also on December 16, 2016, DryShips announced that defendant Kandylidis was appointed President and CFO of the Company.

103.    On December 27, 2016, DryShips announced that it had entered into a Common Stock Purchase Agreement with Kalani for the sale of up to $200 million of shares of DryShips common stock. DryShips agreed to issue up to $1.5 million of its common stock to Kalani as a commitment fee.

104.    Under the terms of the purchase agreement, Kalani would purchase common shares from DryShips at a discount, "equal to the product of (i) 0.94 and (ii) the lowest daily VWAP that equals or exceeds the applicable Floor Price during the applicable Pricing Period." In this formula VWAP is volume weighted average price, Pricing Period is a period of eight consecutive trading days, and Floor Price is a minimum of $1.00 per share subject to adjustments. Therefore, Kalani would generally purchase shares from DryShips at a price equal to 94% of the lowest daily VWAP occurring over an eight trading day period. This represented a very large discount to DryShips' publicly traded market price, and immediate, substantial profits for Kalani.

105.    The securities were issued pursuant to a registration statement that became effective on May 7, 2015. Also on December 27, DryShips filed with the SEC a prospectus supplement, which became part of that registration statement. The prospectus supplement stated

that "The Investor [Kalani] is an 'underwriter' within the meaning of Section 2(a)(11) of the Securities Act of 1933."

106.    On January 6, 2017, DryShips announced that it had acquired an option from certain Economou-controlled companies to purchase up to four very large gas carriers ("VLGCs"). Although DryShips' public disclosures referred to the option agreement in quotation marks as "zero cost," DryShips never revealed the terms of this option agreement or whether DryShips would be required to provide any consideration, or whether Economou would receive any benefit. DryShips never explained the meaning of "zero cost," or why the term always appeared in quotation marks in DryShips' public disclosures.

107.    On January 9, 2017, DryShips announced that it had exercised its option to acquire one VLGC for a price of $83.5 million.

108.    Also on January 9, 2017, DryShips announced that as of that date pursuant to the December 27 share purchase agreement it had sold to Kalani 14,090,507 common shares at an average price of $3.05 per share. Following the settlement of those sales 48,003,563 common shares would be outstanding. The shares were issued pursuant to a registration statement that became effective on May 7, 2015. Also on January 9, DryShips filed with the SEC a prospectus supplement, which became part of that registration statement. The prospectus supplement stated that "The Investor [Kalani] is an 'underwriter' within the meaning of Section 2(a)(11) of the Securities Act of 1933."

109.    On January 13, 2017, DryShips announced that between January 9, 2017 and January 13, 2017 pursuant to the December 27 share purchase agreement, the Company sold an aggregate of 21,150,054 shares to Kalani at an average price of approximately $2.04 per share. Following the settlement of those sales 69,333,763 common shares would be outstanding. The

shares were issued pursuant to a registration statement that became effective on May 7, 2015. Also on January 13, DryShips filed with the SEC a prospectus supplement, which became part of that registration statement. The prospectus supplement stated that "The Investor [Kalani] is an 'underwriter' within the meaning of Section 2(a)(11) of the Securities Act of 1933."

110.    On January 20, 2017, DryShips announced that pursuant to the December 27 share purchase agreement the Company had sold an additional 38,600,767 shares to Kalani at an average price of approximately $1.15 per share. Following the settlement of those sales 107,934,530 common shares would be outstanding. The shares were issued pursuant to a registration statement that became effective on May 7, 2015. Also on January 20, DryShips filed with the SEC a prospectus supplement, which became part of that registration statement. The prospectus supplement stated that "The Investor [Kalani] is an 'underwriter' within the meaning of Section 2(a)(11) of the Securities Act of 1933."

111.    On January 23, 2017, DryShips executed a one-for-eight reverse stock split. This split would reduce the number of outstanding common shares to approximately 13.5 million. Following this split one share of DryShips common stock was equivalent to 480 shares immediately prior to the beginning of the Class Period.

112.    On January 30, 2017, DryShips announced that pursuant to the December 27 share purchase agreement the Company had sold an additional 22,539,773 shares to Kalani at an average price of $3.08 per share. Following the settlement of those sales 36,253,870 common shares would be outstanding. The shares were issued pursuant to a registration statement that became effective on May 7, 2015. Also on January 30, DryShips filed with the SEC a prospectus supplement, which became part of that registration statement. The prospectus supplement stated

that "The Investor [Kalani] is an 'underwriter' within the meaning of Section 2(a)(11) of the Securities Act of 1933."

113.    On January 31, 2017, DryShips announced that it had completed the $200 million share offering with Kalani pursuant to the December 27 share purchase agreement, raising net proceeds for the Company of $198 million. Following the completion of those sales 36,253,870 common shares were outstanding. Based on information and belief, Kalani made at least $13.5 million from these offerings (including (i) the $1.5 million commitment fee, and (ii) a conservative estimate of Kalani's profit from buying and reselling shares at a discount equal to 6% of $200 million, or $12 million).

114.    On February 17, 2017, DryShips announced that it had entered into a Common Stock Purchase Agreement to sell up to $200 million of shares to Kalani. DryShips agreed to issue up to $1.5 million of its common stock to Kalani as a commitment fee.

115.    Under the terms of the purchase agreement, Kalani would purchase common shares from DryShips at a discount, "equal to the product of (i) 0.94 and (ii) the lowest daily VWAP that equals or exceeds the applicable Floor Price during the applicable Pricing Period." In this formula VWAP is volume weighted average price, Pricing Period is a period of eight consecutive trading days, and Floor Price is a minimum of $1.00 per share subject to adjustments. Therefore, Kalani would generally purchase shares from DryShips at a price equal to 94% of the lowest daily VWAP occurring over an eight trading day period. This represented a very large discount to DryShips' publicly traded market price, and immediate, substantial profits for Kalani.

116.    The shares were to be issued pursuant to a registration statement that became effective on May 7, 2015. Also on February 17, DryShips filed with the SEC a prospectus

supplement, which became part of that registration statement. The prospectus supplement stated that "The Investor [Kalani] is an 'underwriter' within the meaning of Section 2(a)(11) of the Securities Act of 1933."

117.    On February 21, 2017, DryShips announced that it had entered into agreements with unaffiliated third parties to acquire two vessels for a total price of $102.5 million.

118.    On February 24, 2017, DryShips announced that pursuant to the February 17 share purchase agreement it had sold 22,482,371 shares to Kalani at an average price per share of $2.45, after which 58,836,362 common shares were outstanding.

119.    On March 3, 2017, DryShips announced that pursuant to the February 17 share purchase agreement the Company had sold an additional 44,958,830 shares to Kalani at an average price of $1.67 per share. Following the settlement of those sales 103,974,393 common shares would be outstanding.

120.    On March 6, 2017, DryShips announced that it had exercised its option to acquire a second VLGC for a price of $83.5 million.

121.    On March 13, 2017, DryShips filed its annual report for the year ended December 31, 2016. The annual report disclosed that as of March 2, 2017 Economou owned 9,837 common shares, or a fraction of 1% of the 87,515,563 million common shares outstanding on March 2. This represented a substantial decrease, due to dilution, from his 4.2% ownership last publicly reported as of November 18, 2016. In the annual report no 5% shareholders were disclosed, and no DryShips director or officer was reported to own more than 1%.

122.    On March 17, 2017, DryShips announced that between March 3, 2017 and March 16, 2017 pursuant to the February 17 share purchase agreement, the Company sold an aggregate

of 45,505,878 shares to Kalani at an average price of approximately $1.47 per share. Following the settlement of those sales 152,055,576 would be outstanding.

123.     On March 17, 2017, DryShips announced that it had completed the previously announced $200 million share offering with Kalani pursuant to the February 17 share purchase agreement, raising net proceeds for the Company of $198 million. Following the completion of those sales 152,055,576 common shares were outstanding. Based on information and belief, Kalani made at least $13.5 million from these offerings (including (i) the $1.5 million commitment fee, and (ii) a conservative estimate of Kalani's profit from buying and reselling shares at a discount equal to 6% of $200 million, or $12 million).

124.     On March 20, 2017, DryShips filed with the SEC a registration statement on Form F-3 to register up to $2 billion worth of common stock and other securities.

125.     On March 27, 2017, DryShips announced that it had entered into agreements with unaffiliated third parties to acquire four vessels for a total price of $124 million.

126.     On April 3, 2017, DryShips announced that it had entered into a Common Stock Purchase Agreement to sell up to $226.4 million of shares to Kalani. DryShips agreed to issue up to $1.5 million of its common stock to Kalani as a commitment fee.

127.     Under the terms of the purchase agreement, Kalani would purchase common shares from DryShips at a discount, "equal to the product of (i) 0.94 and (ii) the lowest daily VWAP that equals or exceeds the applicable Floor Price during the applicable Pricing Period." In this formula VWAP is volume weighted average price, Pricing Period is a period of eight consecutive trading days, and Floor Price is a minimum of $1.00 per share subject to adjustments. Therefore, Kalani would generally purchase shares from DryShips at a price equal to 94% of the lowest daily VWAP occurring over an eight trading day period. This represented a

very large discount to DryShips' publicly traded market price, and immediate, substantial profits for Kalani.

128.    The shares were to be issued pursuant to a registration statement that became effective on May 7, 2015. Also on April 3, DryShips filed with the SEC a prospectus supplement, which became part of that registration statement. The prospectus supplement stated that "The Investor [Kalani] is an 'underwriter' within the meaning of Section 2(a)(11) of the Securities Act of 1933."

129.    Also on April 3, 2017, DryShips announced the acquisition of six vessels, including two VLGCs (later disclosed to be the Mont Fort and the Mont Gele) to be acquired pursuant to the previously announced "zero cost" option agreement with an Economou controlled company. According to the April 3 announcement the two VLGCs "will be acquired from entities that are affiliated with the Company's Chairman and CEO, Mr. George Economou." The purchase price of each VLGC was $83.5 million, or $167 million in total. The total purchase price for all six vessels was $268 million, with the other four vessels being acquired from unaffiliated third parties.

130.    Also on April 3, 2017, DryShips filed a Form 6-K including the Company's Notice of Annual General Meeting and Proxy Statement for the Company's Annual General Meeting of Shareholders, to be held on May 2, 2017. The shareholder proxy was signed by Economou and dated April 3, 2017. It sought shareholder approval to amend DryShips' articles of incorporation to allow for one or more reverse stock splits at ratios of up to one-for-1000. Under the previously approved limit allowing reverse splits of up to one-for-1000 DryShips had conducted a one-for-15 reverse split on November 1, 2016 and a one-for-eight reverse split on January 23, 2017, therefore still allowing room for an additional reverse split of up to one-for-

eight. However, Economou and DryShips apparently foresaw the need to conduct even more reverse splits beyond the amount allowable under the previously approved one-for-1000 limit. In the proxy statement Economou and DryShips stated, "The Board believes that" the reverse split proposal "is in the best interest of the Company and the shareholders," and that "a reverse stock split will only be effected, if at all, upon a determination by the Board that a reverse stock split is in the Company's and the shareholders' best interests."

131.   On April 7, 2017, DryShips announced that pursuant to the April 3 share purchase agreement the Company had sold an additional 35,692,576 shares to Kalani at an average price of $1.08 per share. Following the settlement of those sales 188,043,945 common shares would be outstanding

132.   On April 10, 2017, DryShips announced an amendment to its credit facility with the Economou-controlled Sifnos, which would release DryShips' collateral, increase the borrowing rate to Libor plus 6.5%, and pay Sifnos a $2 million fee for the amendment. Due to Economou's complete control over DryShips and due to the large amounts of cash recently raised from public shareholders, this collateral was no longer necessary to protect the loans extended by Sifnos.

133.   Also on April 10, 2017, DryShips filed with the SEC an amendment to its registration statement on Form F-3 to register up to $2 billion worth of common stock and other securities.

134.   On April 11, 2017, DryShips executed a one-for-four reverse stock split. This split would reduce the number of outstanding common shares to approximately 47 million. Following this split one share of DryShips common stock was equivalent to 1,920 shares immediately prior to the beginning of the Class Period.

135.    On April 17, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 7,912,449 shares to Kalani at an average price of $1.84 per share. Following the settlement of those sales 54,923,434 common shares would be outstanding.

136.    On April 19, 2017, DryShips announced that it had entered into agreements with unaffiliated third parties to acquire three vessels for a total price of $68 million.

137.    On April 21, 2017, DryShips filed with the SEC a second amendment to its registration statement on Form F-3 to register up to $2 billion worth of common stock and other securities. DryShips' registration statement on Form F-3 was declared effective by the SEC as of April 26, 2017.

138.    On April 28, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 10,425,258 shares to Kalani at an average price of $1.37 per share. Following the settlement of those sales 65,564,556 common shares would be outstanding.

139.    Also on April 28, 2017, DryShips announced that it had entered into agreements with an unaffiliated third party to acquire a vessel for a total price of $24 million.

140.    On May 2, 2017, DryShips announced the results from the shareholders meeting that took place that day, at which the proposal to allow additional reverse splits of up to one-for-1000 was approved.  Since Economou directly or indirectly held over 99.9% of the Company's voting power, unaffiliated shareholders had no opportunity to block the authorization.

**F.    May 2017: The Scheme Continues as Economou Falsely Claims it has Ended**

141.    On May 10, 2017, DryShips announced results for the first quarter of 2017. DryShips announced that it had entered into an agreement with an Economou-affiliated company to acquire a new vessel, the Samsara, for $64 million. DryShips gave a summary of recent

financing activities, stating that it had raised approximately $570 million over the last six months which was being used to acquire vessels, and that it had entered agreements to acquire 17 vessels (5 from companies affiliated with Economou) for a total cost of $765.5 million.

142.     The May 10, 2017 announcement quoted Economou as commenting, "DryShips has come a long way since last year when we were fighting for the Company's survival. Since then we have cleaned up the Company's balance sheet and almost doubled our fleet by acquiring modern quality vessels. With this rapid expansion phase behind us we look forward to taking delivery of the vessels we have acquired in the last few months at historically low asset values and starting to generate revenue that will improve our bottom line and demonstrate the earnings capacity of our fleet over the next few quarters."

143.     On May 11, 2017, DryShips executed a one-for-seven reverse stock split. This reduced the number of outstanding common shares from 65,564,307 shares to approximately 9.4 million shares. Following this split one share of DryShips common stock was equivalent to 13,440 shares immediately prior to the beginning of the Class Period.

144.     On May 19, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 2,697,742 shares to Kalani at an average price of $4.42 per share. Following the settlement of those sales 12,064,107 common shares would be outstanding.

145.     On May 24, 2017, DryShips announced that it had taken delivery of a previously announced $64 million purchase of a vessel, the Samsara, from a company affiliated with Economou. DryShips also announced that the vessel was immediately chartered back to the Economou-affiliated seller for a 5 year term.

146.   On May 26, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 1,616,737 shares to Kalani at an average price of $2.96 per share. Following the settlement of those sales 13,778,247 common shares would be outstanding.

147.   On May 30, 2017, DryShips announced that it had received a commitment for a $150 million credit facility with two third-party lenders. Commenting on the transaction, Economou stated, "This will allow us to focus on further accretive vessel acquisitions without the need to raise further equity."

148.   On June 2, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 2,021,157 shares to Kalani at an average price of $2.37 per share. Following the settlement of those sales 15,799,404 common shares would be outstanding.

149.   On June 9, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 4,766,831 shares to Kalani at an average price of $1.82 per share. Following the settlement of those sales 20,566,235 common shares would be outstanding.

150.   On June 16, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 5,195,050 shares to Kalani at an average price of $1.77 per share. Following the settlement of those sales 25,761,285 common shares would be outstanding.

151.   On June 22, 2017, DryShips executed a one-for-five reverse stock split. This reduced the number of outstanding common shares from approximately 28 million shares to approximately 5.7 million shares. Following this split one share of DryShips common stock was equivalent to 67,200 shares immediately prior to the beginning of the Class Period.

152.     On June 23, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 3,868,393 shares to Kalani at an average price of $3.23 per share. Following the settlement of those sales 9,020,650 common shares would be outstanding.

153.     On June 30, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 6,904,566 shares to Kalani at an average price of $1.93 per share. Following the settlement of those sales 15,925,216 common shares would be outstanding.

154.     On July 7, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 10,413,514 shares to Kalani at an average price of $1.07 per share. Following the settlement of those sales 26,609,379 common shares would be outstanding.

155.     On July 14, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 9,089,888 shares to Kalani at an average price of $0.90 per share. Following the settlement of those sales 35,699,267 common shares would be outstanding.

156.     On July 21, 2017, DryShips executed a one-for-seven reverse stock split. This reduced the number of outstanding common shares from approximately 36.3 million shares to approximately 5.2 million shares. Following this split one share of DryShips common stock was equivalent to 470,400 shares immediately prior to the beginning of the Class Period.

157.     On July 25, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 596,806 shares to Kalani at an average price of $0.84 per share prior to the July 21 reverse split, and an additional 13,995,486 shares to Kalani at an average price of $1.88 per share after the July 21 reverse split. Following the settlement of those sales 19,180,639 common shares would be outstanding.

158.     On July 27, 2017, DryShips announced that defendant Kandylidis had been appointed as a director of the Company.

159.     On July 28, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 5,898,364 shares to Kalani at an average price of $1.11 per share. Following the settlement of those sales 25,079,003 common shares would be outstanding.

160.     On August 4, 2017, DryShips announced that pursuant to the April 3 share purchase agreement it had sold an additional 6,468,435 shares to Kalani at an average price of $1.31 per share. Following the settlement of those sales 31,547,436 common shares would be outstanding.

**G.     August 2017: SEC Subpoenas DryShips; Economou Parts with Kalani and Regains Ownership of DryShips' Common Stock**

161.     On August 11, 2017, DryShips announced a preliminary agreement to sell Economou $100 million worth of common shares for $2.75 per share. However, under the terms of the agreement Economou would pay no cash to the Company. Rather, Economou's consideration consisted of: (i) a 49% interest in a tanker operator, Heidmar Holdings LLC, (ii) the termination of participation rights owned by an investment company affiliated with Economou, (iii) forfeiture by Sifnos of the super-voting Series D preferred shares beneficially owned by Economou, and (iv) cancellation of $27 million debt owed by DryShips to an investment company affiliated with Economou.  However, as noted by a shipping industry publication, the Series D preferred shares were not supposed to have been convertible to common stock.  *See* Michael Angell, *Other DryShips concessions could be worth around $48m*, Tradewinds (Aug. 15, 2017).

162.     Later reporting by a shipping industry publication would cast doubt on whether the consideration provided by Economou was in fact worth the stated $100 million, estimating

that the cashless transaction could be worth around $85 million. *See* Joe Brady, *Did DryShips shareholders pay fair price for Heidmar?*, Tradewinds (Aug. 16, 2017).

163.    Also on August 11, 2017, DryShips announced that it would conduct a rights offering to allow public shareholders to purchase up to $100 million worth of common shares for $2.75 per share, with any shares not purchased by the public to be purchased by an entity affiliated with Economou.

164.    Also on August 11, 2017, DryShips announced (i) the termination of the April 3, 2017 stock purchase agreement with Kalani, (ii) that Economou agreed to refrain from selling his newly acquired common shares for 6 months, and (iii) DryShips agreed not to conduct any equity offerings until after December 31, 2017 unless approved by a majority of unaffiliated stockholders.

165.    The termination of the April 3 share purchase agreement with Kalani was abrupt and unexpected. By April 11, DryShips had sold to Kalani approximately $194 million worth of common shares out of the $226.4 million permitted by the April 3 share purchase agreement. However, the full capacity of the two previous Kalani share purchase agreements, which were nearly identical to the April 3 share purchase agreement, had been fully utilized. Based on information and belief, the April 3 share purchase agreement was terminated prior to its full utilization because DryShips had received a subpoena from the SEC inquiring about its financing transactions with Kalani.

166.    On August 29, 2017, DryShips announced that the previously announced private placement with Economou had closed.

167.    On August 30, 2017, DryShips announced that it had received a subpoena from the SEC "requesting certain documents and information from the Company in connection with

offerings made by the Company between June 2016 and July 2017." The date that the subpoena was received was not specified in DryShips' public disclosures.

168.     On September 5, 2017, Economou filed a Schedule 13D reporting his beneficial ownership of DryShips' stock as of August 29, 2017. That schedule reflected his beneficial ownership of 36,363,639 common shares, or 53.5% of the 67,911,072 outstanding as of September 1, 2017.

169.     On October 4, 2017, DryShips announced that the previously announced rights offering had closed, that public shareholders had elected to purchase only $0.8 million worth of shares, and an entity affiliated with Economou had therefore purchased the remaining $99.2 million worth of shares. Following the rights offering there were 104,274,708 million common shares outstanding, 69.5% of which were beneficially owned by Economou.

**H.     Present Day: Ongoing SEC Investigation and End to the Dilution Scheme**

170.     As of the date of this Amended Complaint there is no indication in DryShips' public SEC filings that it has continued any form of relationship with Kalani since announcing the termination of the share purchase agreement on August 11, 2017.

171.      As of the date of this Amended Complaint DryShips has not conducted a reverse stock split since the one-for-seven reverse split executed on July 21, 2017.

172.     As of the date of this Amended Complaint, since the completion of the rights offering that accompanied the end of the dilution scheme and Economou's regaining control of DryShips' common stock, DryShips has not conducted any new public stock sales.

173.     As of the date of this Amended Complaint Economou's most recent Schedule 13D beneficial ownership report regarding DryShips' stock was filed June 18, 2018 and reflects his ownership as of June 15, 2018. That schedule reflects his ownership of 72,421,515 common shares, or 73.1% of the 99,063,448 total outstanding.

174.     On May 10, 2018, DryShips announced its results of operations for the first

quarter of 2018. As of the date of this Amended Complaint, that filing is DryShips' last public

statement regarding the status of the subpoena it received from the SEC, stating, "The Company

received a subpoena from the SEC requesting certain documents and information from the

Company in connection with offerings made by the Company between June 2016 and July 2017.

The Company is providing the requested information to the SEC." Based on information and

belief, the SEC investigation remains ongoing.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

175.     During the Class Period defendants caused to be made numerous false and

misleading statements and omissions.

176.     First and foremost among these, defendants omitted to disclose to the public their

calculated scheme (i) seeking to raise vast amounts of capital from unsuspecting retail investors

in numerous dilutive offerings over many months, (ii) the concealed, true purpose of which was

to misappropriate the freshly raised capital from DryShips for the benefit of Economou and

Bistricer, and (iii) that was designed to ultimately return ownership of DryShips' common stock

to Economou for minimal consideration after having made the Company much wealthier yet

decimating its publicly traded stock price.

177.     These omissions artificially inflated DryShips' common stock price and were

material to shareholders who would not have purchased DryShips common stock, or would not

have purchased stock in the same prices or amounts, had the scheme been disclosed. DryShips'

registration statements under which the stock was sold each failed to disclose this scheme,

although disclosure was required including, *inter alia*, under Item 303 of SEC Regulation S-K

("Identify any known trends or any known demands, commitments, events or uncertainties that

will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way"), and Item 503 of SEC Regulation S-K ("provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky.").

178.    Second, in a September 14, 2016 DryShips press release announcing a financing transaction between DryShips and a company controlled by Economou, defendant Kandylidis stated: "We are pleased to see our founding shareholder actively supporting the company in a way that is not dilutive to the rest of our shareholders."

179.    This statement was materially false and misleading when made because, as defendants knew or were reckless in not knowing, defendants were already engaged in an extremely dilutive share issuance scheme which they planned to continue for many months (and likely would have continued even longer had the SEC not intervened). In fact, only five days earlier, on September 9, DryShips and Economou had amended the terms of the DryShips-Sifnos financing agreement to hand permanent voting control over the Company to Economou for no consideration, apparently for the purpose of enabling Economou to amend DryShips' articles of incorporation to allow for unlimited reverse stock splits going forward on an as-needed basis. As part of that amendment DryShips waived the previous requirement that super-voting preferred shares mandatorily convert on a one to one basis to common shares after three months, demonstrating that defendants knew the scheme would continue well beyond three months.

180.    Third, in two DryShips shareholder proxies signed by Economou and dated September 20, 2016 and April 3, 2017, both of which sought shareholder approval to amend DryShips' articles of incorporation to allow for one or more reverse stock splits at ratios of up to one-for-1000, Economou and DryShips stated, "The Board believes that" the reverse split

proposal "is in the best interest of the Company and the shareholders," and that "a reverse stock split will only be effected, if at all, upon a determination by the Board that a reverse stock split is in the Company's and the shareholders' best interests."

181.    These statements were materially false and misleading when made because, as defendants knew or were reckless in not knowing, continuation of the dilutive share issuance and reverse stock split scheme caused DryShips' common stock price to plummet and so was not in shareholders' best interests. These statements were also materially false and misleading because defendants knew there would be no independent process to review their already made decision to execute numerous reverse stock splits.

182.    Fourth, on May 10, 2017, DryShips announced results for the first quarter of 2017. The May 10, 2017 announcement quoted Economou as commenting, "DryShips has come a long way since last year when we were fighting for the Company's survival. Since then we have cleaned up the Company's balance sheet and almost doubled our fleet by acquiring modern quality vessels. With this rapid expansion phase behind us we look forward to taking delivery of the vessels we have acquired in the last few months at historically low asset values and starting to generate revenue that will improve our bottom line and demonstrate the earnings capacity of our fleet over the next few quarters."

183.    This statement was materially false and misleading when made because, as defendants knew or were reckless in not knowing, DryShips' rapid expansion phase was not behind it and DryShips' was not finished "cleaning up" its balance sheet. Rather, DryShips was continuing to expand its balance sheet by issuing large amounts of new stock, further damaging common shareholders with additional dilution. DryShips announced additional sales of millions of common shares to Kalani on May 19, May 26, June 2, June 9, June 16, June 23, June 30, July

7, July 14, July 25, July 28, and August 4. DryShips executed additional reverse stock splits on May 11 and June 22.

184.    Fifth, in a press release dated May 30, 2017, announcing DryShips' new credit facility, filed as an exhibit to a DryShips Form 6-K, defendant Economou is quoted as commenting, "This will allow us to focus on further accretive vessel acquisitions without the need to raise further equity."

185.    This statement was materially false and misleading when made because, as defendants knew or were reckless in not knowing, DryShips and Kalani were in the midst of a continuing dilutive share issuance and reverse stock split scheme to raise additional equity which they intended to continue for the foreseeable future (and which was in fact continued until defendants learned that the SEC was investigating their scheme). DryShips announced additional sales of millions of common shares to Kalani on June 2, June 9, June 16, June 23, June 30, July 7, July 14, July 25, July 28, and August 4. DryShips executed an additional reverse stock split on June 22. This statement was also materially false and misleading because the ongoing stock issuances were not accretive to shareholder value, but in fact harmed shareholders for the benefit of Economou and Bistricer.

186.    Sixth, prospectus supplements filed by DryShips on June 8, 2016 and November 17, 2016 in connection with securities issuances to Kalani, after which Kalani would promptly resell DryShips' common stock onto public markets, both stated "There is no underwriter or placement agent in connection with the sale of the offered securities."

187.    These statements were false when made because Kalani was acting as an underwriter when purchasing securities from DryShips at a discount and then promptly reselling DryShips' common stock to the public. These statements gave the false impression that Kalani

was a sophisticated institutional investor committing large amounts of its own funds to the Company – a significant vote of confidence if true. In fact, as would be admitted in each of DryShips' seven additional prospectus supplements filed from December 27, 2016 through the end of the Class Period, "The Investor [Kalani] is an 'underwriter' within the meaning of Section 2(a)(11) of the Securities Act of 1933."

188.    Seventh, despite its status as an underwriter Kalani failed to register with the SEC as a dealer in securities, and DryShips' public disclosures during the Class Period including the applicable registration statements under which its stock was sold to the public failed to identify Kalani as a securities dealer.

189.    These omissions were material to shareholders because they gave the false impression that Kalani was a sophisticated institutional investor committing large amounts of its own funds to the Company – a significant vote of confidence if true. In fact, Kalani was promptly reselling for a profit the securities it obtained from DryShips. Section 15(a)(1) of the Exchange Act requires a broker or dealer to register as such with the SEC. Section 3(a)(5) of the Exchange Act defines a "dealer" as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." As a registered securities dealer, Kalani would have been required to file public disclosures with the SEC alerting the investing public to its operations as a securities dealer. Kalani made no such disclosures.

**ADDITIONAL SCIENTER ALLEGATIONS**

190.    Defendant Economou at all times has been the founder, CEO and Chairman of DryShips. At most times since DryShips' inception, Economou has been its controlling shareholder, either as the largest owner of its common stock, or through his ownership of super-

voting preferred shares. In short, Economou is the mastermind behind DryShips, and is intimately familiar with all of its operations and future plans. Because of his nearly complete control over DryShips, at any given time Economou is in a unique position to know and dictate what actions the Company will take in the future. For the same reasons, Economou controlled what disclosures DryShips made or failed to make during the Class Period.

191.    Due to his dominance over DryShips and his role in planning the dilutive share issuance scheme, Economou was also intimately familiar with Kalani's actions as alleged herein, as DryShips and Kalani worked to execute the scheme hand in hand.

192.    Defendant Kandylidis, due to his role as a director and senior executive officer of DryShips, and perhaps more importantly due to the fact that Economou is his uncle, was at all times intimately familiar with DryShips' operations and future plans. For the same reasons, Kandylidis was also intimately familiar with Kalani's role in the fraudulent scheme alleged herein.

193.    Economou, Kandylidis, and DryShips at all times had access to non-public information revealing the truth regarding defendants' scheme and the false statements and omissions alleged herein, and either knew or recklessly disregarded the truth about these matters.

194.    Economou's scienter is further established by the substantial financial benefits that accrued to him by design as a result of the scheme. First, as detailed above Economou and his other companies profited tens of millions of dollars from managing DryShips' vessels, buying vessels from or selling vessels to DryShips, and entering into various financing transactions with DryShips.

195.    Second, Economou benefitted financially from his suspiciously timed transactions in DryShips' securities. Going into the Class Period Economou owned 17.6% of DryShips'

common stock and controlled 17.6% of its voting power. On or around September 13, 2016, dilution reduced Economou's common stock ownership to 7.5% while Economou increased his voting power to over 99.9% through his acquisition of newly created super-voting preferred shares. Although under the previously agreed terms of the DryShips-Sifnos financing agreement such preferred shares were to have five times the voting rights of common shares and would be mandatorily converted into common shares after three months, on September 9, 2016 DryShips agreed (for no apparent consideration) that the preferred shares would have 100,000 times the voting rights of common shares and could remain outstanding indefinitely.

196.    Over the course of the Class Period Economou retained these preferred shares and his total voting control over the Company, while allowing his common stock ownership to be diluted to a fraction of 1% of the total common shares outstanding. At no point during the dilution scheme did Economou acquire any common shares, demonstrating his knowledge that the ongoing dilution scheme would promptly destroy the value of any such shares. At the end of the Class Period, when Economou had decided to end the dilution scheme in response to DryShips' receipt of a subpoena from the SEC, Economou reacquired majority control of DryShips common stock, holding 53.5% of the outstanding as of September 1, 2017. Indeed, in anticipation of the scheme, Economou had arranged in October 2016 to give DryShips, which he controlled, the right to convert $7.5 million of debt owed to Economou into DryShips common stock within 365 days, *i.e.*, after the dilutive scheme had wiped out other shareholders.

197.    Through this sequence of events, Economou ensured his continuous control over DryShips during the Class period while avoiding purchasing common shares during the catastrophic decline in DryShips' common stock price. Through this sequence of events, Economou reacquired a majority of the decimated common stock in a cashless transaction

ostensibly valued at $100 million (the actual value of which was questioned by independent observers) after the company had raised over $700 million in new capital from the public. This highly suspect sequence of events demonstrates the premeditated nature of the scheme.

198.     Based on information and belief, defendant Bistricer at all times has controlled Murchinson and Kalani, and has been intimately familiar with all of their operations and future plans. Because of his control, at any given time Bistricer is in a unique position to know and dictate what actions Kalani will take in the future. For the same reasons, Bistricer controlled Kalani's failure to register as a securities dealer with the SEC.

199.     Due to his control over Kalani and his role in planning the dilutive share issuance scheme, Bistricer was also intimately familiar with DryShips' actions as alleged herein, as DryShips and Kalani worked to execute the scheme hand in hand.

200.     Bistricer, Murchinson and Kalani at all times had access to material non-public information revealing the truth regarding defendants' scheme and the false statements and omissions alleged herein, and either knew or recklessly disregarded the truth about these matters, and further traded in DryShips securities on such non-public information.

201.     Bistricer's scienter is further established by the substantial financial benefits that accrued to him by design as a result of the scheme. As detailed above, Kalani earned tens of millions of dollars in commissions and profits gained by reselling DryShips securities purchased from the Company at substantial discounts to market prices. Based on information and belief, Kalani earned at least $40 million from December 2016 to August 2017 alone (including (i) $4.5 million in commitment fees, and (ii) a conservative estimate of Kalani's profit from buying and reselling shares at a discount equal to 6% of $594 million, or $35.6 million), without even taking into account Kalani's profits from the June 2016 and November 2016 transactions.

## ADDITIONAL LOSS CAUSATION ALLEGATIONS

202. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

203. Throughout the Class Period, Plaintiff and the Class purchased DryShips securities at artificially inflated prices and were damaged thereby. The prices of DryShips stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed or materialized, causing investors' losses.

204. None of the individual disclosures made by Defendants was sufficient to remove the inflation in DryShips stock price because each of them only partially revealed the conditions, risks and trends that had been concealed from investors, and the corrective impact of the disclosures were tempered by Defendants' continuing misstatements about the nature of the financing at issue and whether it was in the best interests of DryShips shareholders.

205. The deceptive and manipulative dilutive stock sale scheme resulted in the price of DryShips declining catastrophically, including over 99.999% for shares held at the beginning of the Class period, proximately causing investor losses.

## INAPPLICABILITY OF THE STATUTORY SAFE HARBOR
## AND THE BESPEAKS CAUTION DOCTRINE

206. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DryShips who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

207.    This is a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf all persons (the "Class") who purchased or otherwise acquired DryShips common stock between June 8, 2016 and August 29, 2017 (the "Class Period") and were damaged as a result of defendants' false statements, omissions, and manipulation alleged herein. Excluded from the Class are the defendants, their officers and directors, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

208.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DryShips common stock was actively traded on the NASDAQ stock exchange. While the exact number of Class members is unknown to Lead Plaintiff, it is believed that there are at least thousands of members in the proposed Class.

209.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' false statements, omissions, and manipulation alleged herein.

210.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

211.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by defendants' acts as alleged herein;

b.      whether statements and omissions made by defendants to the investing public during the Class Period misrepresented material facts about DryShips, Kalani, and the defendants' dilutive financing scheme;

c.      whether defendants manipulated the price of DryShips common stock during the Class Period in furtherance of the dilutive financing scheme;

d.      whether defendants acted knowingly or recklessly in making false statements and omissions, and in manipulating DryShips common stock price;

e.      whether the price of DryShips common stock during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

f.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

212.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

213.    A presumption of reliance applies in this case under the fraud-on-the-market doctrine. DryShips' common stock traded in an efficient market throughout the Class Period. All Class members relied on the integrity of the markets which was compromised by defendants' manipulation, false statements and omissions alleged above.

214.    The presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), applies to defendants' false and misleading omissions. Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as alleged above.

215.    Defendants' false statements, omissions, and manipulative conduct artificially inflated the price of DryShips' common stock. But for defendants' false statements, omissions, and manipulative conduct Class members would not have purchased DryShips common stock, or would not have purchased stock in the same prices or amounts, had the truth been disclosed. As the truth was fully revealed and the scheme came to an end, this removed the artificial inflation from DryShips' stock price causing substantial losses to Class members who purchased shares at inflated prices.

## COUNT I
### Violation of Exchange Act Section 9
### Against All Defendants

216.    Plaintiff incorporates by reference paragraphs 1-215 as if fully set forth herein.

217.    Defendants engaged in a scheme to manipulate the price of DryShips common stock during the Class Period as alleged above, and in so doing violated Section 9 of the Exchange Act.

218.    Defendants effected a series of transactions in DryShips common stock raising its price for the purpose of inducing its purchase by others, in violation of Section 9(a)(2) of the Exchange Act.

219.    Defendants, to induce the purchase of DryShips common stock, made statements which were at the time and in the light of the circumstances under which made, false or misleading with respect to material facts, and which defendants knew or had reasonable ground to believe were false or misleading, in violation of Section 9(a)(4) of the Exchange Act.

220.    Lead Plaintiff and the Class acquired DryShips common stock during the Class Period and suffered damages as a result of defendants' conduct in violation of Section 9 of the Exchange Act.

## COUNT II
### Violation of Exchange Act Section 10(b)
### Against All Defendants

221.    Plaintiff incorporates by reference paragraphs 1-220 as if fully set forth herein.

222.    Defendants employed manipulative and deceptive devices in connection with purchases and sales of DryShips common stock during the Class Period as alleged above, and in so doing violated Section 10(b) of the Exchange Act.

223.    Defendants employed devices, schemes, and artifices to defraud in connection with the purchase or sale of DryShips common stock, in violation of Rule 10b-5(a).

224.    Defendants made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in connection with the purchase or sale of DryShips common stock, in violation of Rule 10b-5(b).

225.     Defendants engaged in acts, practices, and courses of business which operated as a fraud or deceit upon the Class in connection with the purchase or sale of DryShips common stock, in violation of Rule 10b-5(c).

226.     Lead Plaintiff and the Class acquired DryShips common stock during the Class Period and suffered damages as a result of defendants' conduct in violation of Section 10(b) of the Exchange Act.

### COUNT III
### Violation of Exchange Act Section 20(a)
### Against Defendants Economou, Kandylidis, Kerames, Bistricer, and Murchinson

227.     Plaintiff incorporates by reference paragraphs 1-226 as if fully set forth herein.

228.     As alleged above, defendants Economou and Kandylidis directly or indirectly control DryShips. DryShips has violated Sections 9 and 10(b) of the Exchange Act. Economou and Kandylidis directly or indirectly induced such violations and did not act in good faith. Therefore, under section 20(a) of the Exchange Act Economou and Kandylidis are jointly and severally liable to the Class with and to the same extent as DryShips.

229.     As alleged above, Kerames is a director of DryShips. He was involved in approving the transactions and scheme described herein, was fully aware of the undisclosed information alleged herein, and acquiesced in the actions alleged herein.  He had the ability to control the Company's actions and was involved in approving the transactions and scheme described herein.

230.     As alleged above, defendants Bistricer and Murchinson directly or indirectly control Kalani. Kalani has violated Sections 9 and 10(b) of the Exchange Act. Bistricer and Murchinson directly or indirectly induced such violations and did not act in good faith.

Therefore, under section 20(a) of the Exchange Act Bistricer and Murchinson are jointly and severally liable to the Class with and to the same extent as Kalani.

231.    Lead Plaintiff and the Class acquired DryShips common stock during the Class Period and suffered damages as a result of defendants' conduct in violation of Section 20(a) of the Exchange Act.

**COUNT IV**
**Violation of Exchange Act Section 20A**
**Against Defendants Kalani, Bistricer, and Murchinson**

232.    Plaintiff incorporates by reference paragraphs 1-231 as if fully set forth herein.

233.    As discussed herein, Defendants Kalani, Bistricer, and Murchinson each committed underlying violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder by selling DryShips common stock while in possession of material nonpublic information concerning the manipulative scheme, and, consequently, are liable to contemporaneous purchasers of that stock under Section 20A of the Exchange Act.  See 15 U.S.C. § 78t-1(a).

234.    Throughout the Class Period, Defendants Kalani, Bistricer, and Murchinson sold DryShips common stock they had received from the company at prices above that which those shares would trade shortly after the sale.  They are therefore liable under Section 20A of the Exchange Act to all Class Members who purchased DryShips common stock at inflated prices contemporaneously with sales by Defendants Kalani, Bistricer and Murchison, accounting for hundreds of millions of dollars in losses.

235.    Section 20A of the Exchange Act provides that "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material nonpublic information shall be liable in an action . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such

violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class."

236.     As set forth above, Defendants Kalani, Bistricer, and Murchinson each committed underlying violations of Section 10(b) and Rule 10b-5 thereunder, by their acts and omissions as alleged in this Complaint.  Specifically, Defendants Kalani, Bistricer, and Murchinson sold DryShips common stock while in possession of material nonpublic information about the manipulative scheme alleged herein.  Consequently, they are liable pursuant to Section 20A of the Exchange Act to Plaintiff and all other Class members who purchased common stock contemporaneously with Defendants Kalani, Bistricer, and Murchinson's sales of DryShips common stock throughout the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment against defendants as follows:

A.     Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as Class representative and certifying Lead Counsel as Class counsel;

B.     Requiring defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Lead Plaintiff and the Class prejudgment and post-judgment interest, as well as their reasonable counsel fees and expert fees, and other costs and expenses reasonably incurred in this action; and

D.     Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.


Dated: June 29, 2018                          GLANCY PRONGAY & MURRAY LLP


                                              By: */s/ Robert Prongay*_____
                                              Robert Prongay (*pro hac vice*)
                                              rprongay@glancylaw.com
                                              Lesley Frank Portnoy
                                              lportnoy@glancylaw.com
                                              Jonathan M. Rotter (*pro hac vice forthcoming*)
                                              jrotter@glancylaw.com
                                              1925 Century Park East, Suite 2100
                                              Los Angeles, California 90067
                                              Telephone:      (310) 201-9150
                                              Facsimile:      (310) 201-9160

                                              Garth A. Spencer
                                              gspencer@glancylaw.com
                                              230 Park Avenue, Suite 530
                                              New York, New York 10169
                                              Telephone:      (212) 682-5340
                                              Facsimile:      (212) 884-0988

                                              *Lead Counsel for Lead Plaintiff*

                                              MAZZEO SONG P.C.
                                              David Song
                                              444 Madison Avenue, Fourth Floor
                                              New York, NY 10022
                                              Telephone: (212) 599-0700
                                              Facsimile: (212) 599-8400
                                              dsong@mazzeosong.com

                                              *Additional Counsel for Lead Plaintiff*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On June 29, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Eastern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 29, 2018.


*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 2:17-cv-04547-SJF-ARL Silverberg v. DryShips Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David A.P. Brower**
  brower@browerpiven.com

- **Jason R. D'Agnenica**
  jasondag@ssbny.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **William Federman**
  wbf@federmanlaw.com,ngb@federmanlaw.com,law@federmanlaw.com

- **Gregory Alan Frank**
  gfrank@frankllp.com

- **Noah Nehemiah Gillespie**
  noah.gillespie@srz.com,ecf-1822127e5d6b@ecf.pacerpro.com

- **J. Alexander Hood**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Shannon Lee Hopkins**
  shopkins@zlk.com,shalliday@zlk.com

- **Mark J. Hyland**
  hyland@sewkis.com

- **Konstantinos Kazanakis**
  jrievman@ctswlaw.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Thomas Livezey Laughlin**
  tlaughlin@scott-scott.com,ksteinberger@scott-scott.com,ichilaia@scott-scott.com,efile@scott-scott.com,aslaughter@scott-scott.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Brian Paul Maloney**

maloney@sewkis.com

- **Bruce G. Paulsen**
  paulsen@sewkis.com

- **Lesley Frank Portnoy**
  lportnoy@glancylaw.com

- **Robert Prongay**
  rprongay@glancylaw.com,info@glancylaw.com

- **Joshua Daniel Rievman**
  jrievman@ctswlaw.com,jrievman@gmail.com,asalbashian@ctswlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel H. Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Garth Avery Spencer**
  gspencer@glancylaw.com

- **Rhiana L. Swartz**
  rswartz@scott-scott.com,ksteinberger@scott-scott.com,efile@scott-scott.com

- **Peter H. White**
  pete.white@srz.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)