**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HERBERT SILVERBERG, Individually and on Behalf of All Others Similarly Situated, | Civil Action No.: 2:17-cv-04547-SJF-ARL |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| DRYSHIPS INC., GEORGE ECONOMOU, ANTHONY KANDYLIDIS, HARRY KERAMES, KALANI INVESTMENTS LIMITED, MURCHINSON LTD., and MARC BISTRICER, | |
| Defendants. | |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ...................................................................................1

II.     JURISDICTION AND VENUE ..................................................................................5

III.    PARTIES .....................................................................................................................6

IV.     SUBSTANTIVE ALLEGATIONS .............................................................................8

      A.      George Economou and DryShips ....................................................................8

      B.      Marc Bistricer and Kalani .............................................................................10

      C.      Defendants' Fraudulent Scheme ....................................................................11

            1.      Prior to the Class Period, DryShips Was a Small, Financially
                  Troubled Company Unable to Access Capital Markets............................11

            2.      June-August 2016: Defendants Launch Their Scheme to
                  Manipulate the Market for DryShips Common Stock ..............................12

            3.      September-October 2016: Defendant Economou Locks Up Voting
                  Control of the Company and Approves Additional Reverse Stock
                  Splits to Further the Fraudulent Scheme.................................................16

            4.      November 2016: The Scheme Continues with Another Reverse
                  Stock Split and Second Agreement with Kalani.......................................18

            5.      December 2016-January 2017: The Scheme Continues with a Third
                  Agreement with Kalani as Underwriter, More Dilutive Stock Sales,
                  and a Third Reverse Stock Split...............................................................20

            6.      February-March 2017: The Scheme Continues with a Fourth
                  Agreement with Kalani and More Dilutive Stock Sales ..........................22

            7.      April-August 2017: The Scheme Escalates with a Fifth and Final
                  Agreement with Kalani, Even More Dilutive Stock Sales, and Four
                  More Reverse Stock Splits........................................................................24

            8.      August 2017: The SEC Subpoenas DryShips and the Scheme Ends.........29

      D.      Defendants Rerouted Money Raised in the Fraudulent Financing Scheme
          to Their Related Affiliates .............................................................................31

            1.      Fabiana..................................................................................................32

            2.      TMS Entities ........................................................................................33

|   |   | 3. | Ocean Rig | 34 |
|   |   | 4. | Sifnos and Sierra | 34 |
|   |   | 5. | Vivid | 36 |
|   |   | 6. | Basset Holdings | 36 |
|   |   | 7. | Cardiff Tankers and Cardiff Gas | 36 |
|   |   | 8. | Purchase and Sale Agreements for DryShips Vessels | 37 |

    E.    Economou Manipulated His Ownership of DryShips Stock and Debt to Insulate Himself from Losses During the Scheme and Recoup Control of DryShips After the Scheme Ended ........................................................ 38

V.    DEFENDANTS' MATERIAL MISREPRESENTATIONS AND MISLEADING OMISSIONS DURING THE CLASS PERIOD ................................................ 42

VI.    ADDITIONAL SCIENTER ALLEGATIONS ................................................ 49

    A.    Defendants Coordinated the Stock Issuances and Reverse Stock Splits ............. 49

    B.    Defendant Economou Personally Profited from the Fraudulent Scheme ............. 50

    C.    Defendants Kalani and Bistricer Personally Profited from the Fraudulent Scheme ............................................................ 51

VII.    LOSS CAUSATION ................................................ 52

VIII.    CLASS ACTION ALLEGATIONS ................................................ 53

IX.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE ................................................ 56

X.    NO SAFE HARBOR ................................................ 58

XI.    PRAYER FOR RELIEF ................................................ 65

XII.    JURY TRIAL DEMANDED ................................................ 66

Lead Plaintiffs Robert Luke, Chayn Mousa, Mary Jane Silvey, Kamal Kheridden, and Konrad Wottge (collectively, the "DRYS Investor Group" or "Plaintiffs"), by and through their attorneys, and on behalf of all others similarly situated, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based on, among other things, their counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by DryShips Inc. ("DryShips" or the "Company"); (b) a review and analysis of press releases and media reports disseminated by the Company; and (c) a review of other publicly available information concerning Defendants.

## I.      SUMMARY OF THE ACTION

1.      This is a securities class action brought to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities that purchased, or otherwise acquired, DryShips common stock between June 8, 2016 and August 29, 2017, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

2.      This action arises from a fraudulent scheme perpetrated by Defendants DryShips, George Economou ("Economou"), Anthony Kandylidis ("Kandylidis"), Harry Kerames ("Kerames" and collectively, with DryShips, Economou, and Kandylidis, the "DryShips Defendants"), and Kalani Investments Limited ("Kalani"), a hedge fund owned and controlled by Defendants Murchinson Ltd. ("Murchinson") and Marc Bistricer ("Bistricer" and collectively, with Kalani and Murchinson, the "Kalani Defendants"), which enabled the DryShips Defendants to raise approximately $700 million from investors. Specifically, Defendants deliberately manipulated the price of DryShips common stock through an illicit and dizzying series of dilutive stock issuances and reverse stock splits that enriched Defendants and caused shareholders to lose more than 99.999% of the value of their shares in a matter of months. The

U.S. Securities and Exchange Commission ("SEC") is currently investigating Defendants' illegal conduct.

3.      DryShips, which owns drybulk carriers and offshore support cargo shipping vessels operating worldwide, is headquartered in Athens, Greece, and is incorporated in the Marshall Islands.   Its common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "DRYS."   At the beginning of the Class Period, DryShips was financially troubled and had a market capitalization of only $60 million.  Economou himself admitted that the Company was "'practically bankrupt' back in 2016."[1]  Unable to access the U.S. securities markets to raise capital by conventional means, DryShips, in conjunction with Kalani, launched the fraudulent scheme alleged herein in June 2016.

4.      The scheme itself was straightforward in nature.  First, DryShips used a reverse stock split to artificially drive up the price of its stock.  Then, DryShips monetized the stock-price spike by selling Kalani shares of DryShips common stock (or other securities convertible into its common stock) realizing proceeds of approximately $700 million.  Moreover, because Kalani acquired DryShips common stock at substantial discounts to its market price, Kalani realized profits of over $40 million reselling the DryShips shares to unsuspecting investors at the higher, prevailing market prices resulting from the reverse stock splits.  When these sales rapidly drove down the price of DryShips stock, the cycle was repeated.

5.      This brazen scheme is depicted in the below two charts.  The first chart shows how Dryships repeatedly used reverse stock splits to manipulate its stock price.  The second chart shows how, through DryShips' illicit arrangment with Kalani, Defendants dumped hundreds of millions of shares of DryShips stock into the market in order to monetize the price

---

[1]        Harry Papachristou, *Economou on the art of perseverance*, TRADEWINDS (May 31, 2018), http://www.trade windsnews.com/tankers/1493029/economou-on-the-art-of-perseverance.

spikes the reverse stock splits had created for their own benefits.  In total, Defendants' scheme involved at least 23 separate sales of DryShips securities to Kalani (21 of which occurred in a seven-month period), pursuant to five separate agreements, which were proceeded by seven reverse stock splits (four of which occured in a four-month period).[2]



Chart 1: Unadjusted Closing Stock Price Impacted by Reverse Stock Splits

---

[2]      Further detail on the agreements, sales, and reverse stock splits is summarized in the chart annexed hereto as Exhibit A.



6. In furtherance of their scheme, Defendants made numerous materially false and misleading statements and omissions, including (i) that the reverse stock splits were in the "best interests" of DryShips and shareholders when, in fact, Defendants were engaged in a scheme to manipulate the price of DryShips common stock that was designed to enrich Defendants at the expense of shareholders, (ii) that DryShips intended to use the proceeds from the sales of securities to Kalani "for general corporate purposes and/or to repay indebtedness" when, in fact, Defendants intended to siphon the vast majority of the proceeds from the Company for the benefit of Economou and Kandylidis, and (iii) that there was "no underwriter" in connection with the offerings when, in fact, Kalani was acting as an underwriter.

7.      Defendants' fraud has devasted DryShips investors.  The DryShips shares held by investors at the start of the Class Period or purchased during the Class Period have been rendered virtually worthless by Defendants' fraud.  In total, Defendants wiped out 99.999% of shareholder value in a matter of months.

8.      In contrast, hundreds of millions of dollars that DryShips received from Kalani as a result of the scheme were siphoned out of the Company by Individual Defendants Economou and Kandylidis through a series of transactions with related entities they controlled.  In short, Defendants treated the Company as nothing more than a vehicle to raise funds from unwitting investors and funnel money to themselves, while investors were left holding the bag – the quintessential type of manipulative scheme that the Exchange Act was designed to curb.

9.      Kalani also profited to the tune of tens of millions of dollars through its immediate resale of the discounted securities purchased from DryShips to the unsuspecting public and receipt of millions of dollars in commitment fees from DryShips.  Kalani effectively acted as an underwriter, but its true identity was concealed because: (i) it failed to register as a securities dealer under §14(a)(1) of the Exchange Act (15 U.S.C. §78o(a)(1)); and (ii) DryShips failed to disclose that Kalani was acting as an underwriter until the final days of 2016.  Instead, Defendants misled investors by holding Kalani out as a sophisticated, independent investor willing to invest in the Company, encouraging the unsuspecting public to invest in turn.

## II.      JURISDICTION AND VENUE

10.      The claims asserted herein arise from §§9(a), 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

12.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).   DryShips' stock trades on the NASDAQ, located within this Judicial District.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

14.     Lead Plaintiff Robert Luke, as set forth in his certification (ECF No. 39-2), purchased DryShips common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

15.     Lead Plaintiff Chayn Mousa, as set forth in his certification (ECF No. 39-2), purchased DryShips common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

16.     Lead Plaintiff Mary Jan Silvey, as set forth in her certification (ECF No. 39-2), purchased DryShips common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

17.     Lead Plaintiff Kamal Kheridden, as set forth in his certification (ECF No. 39-2), purchased DryShips common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

18.     Lead Plaintiff Konrad Wottge, as set forth in his certification (ECF No. 39-2), purchased DryShips common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

19.     Defendant DryShips is a corporation incorporated under the laws of the Republic of the Marshall Islands with its principal executive offices located at 109 Kifissias Avenue and Sina Street, 151 24, Marousi, Athens, Greece.  DryShips' common stock trades on the NASDAQ under the ticker symbol "DRYS."

20.     Defendant Economou was, at all relevant times, the founder, controlling shareholder, Chairman, and Chief Executive Officer ("CEO") of DryShips.  Throughout the Class Period, Economou engaged in the fraudulent scheme alleged herein, which included making materially false and misleading statements and omissions in the Company's press releases and SEC filings.  At all relevant times, Economou made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading.

21.     Defendant Kandylidis is the Chief Financial Officer ("CFO") and President of DryShips.  Before December 2016, Kandylidis was DryShips' Executive Vice President.  On August 8, 2016, Defendant Kandylidis assumed the duties of interim CFO of DryShips.  On December 16, 2016, DryShips announced that Defendant Kandylidis was appointed President and CFO of the Company.  He was appointed to the Company's Board of Directors (the "Board") in July 2017.  He is the nephew of Defendant Economou.  Throughout the Class Period, Kandylidis engaged in the fraudulent scheme alleged herein which included making materially false and misleading statements and omissions in the Company's press releases and SEC filings.  At all relevant times, Kandylidis made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading.

22.     Defendant Kerames was appointed to DryShips' Board in July 2009.  He signed DryShips' SEC filings relevant to the scheme alleged herein, including, *inter alia*, registration statements for the share issuances made pursuant to the scheme.

23.     Defendant Kalani is an entity organized under the laws of the British Virgin Islands.  Kalani is a vehicle established by Defendants Bistricer and Murchinson for financial transactions with the shipping industry.  Kalani served as the underwriter and distributer of multiple offerings of DryShips common stock to the public during the Class Period.

24.     Defendant Murchinson is, upon information and belief, a Toronto-based hedge fund controlled by Defendant Bistricer.  Together with Defendant Bistricer, Murchinson controls Kalani.

25.     Defendant Bistricer is, upon information and belief, the head of Murchinson and therefore controls Kalani.  Upon information and belief, Bistricer resides at 4611 12th Avenue, Suite 1L, Brooklyn, New York 11219-2514.

26.     The Defendants referenced above in ¶¶20-22 are sometimes collectively referred to herein as the "Individual Defendants."

27.     The Defendants referenced above in ¶¶19-25 are collectively referred to herein as the "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     George Economou and DryShips

28.     Defendant Economou is a Greek billionaire ship owner. Economou was number 707 on the 2008 Forbes Magazine list of the world's billionaires, with an estimated net worth of $1.7 billion.

29.     DryShips operates primarily as an owner of vessels, the management and operation of which are contracted out to other entities, most of which are under the control of Economou.

30.     Economou has served as DryShips' founder, Chairman, and CEO since its incorporation in 2004. He also owns, controls, and serves as a director and/or officer of numerous other companies operating in the shipping industry, many of which enter into complex transactions with each other.  Since the Company's initial public offering ("IPO"), DryShips has been completely dominated by Economou, despite having a majority of ostensibly independent Board members, including Economou's nephew Kandylidis.

31.     Economou has a history of underhanded transactions that have enriched him at the expense of investors. As a recent article in the *Seatrade Maritime News* commented: "For going on two decades, non-shipping investors typically of the retail variety, have been on the losing side of one deal after another, when it comes to DryShips or predecessor companies."[3]  For example, Economou raised $175 million for Alpha Shipping Plc ("Alpha") in 1998 by selling junk bonds, which were defaulted within one year of issuance leaving a number of Wall Street institutions with large losses. Economou then acquired most of Alpha Shipping's fleet by paying $0.37 on the dollar to owners of its defaulted debt.

32.     Economou has stated that he views Americans as "'*the dumbest investors around*[.]'"[4]

---

[3]     Barry Parker, *DryShips' George Economou - The smartest guy in the room*, Seatrade Maritime News (Aug. 15, 2017), http://www.seatrade-maritime.com/news/americas/dryships-george-economou-the-smartest-guy-in-the-room.html.

[4]     Kathryn M. Welling, *The Golden Fleece?: DryShips' Debut Shows Speculation, Liquidity Trumping Experience*, welling@weeden (Feb. 28, 2005), https://www.wellingonwallst.com/files/DDF/0704_SB_DRYS_LI_Klein.pdf.

33.     In DryShips, Economou, with the aid of Kalani, saw the opportunity to again enrich himself at the expense of investors.

**B.     Marc Bistricer and Kalani**

34.     In November 2016, DryShips announced that it had entered into various financing transactions with Kalani.  Prior to this, Kalani was unknown to the public, organized in an offshore jurisdiction known for its secrecy, the British Virgin Islands.  The agents listed in Kalani's SEC filings were members of a law firm based in another offshore jurisdiction also known for its secrecy, Gibraltar.

35.     Similarly, little is known about Bistricer or Murchinson, who controlled Kalani. Murchinson is, upon information and belief, a Toronto-based hedge fund controlled by Defendant Bistricer.

36.     According to the *Wall Street Journal*, based on interviews with three Greek shipping executives, including Defendant Kandylidis, Kalani began approaching shipping companies in early 2016 to pitch the fraudulent scheme alleged herein.  "Kalani's idea was that it would buy newly issued shares directly from the shipping companies at a discount to the stock-market price, thus injecting cash into the companies."[5]

37.     DryShips was not the only company to avail itself of Kalani's fraudulent scheme.   At least two other shipping companies, Diana Containerships Inc. ("Diana Containerships") and TOP Ships Inc. ("TOP Ships"), engaged in a similar series of fraudulent transactions as alleged herein.

---

[5]      Spencer Jakab, *A Shipping Company's Bizarre Stock Maneuvers Create High Seas Intrigue*, WALL ST. J. (July 13, 2017, 12:21 PM ET), https://www.wsj.com/articles/a-shipping-companys-bizarre-stock-maneuvers-create-high-seas-intrigue-1499960367.

38.     Shareholder lawsuits have been filed against Kalani in connection with these schemes as well.  And, as is the case with respect to DryShips, TOP Ships' scheme also triggered an SEC investigation.

**C.     Defendants' Fraudulent Scheme**

**1.     Prior to the Class Period, DryShips Was a Small, Financially Troubled Company Unable to Access Capital Markets**

39.     Prior to 2016, DryShips experienced years of financial difficulties that adversely impacted the Company's share price.

40.     Indeed, on April 15, 2015, DryShips had been notified by NASDAQ that the Company was not in compliance with listing rules because the closing bid price for its shares remained below $1.00 per share.  In response, DryShips announced that it would seek shareholder consent to conduct a reverse stock split in an effort to bring itself into compliance with NASDAQ listing requirements.

41.     However, DryShips was unable to obtain approval for a reverse stock split at its Annual Shareholders Meeting in June 2015, and the Company was forced to temporarily transfer the listing of its stock to the NASDAQ Capital Market until it could meet NASDAQ's minimum bid price requirement.

42.     Although approval for the reverse stock split of not more than one-for-100 was finally obtained in February 2016 at a Special Meeting of Shareholders, the experience prompted the DryShips Defendants to seize voting control of the Company.

43.     On March 11, 2016, DryShips executed a one-for-25 reverse stock split, reducing the number of outstanding commons shares from approximately 672 million to approximately 26.9 million.

44.     On March 24, 2016, DryShips announced that, pursuant to a financing agreement with Sifnos Shareholders Inc. ("Sifnos"), a financing company controlled by Economou, Sifnos would exchange all of its DryShips Series B Preferred Shares for $8.75 million of debt.

45.     Although DryShips' only outstanding class of stock following this transaction was common stock, under the terms of the financing agreement, DryShips had the right to convert the $8.75 million in debt to Sifnos into 3.5 million in DryShips preferred shares, having five times the voting power of a common share.  However, once DryShips elected to convert its debt into preferred shares, the preferred shares would convert common stock on a one-to-one basis within three months of the conversion.  Given the 26.9 million common shares outstanding at the time, the conversion of Sifnos' debt into "new" DryShips preferred share gave Sifnos roughly 40% of DryShips' total voting power for a period of three months, after which its voting power would be reduced to 12%.

### 2.     June-August 2016: Defendants Launch Their Scheme to Manipulate the Market for DryShips Common Stock

46.     At the start of the Class Period, the Company had a market capitalization of only $60 million and, leading up to the Class Period, DryShips was engaged in discussions with creditors about restructuring and had been selling vessels to raise capital.  Economou himself admitted that the Company was "'practically bankrupt' back in 2016."[6]  Indeed, on May 19, 2016, DryShips announced it had suspended principal and interest payments on loans to preserve cash liquidity.

47.     Shortly thereafter, in or about June 2016, Defendant Kandylidis, acting on behalf of DryShips, met with Defendant Bistricer, acting on behalf of Kalani, in New York.  Together,

---

[6]     Harry Papachristou, *supra* n.1.

they devised the manipulative scheme of stock offerings and dilutive reverse stock splits, which enabled Defendants to raise hundreds of millions of dollars from unwitting investors that was then funneled to Defendants and other DryShips-related parties.

48.     The DryShips Defendants' nefarious arrangement with Kalani began on June 8, 2016, when the Company entered into a Securities Purchase Agreement (the "June 8 Agreement") with an anonymous "institutional investor," later revealed to be Kalani, "for the sale of 5,000 newly designated Series C Convertible Preferred Shares, warrants to purchase 5,000 Series C Convertible Preferred Shares, and 148,998 common shares[,]" for proceeds of approximately $5 million, or up to $10 million in total if all warrants were exercised.

49.     The Series C shares were convertible into common shares, at any time, according to the following formula: "The number of shares of Common Stock issuable upon conversion of any Preferred Share pursuant to Section 3(a) shall be determined by dividing (x) the Conversion Amount of such Preferred Share by (y) the Conversion Price."  The Conversion Amount was generally the Series C shares' stated value of $1,000 each, subject to adjustment.  The Conversion Price was generally $2.75 per share, which would be adjusted downward according to a formula in the event that the common shares traded below $2.75 per share.  Therefore, assuming no adjustments to the $1,000 Conversion Amount or the $2.75 Conversion Price, each Series C share was convertible into 363.6 common shares.

50.     The securities were issued pursuant to a Registration Statement, filed with the SEC on May 7, 2015 (the "2015 Registration Statement").  DryShips also filed a Prospectus Supplement with the SEC on June 8, 2016, which became part of the 2015 Registration Statement.  Neither the June 8 Prospectus Supplement nor any other disclosure filed by DryShips

identified the anonymous institutional investor as Kalani.  The filings likewise failed to disclose that Kalani was an underwriter as defined by the Securities Act.

51.     An underwriter is "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking[.]"  15 U.S.C. §77b(a)(11).  Kalani clearly qualified as an underwriter because it purchased securities "with a view" toward selling DryShips stock into the secondary market.

52.     However, the Company's 2015 Registration Statement, after acknowledging that "any broker-dealers or other persons acting on our behalf . . . that participates with us . . . in the distribution of the securities, may be deemed to be underwriters," falsely represented that "we are not a party to any agreement, arrangement or understanding between any broker or dealer and us with respect to the offer or sale of the securities pursuant to this prospectus."

53.     DryShips further represented in its 2015 Registration Statement that "the names of any underwriters, dealers or agents" will be included in "a prospectus supplement."  However, despite this representation, the Company's June 8 Prospectus Supplement falsely stated that "[t]here is no underwriter or placement agent in connection with the sale of the offered securities."

54.     Defendants' conduct also violated SEC regulations requiring registration and disclosure of underwriters.  *See infra* §V.  In violation of these regulations, Defendants did not disclose that Kalani would act as an underwriter, convert its preferred shares into common shares that would be dumped into the market shortly after the issuance, and severely impact the price of

DryShips stock.   Instead, Kalani was held out as an independent investor willing to invest millions in the Company – a significant vote of confidence for the investing public.

55.     Further, although the Company's disclosures stated that the proceeds from the Kalani securities issuances would be used for "general corporate purposes" or "to repay indebtedness under one or more of our existing credit facilities," unbeknownst to investors, the true purpose of the financing scheme, which was to enrich Kalani and Economou, remained concealed.

56.     On June 15, 2016, DryShips announced that the offering previously announced in the June 8 Agreement had closed with $5 million of gross proceeds raised, and Kalani proceeded to flood the market with DryShips stock.   In this regard, on August 9, 2016, DryShips filed a Form 6-K containing its financial results for the second quarter of 2016. In this report, DryShips disclosed that, as of August 7, 2016, 4,635 of the 5,000 Series C Convertible Preferred shares had been converted to 12,719,431 common shares.   Although 12.7 million shares represented well over 5% of DryShips' outstanding common shares, Kalani did not file the required beneficial ownership report with the SEC, which indicates that, as Defendants intended, Kalani had acted as an underwriter and, after converting the Series C Convertible Preferred shares into common stock, it had immediately dumped the shares into the secondary market.

57.     Unsurprisingly, after Kalani dumped millions of shares into the market, the closing bid price for DryShips shares again fell below $1.00 per share on August 1, 2016, and DryShips announced its intention to conduct another reverse stock split to bolster its stock price.

58.     On August 15, 2016, DryShips executed a one-for-four reverse stock split, reducing the number of outstanding common shares from 39,750,275 shares to approximately 9.9 million shares.

      **3.**      **September-October 2016: Defendant Economou Locks Up Voting Control of the Company and Approves Additional Reverse Stock Splits to Further the Fraudulent Scheme**

59.    To prevent the financing scheme from running its course before Defendants could maximize their own returns, the DryShips Defendants needed to artificially prop up the Company's stock price.  Because the market was continually saturated with Kalani's converted common shares, the most expedient way to manipulate DryShips' stock price was to implement additional reverse stock splits.

60.    For that purpose, Defendant Economou sought to lock up voting control of the Company, so additional reverse stock split proposals were guaranteed approval.  As stated above, per the terms of the DryShips financing agreement with Economou-controlled Sifnos, as amended on March 24, 2016, Sifnos had the right to convert $8.75 million of its debt into 3.5 million DryShips preferred shares with five times the voting power of a common share.

61.    However, as noted above, while that arrangement gave Economou voting control at the time of conversion, that control would expire three months later when the preferred shares would convert to common stock.  Thus, on September 9, 2016, DryShips and the Economou-controlled Sifnos amended their agreement (the "September 9 Agreement") – without explanation and seemingly for no consideration – to provide that each preferred share had *100,000* times the voting power of a common share.

62.    This amendment gave Economou complete ***voting control*** to approve dilutive reverse stock splits in furtherance of Defendants' scheme.  Additonally, in the September 9 Agreement, DryShips and Sifnos removed – again, without explanation and seemingly for no consideration – the previously agreed provision that required mandatory conversion of the preferred shares into common stock on a one-to-one basis within three months after issuance of the preferred shares, allowing Sifnos and Economou to retain their voting control indefinitely.

63.     Days later, on September 14, 2016, DryShips disclosed that, pursuant to its financing arrangements with the Economou-controlled Sifnos, it had elected to convert its $8.75 million debt to Sifnos into 3.5 million DryShips Class D preferred shares.

64.     Also on September 14, 2016, DryShips published a press release regarding the recent transaction with Sifnos, which quoted Defendant Kandylidis as stating: "'We are pleased to see our founding shareholder actively supporting the company in a way that is ***not dilutive*** to the rest of our shareholders.'"  [Emphasis added].

65.     A week later, Economou announced his intention to exercise his voting control to approve additional reverse stock splits in furtherance of the scheme.  On September 23, 2016, DryShips filed a Form 6-K that included the Company's Notice of Annual General Meeting and Proxy Statement for the Company's Annual General Meeting of Shareholders to be held on October 26, 2016.  The Proxy Statement for the Annual General Meeting, signed by Economou, informed shareholders that the Board was soliciting shareholder approval of an amendment to the Company's Amended and Restated Articles of Incorporation, which would allow the Board to effect one or more reverse stock splits of the Company's common shares at the extreme ratio of up to ***one-for-1,000*** in the aggregate without further shareholder approval.

66.     The DryShips Defendants assured investors that "shareholder approval of an exchange ratio range (rather than an exact exchange ratio) . . . provide[d] the Board of the Directors with maximum flexibility to achieve the purposes of . . . one or more reverse stock splits."  The DryShips Defendants further assured investors that "[t]he Board of Directors intends to effect one or more reverse stock splits only if it believes that a decrease in the number of Common Shares outstanding is likely to improve the trading price for the Company's Common Shares, and only if the implementation of a reverse stock split is determined by the Board of

Directors to be in the best interests of the Company and its shareholders." These statements were materially false and misleading because, in fact, Defendants were utilizing the financing scheme to manipulate DryShips' stock price and benefit themselves at the expense of investors.

67. Belying any assertion that they were acting in shareholders' best interests, on October 27, 2016, the DryShips Defendants announced the foregone conclusion that the reverse stock split proposal was approved at the adjourned Annual General Meeting.

### 4. November 2016: The Scheme Continues with Another Reverse Stock Split and Second Agreement with Kalani

68. With shareholders' voting rights effectively eliminated, Defendants were free to execute the remaining phases of their fraudulent scheme. Mere days later, on November 1, 2016, the DryShips Defendants executed a one-for-15 reverse stock split, reducing the number of common shares outstanding from 17,025,140 shares to approximately 1.1 million.

69. Following the November 1, 2016 reverse stock split, the price of DryShips common stock steadily increased and closed at $73.00 on November 15. The November 15 closing price represented an increase of more than 1400% over the closing price just five trading days earlier on November 9. The stock traded as high as $119.97 per share (an increase of almost 2500% from November 9) in pre-market trading on November 16.

70. The rapid increase prompted NASDAQ to temporarily halt trading in DryShips stock on November 16, 2016.

71. However, NASDAQ allowed trading in DryShips stock to resume the following day. DryShips' stock price fell to its pre-November 10, 2016 levels. The stock closed at $11.00 per share on November 17 and returned to its prior $4.00-$5.00 range by November 28.

72. On November 17, 2016, DryShips issued a press release describing a new financing transaction with Kalani and stating that, apart from that transaction, "the Company is

not aware of any other news that would result in the increased trading activity of its stock or a fluctuation of its stock price."

73.     DryShips' November 17, 2016 press release also announced that it had entered into a second Securities Purchase Agreement with Kalani, mere weeks after the November 1 reverse stock split, "for the sale of 20,000 newly designated Series E-1 Convertible Preferred Shares, preferred warrants to purchase 30,000 Series E-1 Convertible Preferred Shares, preferred warrants to purchase 50,000 newly designated Series E-2 Convertible Preferred Shares, prepaid warrants to initially purchase an aggregate 372,874 common shares (. . . subject to adjustment . . .), and 100 common shares[,]" for proceeds of approximately $20 million, or up to $100 million in total if all warrants were exercised.

74.     By their terms, the Series E-1 shares were convertible into common shares according to the following formula: "The number of shares of Common Stock issuable upon conversion of any Series E-1 Preferred Share pursuant to Section 4(a) shall be determined by dividing (x) the Conversion Amount of such Series E-1 Preferred Share by (y) the Conversion Price."   The Conversion Amount was generally the Series E-1 shares' stated value of $1,000 each, subject to adjustment.   The Conversion Price was generally $30.00 per share, which would be adjusted downward according to a formula in the event that the common shares traded below $30.00 per share.   Therefore, assuming no adjustments to the $1,000 Conversion Amount or the $30.00 Conversion Price, each Series E-1 share was convertible into 33.3 common shares.

75.     The terms of the Series E-2 shares were substantially similar to the terms of the Series E-1 shares.

76. DryShips disclosed that anywhere between 3.6 and 72.1 million common shares would be issuable in satisfaction of the securities, depending on market prices for DryShips common stock.

77. The securities were issued pursuant to the 2015 Registration Statement. DryShips also filed a Prospectus Supplement with the SEC on November 17, 2016, which became part of the 2015 Registration Statement.  The November 17 Prospectus Supplement again falsely stated that "[t]here is no underwriter or placement agent in connection with the sale of the offered securities."

78. On November 21, 2016, DryShips announced that the November 17 offering had closed, raising gross proceeds of approximately $20 million.

**5.    December 2016-January 2017: The Scheme Continues with a Third Agreement with Kalani as Underwriter, More Dilutive Stock Sales, and a Third Reverse Stock Split**

79. On December 12, 2016, DryShips announced that the offering previously announced on November 17 had completed, with approximately $100 million of gross proceeds raised.  Following the completion of the offering, DryShips had 33.8 million common shares outstanding.

80. A few weeks later, on December 27, 2016, DryShips announced that it had entered into a Common Stock Purchase Agreement with Kalani for the sale of up to $200 million of shares of DryShips common stock (the "December 27 Agreement").  DryShips "agreed to issue up to $1.5 million of its common stock to Kalani as a commitment fee."

81. Under the terms of the purchase agreement, Kalani would purchase common shares from DryShips at a discount "equal to the product of" (i) 0.94; and (ii) "the lowest daily VWAP that equals or exceeds the applicable Floor Price during the applicable Pricing Period." In this formula, VWAP is "volume weighted average price," Pricing Period is a period of "eight

consecutive trading days[,]" and Floor Price is a minimum of "$1.00 per share" subject to adjustments.  Therefore, Kalani would generally purchase shares from DryShips at a price equal to 94% of the lowest daily VWAP occurring over an eight trading day period.  This represented a significant discount to DryShips' publicly traded market price and immediate, substantial profits for Kalani.

82.     The securities were issued pursuant to the 2015 Registration Statement. DryShips also filed a Prospectus Supplement with the SEC on December 27, 2016, which became part of the 2015 Registration Statement.  The December 27 Prospectus Supplement admitted – for the first time – that "[t]he Investor [Kalani] is an 'underwriter' within the meaning of Section 2(a)(11) of the Securities Act of 1933[.]"

83.     Over the next month, DryShips announced several, dilutive sales to Kalani pursuant to the December 27 Agreement, along with a reverse stock split to counter the flood of shares into the market and corollary stock price drop:

a.  On January 9, 2017, DryShips filed a Prospectus Supplement and announced that the Company had sold 14,090,507 common shares to Kalani at an average price of $3.05 per share, increasing the number of outstanding common shares to 48,003,563.

b.  On January 13, 2017, DryShips filed a Prospectus Supplement and announced that the Company had sold an additional 21,150,054 shares to Kalani at an average price of approximately $2.04 per share, increasing the number of outstanding common shares to 69,333,763.

c.  On January 19, 2017, DryShips announced a one-for-eight reverse stock split.

d.  On January 20, 2017, DryShips filed a Prospectus Supplement and announced the Company had sold an additional 38,600,767 shares to Kalani at an average price of

21

approximately $1.15 per share, increasing the number of outstanding common shares to. 107,934,530

e.  On January 23, 2017, DryShips executed the one-for-eight reverse stock split, reducing the number of outstanding common shares from 107,934,530 shares to approximately 13.5 million shares.  Following this split, one share of DryShips common stock was equivalent to 480 shares immediately prior to the beginning of the Class Period.

f.  On January 30, 2017, DryShips filed a Prospectus Supplement and announced the Company had sold an additional 22,539,773 shares to Kalani at an average price of $3.08 per share, increasing the number of outstanding common shares to 36,253,870.

g.  Each Prospectus Supplement admitted that "[t]he Investor [Kalani] is an 'underwriter' within the meaning of Section 2(a)(11) of the Securities Act of 1933[.]"

84.  On January 31, 2017, DryShips announced that it had completed the $200 million share offering with Kalani, pursuant to the December 27 Agreement, raising net proceeds for the Company of $198 million.  Following the completion of those sales, 36,253,870 common shares were outstanding.  Based on information and belief, Kalani made at least $13.5 million from these offerings (including: (i) the $1.5 million commitment fee; and (ii) a conservative estimate of Kalani's profit from buying and reselling shares at a discount equal to 6% of $200 million, or $12 million).

### 6.  February-March 2017: The Scheme Continues with a Fourth Agreement with Kalani and More Dilutive Stock Sales

85.  On February 17, 2017, DryShips announced that it had entered into another Common Stock Purchase Agreement to sell an additional $200 million of shares to Kalani (the "February 17 Agreement").

86.     The terms of the February 17 Agreement were substantively the same as the December 27 Agreement and provided the same opportunity for Kalani to purchase DryShips shares at a significant discount and to receive a $1.5 million commitment fee.

87.     The securities were issued pursuant to the 2015 Registration Statement. DryShips also filed a Prospectus Supplement with the SEC on February 17, 2017, which became part of the 2015 Registration Statement.   The February 17 Prospectus Supplement admitted that "[t]he Investor [Kalani] is an 'underwriter' within the meaning of Section 2(a)(11) of the Securities Act of 1933[.]"

88.     As before, over the next few months, DryShips announced even more dilutive sales to Kalani pursuant to the February 17 Agreement:

a.  On February 24, 2017, DryShips announced that the Company had sold 22,482,371 shares to Kalani at an average price of $2.45 per share, increasing the number of outstanding common shares to 58,836,362.

b.  On March 3, 2017, DryShips announced that the Company had sold an additional 44,958,830 shares to Kalani at an average price of $1.67 per share, increasing the number of outstanding common shares to 103,974,393.

c.  On March 17, 2017, DryShips announced that the Company sold an additional 45,505,878 shares to Kalani at an average price of approximately $1.47 per share, increasing the number of outstanding shares to 152,055,576.

89.     On March 17, 2017, DryShips announced that it had completed the previously announced $200 million share offering with Kalani, pursuant to the February 17 Agreement, raising net proceeds for the Company of $198 million.  Following the completion of those sales, 152,055,576 common shares were outstanding.  Based on information and belief, Kalani made at

least $13.5 million from these offerings (including: (i) the $1.5 million commitment fee; and (ii) a conservative estimate of Kalani's profit from buying and reselling shares at a discount equal to 6% of $200 million, or $12 million).

90.     On March 20, 2017, DryShips filed a Registration Statement on Form F-3 with the SEC to register up to $2 billion worth of additional common stock and other securities.

### 7.     April-August 2017: The Scheme Escalates with a Fifth and Final Agreement with Kalani, Even More Dilutive Stock Sales, and Four More Reverse Stock Splits

91.     On April 3, 2017, DryShips announced that it had entered into another Common Stock Purchase Agreement, this time to sell up to $226.4 million of shares to Kalani (the "April 3 Agreement").

92.     The terms of the April 3 Agreement were substantively the same as the December 27 and February 17 Agreements and provided the same opportunity for Kalani to purchase DryShips shares at a significant discount and to receive a $1.5 million commitment fee.

93.     The shares were to be issued pursuant to the 2015 Registration Statement. DryShips also filed a Prospectus Supplement with the SEC on April 3, 2017, which became part of the 2015 Registration Statement.  The April 3 Prospectus Supplement admitted that "[t]he Investor [Kalani] is an 'underwriter' within the meaning of Section 2(a)(11) of the Securities Act of 1933[.]"

94.     Given the increased volume of shares for purchase in the April 3 Agreement, DryShips realized it would need even more reverse stock split approval to escalate the fraud over the next several months.  Accordingly, on April 3, 2017, DryShips filed a Form 6-K that included the Company's Notice of Annual General Meeting and Proxy Statement for the Company's Annual General Meeting of Shareholders to be held on May 2, 2017.  The Proxy Statement was signed by Economou and dated April 3, 2017.  It sought shareholder approval to

amend DryShips' Articles of Incorporation to allow for one or more reverse stock splits at ratios of up to one-for-1,000.

95.     DryShips had conducted a one-for-15 reverse split on November 1, 2016 and a one-for-eight reverse split on January 23, 2017, therefore still allowing room for an additional reverse split of up to one-for-eight under the previously approved limit of one-for-1,000. However, Economou and DryShips apparently planned to conduct even more reverse splits beyond that limit to further manipulate the price of the stock.  Nonetheless, in the April 3 Proxy Statement, Economou and DryShips stated: "The Board believes that" the reverse split proposal "is in the best interest of the Company and the shareholders," and that "a reverse stock split will only be effected, if at all, upon a determination by the Board of Directors that a reverse stock split is in the Company's and the shareholders' best interests."

96.     On May 2, 2017, DryShips announced the foregone results from the shareholders meeting that took place that day: the proposal to allow additional reverse splits of up to *one-for-1,000* was approved.

97.     As before, in the months of April through July 2017, DryShips announced a staggering 14 additional dilutive sales to Kalani in less than four months, pursuant to the April 3 Agreement, along with two reverse stock splits to counter the flood of shares into the market and corollary stock price drop:

    a.   On April 6, 2017, DryShips announced a one-for-four reverse stock split.

    b.   On April 7, 2017, DryShips announced that the Company had sold an additional 35,692,576 shares to Kalani at an average price of $1.08 per share, increasing the number of outstanding common shares to 188,043,945.

c.   On April 11, 2017, DryShips executed the one-for-four reverse stock split, reducing the number of outstanding common shares from approximately 188 million to approximately 47 million.  Following this split, one share of DryShips common stock was equivalent to 1,920 shares immediately prior to the beginning of the Class Period.

d.   On April 17, 2017, DryShips announced that the Company had sold an additional 7,912,449 shares to Kalani at an average price of $1.84 per share, increasing the number of outstanding common shares to 54,923,434.

e.   On April 28, 2017, DryShips announced that the Company had sold an additional 10,425,258 shares to Kalani at an average price of $1.37 per share, increasing the number of outstanding common shares to 65,564,556.

f.   On May 2, 2017, DryShips announced a one-for-seven reverse stock split.

g.   On May 11, 2017, DryShips executed the one-for-seven reverse stock split, reducing the number of outstanding common shares from 65,564,307 shares to approximately 9.4 million shares.  Following this split, one share of DryShips common stock was equivalent to 13,440 shares immediately prior to the beginning of the Class Period.

h.   On May 19, 2017, DryShips announced that the Company had sold an additional 2,697,742 shares to Kalani at an average price of $4.42 per share, increasing the number of outstanding common shares to 12,064,107.

i.   On May 26, 2017, DryShips announced that the Company had sold an additional 1,616,737 shares to Kalani at an average price of $2.96 per share, increasing the number of outstanding common shares to 13,778,247.

j.  On June 2, 2017, DryShips announced that the Company had sold an additional 2,021,157 shares to Kalani at an average price of $2.37 per share, increasing the number of outstanding common shares to 15,799,404.

k.  On June 9, 2017, DryShips announced that the Company had sold an additional 4,766,831 shares to Kalani at an average price of $1.82 per share, increasing the number of outstanding common shares to 20,566,235.

l.  On June 16, 2017, DryShips announced that the Company had sold an additional 5,195,050 shares to Kalani at an average price of $1.77 per share, increasing the number of outstanding common shares to 25,761,285.

m.  On June 19, 2017, DryShips announced a one-for-five reverse stock split.

n.  On June 22, 2017, DryShips executed the one-for-five reverse stock split, reducing the number of outstanding common shares from approximately 24 million shares to approximately 4.8 million shares.   Following this split, one share of DryShips common stock was equivalent to 67,200 shares immediately prior to the beginning of the Class Period

o.  On June 23, 2017, DryShips announced that the Company had sold an additional 3,868,393 shares to Kalani at an average price of $3.23 per share, increasing the number of outstanding common shares to 9,020,650.

p.  On June 30, 2017, DryShips announced that the Company had sold an additional 6,904,566 shares to Kalani at an average price of $1.93 per share, increasing the number of outstanding common shares to 15,925,216.

q. On July 7, 2017, DryShips announced that the Company had sold an additional 10,413,514 shares to Kalani at an average price of $1.07 per share, increasing the number of outstanding common shares to 26,609,379.

r. On July 14, 2017, DryShips announced that the Company had sold an additional 9,089,888 shares to Kalani at an average price of $0.90 per share, increasing the number of outstanding common shares to 35,699,267.

s. On July 18, 2017, DryShips announced a one-for-seven reverse stock split.

t. On July 21, 2017, DryShips executed the one-for-seven reverse stock split, reducing the number of outstanding common shares from approximately 36.3 million shares to approximately 5.2 million shares. Following this split, one share of DryShips common stock was equivalent to 470,400 shares immediately prior to the beginning of the Class Period

u. On July 25, 2017, DryShips announced that the Company had sold an additional 596,806 shares to Kalani at an average price of $0.84 per share prior to the July 21 reverse split, and an additional 13,995,486 shares to Kalani at an average price of $1.88 per share after the July 21 reverse split, increasing the number of common outstanding common shares to 19,180,639.

v. On July 28, 2017, DryShips announced that the Company had sold an additional 5,898,364 shares to Kalani at an average price of $1.11 per share, increasing the number of outstanding common shares to 25,079,003.

w. On August 4, 2017, DryShips announced that the Company had sold an additional 6,468,435 shares to Kalani at an average price of $1.31 per share, increasing the number of outstanding common shares to 31,547,436.

98.     Moreover, on April 10, 2017, DryShips filed an amendment to its 2017 Registration Statement on Form F-3 with the SEC to register up to $2 billion worth of common stock and other securities.  DryShips' 2017 Registration Statement was declared effective by the SEC as of April 26, 2017.

### 8.     August 2017: The SEC Subpoenas DryShips and the Scheme Ends

99.     On August 11, 2017, DryShips abruptly announced: (i) the termination of the April 3 Agreement with Kalani; (ii) that Economou agreed to refrain from selling his newly acquired common shares for 6 months; and (iii) DryShips agreed not to conduct any equity offerings until after December 31, 2017, unless approved by a majority of unaffiliated stockholders.

100.     The termination of the April 3 Agreement with Kalani was unexpected since the agreement had not been fully utilized.  By April 11, 2017, DryShips had sold to Kalani approximately $194 million worth of common shares out of the $226.4 million permitted by the April 3 Agreement.  Tellingly, the full capacity of the two previous Kalani common stock purchase agreements, which were nearly identical to the April 3 Agreement, had been fully utilized.

101.     Based on information and belief, the April 3 Agreement was terminated prior to its full utilization because DryShips had received a subpoena from the SEC inquiring about its financing transactions with Kalani.

102.     However, DryShips did not disclose that it had received a subpoena from the SEC until August 30, 2017, when it announced that the SEC was "requesting certain documents and information from the Company in connection with offerings made by the Company between June 2016 and July 2017."  The date that the subpoena was received has never been specified in

DryShips' public disclosures, though TOP Ships disclosed it had received a similar subpoena from the SEC on August 1, 2017.

103.    On August 1, 2018, DryShips announced its results of operations for the second quarter of 2018.  As of the date of this Amended Complaint, that filing contains DryShips' last public statement regarding the status of the subpoena it received from the SEC: "The Company received a subpoena from the SEC requesting certain documents and information from the Company in connection with offerings made by the Company between June 2016 and July 2017. The Company is providing the requested information to the SEC."  Based on information and belief, the SEC investigation remains ongoing.

104.    By the end of the Class Period, as a result of Defendants' ongoing dilutive and manipulative conduct, the price of DryShips common stock had declined to approximately $3.50 on an unadjusted basis.   At this share price, DryShips had a market capitalization of approximately $238 million, despite having raised over $700 million from investors since June 8, 2016.  The decimation of shareholder value was entirely attributable to the fraudulent financing scheme, through which Defendants manipulated the price of DryShips' common stock through manipulative and deceptive stock offerings and reverse stock splits.

105.    While shareholders lost millions of dollars, Defendants reaped the benefits of their fraudulent scheme.  Economou has earned millions of dollars through self-dealing, as monies have been funneled to companies he owns and controls, as detailed below.  Similarly, Kalani made hundreds of millions of dollars in commissions, fees, and profits from its resale of the discounted DryShips common stock to unsuspecting investors in the secondary market.

**D.      Defendants Rerouted Money Raised in the Fraudulent Financing Scheme to Their Related Affiliates**

106.    Throughout the Class Period, the DryShips Defendants rerouted hundreds of millions of dollars to affiliated entities that were raised by investors through their fraudulent scheme with Kalani.

107.    First, the Company issued quarterly dividends, payable as of March 31, May 15, and August 4, 2017, which each paid $2.5 million to DryShips' common stock owners – the largest of whom included Economou and Kalani.

108.    In addition, at all relevant times, DryShips has operated as an owner of vessels, the management and operation of which are contracted out to other entities, many or most of which are under the control of Defendants Economou and/or Kandylidis.   Through their affiliated entities, Economou and Kandylidis were motivated to, and did, derive substantial financial benefits prior to and throughout the Class Period that were dependent on the perpetration of Defendants' fraudulent scheme.

109.    The related party transactions, which benefitted Economou and Kandylidis, came at a substantial cost to DryShips and its investors.  For example, for years ended December 31, 2017 and 2016, DryShips recorded general and administrative expenses for related-party transactions of approximately $23.9 million and $32.4 million, respectively.  DryShips also reported a loss from the sale of vessel owning companies for related party transactions of $22.32 million in 2016.

110.    The relationship between Economou- and Kandylidis-controlled entities and DryShips are numerous and intertwined, often with several overlapping connections.  These relationships are explained more fully below, but can be summarized as follows:

a.  DryShips entered into consulting agreements or services with the following entities, all of which are controlled and/or beneficially owned by Economou and/or Kandylidis: (i) Fabiana Services S.A. ("Fabiana"); (ii) TMS Offshore Services Ltd. ("TMS Offshore"), TMS Tankers Ltd. ("TMS Tankers"), and TMS Bulkers Ltd. ("TMS Bulkers") (collectively, "TMS"); (iii) Vivid Finance Limited ("Vivid"); (iv) Basset Holdings Inc. ("Basset Holdings"); and (v) Cardiff Tankers Inc. ("Cardiff Tankers") and Cardiff Gas Ltd. ("Cardiff Gas");

b.  DryShips entered into a promissory note with the following entity, which is controlled and/or beneficially owned by Economou and Kandylidis: (i) Ocean Rig UDW, Inc. ("Ocean Rig"), a former subsidiary of DryShips where Economou remains CEO and Chairman and Kandylidis remains President and CFO, both of whom maintain substantial holdings in Ocean Rig; and

c.  DryShips entered into credit facility agreements or rights offerings with the following entities, all of which are controlled and/or beneficially owned by Economou: (i) Sifnos; (ii) Sierra Investments Inc. ("Sierra"); (iii) Mountain Investments Inc. ("Mountain"); and (iv) SPII Holdings.

111.    Additionally, DryShips entered into numerous agreements with undisclosed companies controlled and/or beneficially owned by Economou.

### 1.    Fabiana

112.    Economou owns and controls Fabiana, a Marshall Islands entity, and provided services as its CEO from 2008 until December 31, 2016.  Pursuant to the terms of their consulting agreement, DryShips was obligated to pay Fabiana annual remuneration and had discretion to award Fabiana a cash or equity based bonus compensation for services provided at the end of the year.

113.    Over the course of the consulting agreement, which was terminated at no cost on December 31, 2016, Fabiana received a total of 13.3 million shares of DryShips common stock and $1 million in cash.

### 2.    TMS Entities

114.    TMS, another Economou-controlled entity, also acted as a DryShips' consultant. Economou controls and beneficially owns TMS Offshore, TMS Tankers, and TMS Bulkers, which have managed DryShips' vessels since January 1, 2011.  According to DryShips' March 13, 2017 Form 20-F, DryShips "*depend[s] entirely on the TMS Entities to manage and charter [its] drybulk, tanker, LPG, and offshore support fleet*[.]"

115.    Specifically, TMS Bulkers provides comprehensive drybulk ship management services, including technical supervision, such as repairs, maintenance, and inspections, safety and quality, and crewing and training, as well as supply provisioning to DryShips.

116.    As reported in the Company's April 4, 2018 Form 20-F, during the years ended December 31, 2017 and 2016, total charges from TMS Bulkers under the management agreements amounted to $11.8 million and $19 million, respectively.

117.    TMS Offshore is responsible for providing overall technical and crew management of the Company's platform supply and oil spill recovery vessels.

118.    For the years ended December 31, 2017 and 2016, total charges from TMS Offshore Services amounted to $4.7 million and $4.6 million, respectively.

119.    TMS Tankers provides the commercial and technical management functions of DryShips' tankers, including while tankers are under construction.

120.    For the year ended December 31, 2017, total charges from TMS Tankers amounted to $1.4 million.

### 3.      Ocean Rig

121.     Prior to and throughout the Class Period, DryShips and Ocean Rig engaged in a series of financial agreements.  Ocean Rig is an international drilling contractor and former subsidiary of DryShips, of which Economou is the CEO and Chairman.  DryShips purchased 30% of Ocean Rig for $405 million in 2007, paying a $4 million brokerage free to Cardiff Marine, another Economou-owned company.  Kandylidis served as the President and CFO of Ocean Rig until January 2018, at which point he was appointed Executive Vice Chairman.

122.     On April 5, 2016, however, DryShips sold its stake in Ocean Rig to an Ocean Rig subsidiary for approximately $50 million.  The sales proceeds were then partly used to reduce the outstanding amount under the revolving credit facility provided to the Company by Sifnos, an entity beneficially owned by Economou.

### 4.      Sifnos and Sierra

123.     On October 21, 2015, as amended on November 11, 2015, DryShips entered into an Initial Revolving Credit Facility of up to $60 million for general working purposes with Sifnos, an entity that is controlled and beneficially owned by Economou.

124.     The 2015 Initial Revolving Credit Facility was secured by shares that DryShips held in Ocean Rig and Nautilus Offshore Services Inc. ("Nautilus"), a company acquired by DryShips in 2015 that was financed through an Economou-controlled entity, and by a first priority mortgage over one Panamax drybulk carrier.  The Initial Revolving Credit Facility was amended on March 24, April 5, September 9, and October 31, 2016.  As of December 2016, DryShips had repaid $33.5 million under this facility and wrote off approximately $1.6 million of overdue interest.

125.    Separately, on April 5, 2016, DryShips paid Sifnos an additional $45 million from the sale proceeds in connection with the sale of DryShips' ownership of Ocean Rig common stock.

126.    On December 30, 2016, Sifnos entered into a New Revolving Credit Facility of up to $200 million, which refinanced the majority of DryShips' outstanding debt, including that from the Initial Revolving Credit Facility.  The new agreement carried an interest rate of LIBOR plus 5.5%, was non-amortizing, had a tenor of three years, no financial covenants, and was arranged with a fee of 2.0%.  In addition, Sifnos had the ability to participate in realized asset value increases of the collateral base in a fixed percentage of 30%. As of December 31, 2016, there was $121 million outstanding under the New Revolving Credit Facility.

127.    On April 10, 2017, the credit facility was amended once again, resulting in an amendment fee of $2.0 million payable to Sifnos and an increased margin over LIBOR by 1% to 6.5%.

128.    On May 23, 2017, DryShips was released from all of its obligations and liabilities under the New Revolving Credit Facility from Sifnos and entered into a credit facility with Sierra (the "Sierra Credit Facility"), and a separate participation rights agreement with Mountain, an entity beneficially owned by Economou.

129.    The Sierra Credit Facility carried an interest rate of LIBOR plus 6.5%, was non-amortizing, had a tenor of five years, no financial covenants, and was arranged with a fee of 1%. Mountain also had the ability to participate in realized asset increases of all of DryShips present and future assets, except the vessel Samsara, in a fixed percentage of 30% in the case of their sale.

### 5. Vivid

130.    Vivid is controlled by Economou and has provided DryShips with financing-related services since 2010, including: (i) negotiating and arranging new loan and credit facilities, interest rate swap agreements, foreign currency contracts, and forward exchange contracts; (ii) renegotiating existing loan facilities and other debt instruments; and (iii) raising equity or debt in the capital markets.

131.    In exchange for its services, Vivid is entitled to a fee equal to 0.20% on the total transaction amount.  DryShips has not disclosed the fees that it paid to Vivid.

### 6. Basset Holdings

132.    Effective January 1, 2015, the Company entered into a consultancy agreement with Basset Holdings, a Marshall Islands company beneficially owned by Kandylidis. Basset Holdings provides the services of Kandylidis in his capacity as DryShips' Executive Vice President, President, and CFO.  Effective December 31, 2016, the consultancy agreement with Basset Holdings was terminated.  DryShips has not disclosed the fees that it paid to Basset Holdings.

### 7. Cardiff Tankers and Cardiff Gas

133.    Cardiff Tankers and Cardiff Gas, two Marshall Islands identities, are beneficially owned by Economou and provide services to DryShips related to the sourcing, negotiation, and execution of charters.  Cardiff Tankers and Cardiff Gas are entitled to a 1.25% commission on the charter hire earned by those vessels.  DryShips has not disclosed the amount that it has paid to Cardiff Tankers and Cardiff Gas for their services.

### 8.   Purchase and Sale Agreements for DryShips Vessels

134.   DryShips has a history of engaging in purchase and sale agreements with entities controlled by Economou for the benefit of Economou, many of which involve DryShips *paying* entities for vessels the entities purchased.

135.   This pattern began long before the Class Period and has continued to this day.

136.   For example, on March 24, 2016, DryShips executed a sales agreement with undisclosed entities controlled by Economou for the sale of DryShips' Capesize vessels (Rangiroa, Negonego, and Fakarava) for an aggregate price of $70 million, along with the associated debt of $102.1 million.  Since the debt associated with these vessels exceeded the purchase price, DryShips was obligated to pay the purchaser the difference between the purchase price and the outstanding balance of the debt.  DryShips made a prepayment of $15 million in this regard on March 30, 2016 and, on March 31, 2016, delivered the shares of the vessel owning companies to their new owners, *i.e.*, Economou.

137.   Similarly, on September 16, 2016, DryShips entered into a sale agreement with an undisclosed entity beneficially owned by Economou for the sale of shares of the owning company of the Panamax vessel, Oregon, including the associated bank debt, for a gross price of $4.675 million. As part of the transaction, DryShips *paid* $7.83 million, the difference between the purchase price and the outstanding balance of the respective debt facility, to Economou.

138.   Likewise, on October 26, 2016, the Company entered into a sales agreement with undisclosed entities beneficially owned by Economou for the sale of the owning companies of three Panamax vessels (Amalfi, Galveston (the vessel Galveston was sold and delivered to its owners on November 30, 2015), and Samatan), along with the associated bank debt for an aggregate gross price of $15 million.  As part of the transaction, the Company also *paid* the

amount of $58.7 million, being the difference between the purchase price and the outstanding balance of the respective debt facility, to the new owners, *i.e.*, Economou.

139.     On January 5, 2017, DryShips announced that it had entered into a "zero cost" LPG Option Agreement with undisclosed companies controlled by Economou to purchase up to four very large gas carriers ("VLGCs").  On January 19 and March 10, 2017, the first and second VLGCs were acquired, respectively, for a purchase price of $83.5 million each. In connection with this acquisition, DryShips entered into new service agreements with TMS and Cardiff Gas amounting to total charges of $0.5 million for the year ended December 31, 2017.

140.     The third and fourth VLGCs were acquired on April 6, 2017 for $83.5 million each.  For year ended December 31, 2017, DryShips reported operating expenses amounting to $5.7 million for three of the four VLGC vessels acquired.  The Company also reported general and administrative expenses related to three of the four VLGC vessels as amounting to $1.8 million.

141.     On May 15, 2017, DryShips entered into a purchase agreement with a company beneficially owned by Economou for the purchase of shares of the owning company of the Suezmax newbuilding vessel, Samsara, for a purchase price of $64 million.

### E.     Economou Manipulated His Ownership of DryShips Stock and Debt to Insulate Himself from Losses During the Scheme and Recoup Control of DryShips After the Scheme Ended

142.     In addition to the transactions described above, Defendant Economou personally profited through his control over DryShips stock and its debt.

143.     Over the course of the Class Period, Economou's ownership of DryShips common shares dwindled to less than 1%, effectively insulating himself from the price dilution resulting from Defendants' scheme, only to recoup control over the Company after the scheme was forced

to end.  The chronology of his ownership illustrates his manipulative control and is summarized in the chart below:

| Date | Economou Ownership |
|---|---|
| **Pre-Scheme** | |
| March 31, 2016 | 17.6% |
| **Mid-Scheme** | |
| September 16, 2016 | 7.5% |
| November 25, 2016 | 4.2% |
| | >1% |
| **Post-Scheme** | |
| September 5, 2017 | 53.5% |
| June 15, 2018 | 73.1% |
| September 19, 2018 | 76.2% |

144.    Prior to the scheme, on March 31, 2016, Economou owned 17.6% of the total outstanding common shares of DryShips stock.

145.    On September 16, 2016, Economou filed an amended Schedule 13D reporting he owned 1.2 million common shares of DryShips stock, or 7.5% of the total outstanding.

146.    On November 25, 2016, Economou filed an amended Schedule 13D reporting he owned 78,708 common shares, or 4.2% of the total outstanding.

147.    Over the course of the Class Period, Economou's ownership of common stock was diluted to approximately 10 shares, a small fraction of 1% of the total outstanding.

148.    On February 27, 2017, DryShips announced the initiation of a quarterly dividend and declared a dividend of $2.5 million to the common shareholders.

149.    To take advantage of the new dividend policy and the newly acquired wealth of the Company, Economou ultimately returned ownership to himself and recouped a majority interest in DryShips' common stock in a cashless transaction ostensibly valued at $100 million,

announced on August 11, 2017, after having made the Company much wealthier while existing shareholders' holdings were effectively worthless.

150.    Under the terms of the transaction, DryShips agreed to sell Economou $100 million worth of common shares for $2.75 per share.  However, Economou would pay no cash to the Company. Rather, Economou's consideration consisted of a number of arrangements with Economou-affiliated entities: (i) a 49% interest in a tanker operator, Economou-controlled Heidmar; (ii) the termination of participation rights owned by an Economou-affiliated investment company; (iii) forfeiture by Economou-controlled Sifnos of the super-voting Series D preferred shares beneficially owned by Economou; and (iv) cancellation of $27 million debt owed by DryShips to an Economou-affiliated investment company.

151.    Unsurprisingly, the shipping industry quickly questioned the value of this deal, noting that the Series D preferred shares were not convertible to common stock and casting doubt on whether the consideration was, in fact, worth $100 million.[7]

152.    Also on August 11, 2017, DryShips announced that it would conduct a rights offering to allow public shareholders to purchase up to $100 million worth of common shares for $2.75 per share, with any remaining shares to be purchased by an Economou-affiliated entity.

153.    On August 29, 2017, DryShips announced that the previously announced private placement with Economou had closed.

154.    After the scheme ended, on September 5, 2017, Economou filed a Schedule 13D reporting he owned 36,363,639 common shares, or 53.5% of the 67,911,072 outstanding as of September 1, 2017.

---

[7]      Michael Angell, *Other DryShips concessions could be worth around $48m*, TRADEWINDS (Aug. 15, 2017), http://www.tradewindsnews.com/finance/1327507/other-dryships-concessions-could-be-worth-around-usd-48m; Joe Brady, *Did DryShips shareholders pay fair price for Heidmar?*, TRADEWINDS (Aug. 16, 2017) http://www.tradewindsnews.com/weekly/1327505/did-dryships-shareholders-pay-fair-price-for-heidmar.

155.    On October 4, 2017, DryShips announced that the previously announced rights offering had closed, public shareholders predictably had elected to purchase only $0.8 million worth of shares, and the Economou-affiliated entity had therefore purchased the remaining $99.2 million worth of shares.   Following the rights offering, Economou owned 69.5% of the 104,274,708 million common shares outstanding.

156.    As of the date of this Amended Complaint, Economou's most recent Schedule 13D was filed on September 19, 2018.   That schedule reflects his ownership of 72,421,515 common shares, or 76.2% of the 95,009,710 total outstanding.   This also entitles Economou to 76.2% of the quarterly dividend.

157.    In addition, Economou consolidated his control over the debt of DryShips to his benefit over the course of the Class Period.

158.    On December 2, 2016, DryShips announced that an Economou-controlled company became the lender of record under an $85.1 million syndicated loan previously held by a third party, following which Economou-affiliated entities controlled over 90% of DryShips' outstanding debt.

159.    Shortly thereafter, on December 16, 2016, DryShips announced an agreement with the Economou-controlled Sifnos to refinance the majority of the Company's outstanding debt. Sifnos would extend a new loan of up to $200 million secured by almost all of the company's assets, in exchange for interest of LIBOR plus 5.5% and an arrangement fee of 2% (*i.e.*, an upfront payment of $4 million from DryShips).   In addition, Sifnos would obtain the benefit of 30% of any increase in DryShips' realized asset value (*i.e.*, if DryShips sold a vessel for a gain, DryShips would have to pay Sifnos 30% of the gain).

## V.   DEFENDANTS' MATERIAL MISREPRESENTATIONS AND MISLEADING OMISSIONS DURING THE CLASS PERIOD

160.   During the Class Period, Defendants made numerous false and misleading statements and omissions.

161.   First and foremost, neither the 2015 Registration Statement nor the Prospectus Supplements, filed on June 8, November 17, and December 27, 2016 and February 17 and April 3, 2017, in connection with the securities issuances to Kalani and incorporated into the 2015 Registration Statement, disclosed Defendants' scheme to manipulate the price of DryShips common stock through a coordinated series of dilutive stock issuances and reverse stock splits designed to enrich Defendants at the expense of shareholders.

162.   These omissions artificially inflated DryShips' common stock price and were material to shareholders who would not have purchased DryShips common stock, or would not have purchased stock in the same prices or amounts, had the scheme been disclosed.  DryShips' 2015 Registration Statement, under which the stock was sold, failed to disclose this scheme, although disclosure was required, including, *inter alia*, under Item 303 of SEC Regulation S-K ("Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way"), and Item 503 of SEC Regulation S-K ("provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky").

163.   Instead, the 2015 Registration Statement contained certain boilerplate disclosures about the potential for purportedly hypothetical dilution from purportedly hypothetical future share issuances, including that, *inter alia*:

a. "The market price of our common shares ***could*** decline due to sales, or the announcements of proposed sales, of a large number of common shares in the market, including sales of common shares by our large shareholders, or the perception that these sales could occur." [Emphasis added];

b. "We ***may*** issue such additional equity or convertible securities to raise additional capital. The issuance of any additional shares of common or preferred stock or convertible securities ***could be substantially dilutive*** to our shareholders. Moreover, to the extent that we issue restricted stock units, stock appreciation rights, options or warrants to purchase our common shares in the future and those stock appreciation rights, options or warrants are exercised or as the restricted stock units vest, our shareholders ***may experience further dilution***. Holders of shares of our common shares have no preemptive rights that entitle such holders to purchase their pro rata share of any offering of shares of any class or series and, therefore, such sales or offerings ***could*** result in increased dilution to our shareholders." [Emphasis added]; and

c. "[O]ur existing shareholders' proportionate ownership interest in us will decrease; . . . the relative voting strength of each previously outstanding common share ***may*** be diminished; and . . . the market price of shares of our common stock ***may*** decline." [Emphasis added].

164.   The 2015 Registration Statement further stated: "We intend to use the net proceeds [from the sale of the offered securities] for general corporate purposes" and/or "to repay indebtedness under one or more of our existing credit facilities . . ., although we have no present agreements to do so."

165.    The statements in ¶¶163-64 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because: (i) DryShips and Kalani were in the midst of a continuing dilutive share issuance and reverse stock split scheme to raise additional equity, which they intended to continue for the foreseeable future (and which was, in fact, continued until Defendants learned that the SEC was investigating their scheme); (ii) the ongoing stock issuances were not accretive to shareholder value, but, in fact, harmed shareholders for the benefit of Economou and Bistricer; and (iii) the proceeds were not used "for general corporate purposes" and/or "to repay indebtedness," but instead were misappropriated to personally enrich Defendants at shareholders' expense.

166.    Second, despite its status as an underwriter, Kalani failed to register with the SEC as a dealer in securities, and DryShips' initial public disclosures during the Class Period failed to identify Kalani as a securities dealer.

167.    These omissions were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because they gave the false impression that Kalani was a sophisticated institutional investor committing large amounts of its own funds to the Company – a significant vote of confidence if true.  In fact, Kalani was promptly reselling the securities bought from DryShips for a profit.  Section 15(a)(1) of the Exchange Act requires a broker or dealer to register as such with the SEC.  Section 3(a)(5) of the Exchange Act defines a "dealer" as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise."  As a registered securities dealer, Kalani would have been required to file public disclosures with the SEC alerting the investing public to its operations as a securities dealer.  Kalani made no such disclosures.

168.     The 2015 Registration Statement also violated Item 508 of SEC Regulation S-K ("Item 508"), 17 C.F.R. §229.508(a), which regulates the content of registration statements, and states, as follows:

> If the securities are to be offered through underwriters, name the principal underwriters, and state the respective amounts underwritten. Identify each such underwriter having a material relationship with the registrant and state the nature of the relationship. State briefly the nature of the obligation of the underwriter(s) to take the securities.

In violation of Item 508, Kalani was not named, and its relationship as a co-conspirator in the fraudulent stock manipulation scheme was not disclosed.

169.     The 2015 Registration Statement also violated §229.508(c)(2) of Item 508, which states:

> If the securities are to be offered through the selling efforts of brokers or dealers, describe the plan of distribution and the terms of any agreement, arrangement, or understanding entered into with broker(s) or dealer(s) prior to the effective date of the registration statement, including volume limitations on sales, parties to the agreement and the conditions under which the agreement may be terminated. If known, identify the broker(s) or dealer(s) which will participate in the offering and state the amount to be offered through each.

Again, Defendants completely failed to comply with these requirements.

170.     The 2015 Registration Statement also violated §229.508(*l*)(1) of Item 508, which states:

> Briefly describe any transaction that the underwriter intends to conduct during the offering that stabilizes, maintains, or otherwise affects the market price of the offered securities. Include information on stabilizing transactions, syndicate short covering transactions, penalty bids, or any other transaction that affects the offered security's price. Describe the nature of the transactions clearly and explain how the transactions affect the offered security's price. Identify the exchange or other market on which these transactions may occur. If true, disclose that the underwriter may discontinue these transactions at any time.

In violation of this provision, Defendants did not disclose that Kalani would convert its preferred shares into the market shortly after the issuance and severely impact the price of DryShips stock.

171.    Third, the June 8, 2016 Form 6-K, which Defendant Economou signed, announced a Securities Purchase Agreement, dated June 8, 2016, which was annexed as an exhibit.  The Securities Purchase Agreement stated the following regarding manipulation of the price of DryShips' securities, without limitation:

> Neither the Company nor any of its Subsidiaries has, and, to the knowledge of the Company, no Person acting on their behalf has, directly or indirectly, (i) taken any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company or any of its Subsidiaries to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities (other than the Financial Advisor), or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company or any of its Subsidiaries.

172.    The Securities Purchase Agreement further represented:  "The Company does not have any agreement or understanding with any Buyer with respect to the transactions contemplated by the Transaction Documents other than as specified in the Transaction Documents."

173.    In the Securities Purchase Agreement, DryShips also disclosed the following regarding disclosure of material, non-public information, without limitation:

> The Company confirms that neither it nor any other Person acting on its behalf has provided any of the Buyers or their agents or counsel with any information that constitutes or could reasonably be expected to constitute material, non-public information concerning the Company or any of its Subsidiaries, other than the existence of the transactions contemplated by this Agreement and the other Transaction Documents. The Company understands and confirms that each of the Buyers will rely on the foregoing representations in effecting transactions in securities of the Company. All disclosure provided to the Buyers regarding the Company and its Subsidiaries, their businesses and the transactions contemplated hereby, including the schedules to this Agreement, furnished by or on behalf of the Company or any of its Subsidiaries, taken as a whole, is true and correct and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. All of the written information furnished after the date hereof by or on behalf of the Company or any of its Subsidiaries to each Buyer pursuant to or in connection with this Agreement and the other Transaction Documents, taken as a whole, will

be true and correct in all material respects as of the date on which such information is so provided and will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. No event or circumstance has occurred or information exists with respect to the Company or any of its Subsidiaries or its or their business, properties, liabilities, prospects, operations (including results thereof) or conditions (financial or otherwise), which, under applicable law, rule or regulation, requires public disclosure at or before the date hereof or announcement by the Company but which has not been so publicly disclosed. All financial projections and forecasts that have been prepared by or on behalf of the Company or any of its Subsidiaries and made available to the Buyers have been prepared in good faith based upon reasonable assumptions and represented, at the time each such financial projection or forecast was delivered to each Buyer, the Company's best estimate of future financial performance (it being recognized that such financial projections or forecasts are not to be viewed as facts and that the actual results during the period or periods covered by any such financial projections or forecasts may differ from the projected or forecasted results). The Company acknowledges and agrees that no Buyer makes or has made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in Section 2.

174.    The statements in ¶¶171-73 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because DryShips and Kalani were in the midst of a collusive dilutive share issuance and reverse stock split scheme specifically designed to manipulate the price of DryShips stock and enrich Defendants at shareholders' expense.

175.    Fourth, in a September 14, 2016 DryShips press release announcing a financing transaction between DryShips and a company controlled by Economou, Defendant Kandylidis stated: "'We are pleased to see our founding shareholder actively supporting the company in a way that is *not dilutive* to the rest of our shareholders.'" [Emphasis added].

176.    The statements in ¶175 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because Defendants were already engaged in an extremely dilutive share issuance scheme that they planned to continue for many months (and likely would have continued even longer had the SEC not

intervened).  In fact, only five days earlier, on September 9, 2016, DryShips and Economou had amended the terms of the DryShips-Sifnos financing agreement to cede permanent voting control over the Company to Economou for no consideration, apparently for the purpose of enabling Economou to amend DryShips' Articles of Incorporation to allow for unlimited reverse stock splits going forward on an as-needed basis with no time limit.

177.   Fifth, in two DryShips shareholder proxies, signed by Economou and dated September 20, 2016 and April 3, 2017, both of which sought shareholder approval to amend DryShips' Articles of Incorporation to allow for one or more reverse stock splits at ratios of up to one-for-1,000, Economou and DryShips stated that the "purpose for seeking approval to effect the reverse stock split is to increase the market price of each Common Share," further assured investors that the DryShips "Board believes that" the reverse split proposal "is in the best interest of the Company and the shareholders," and "a reverse stock split will only be effected, if at all, upon a determination by the Board of Directors that a reverse stock split is in the Company's and the shareholders' best interests."

178.   The statements in ¶177 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because continuation of the dilutive share issuance and reverse stock split scheme caused DryShips' common stock price to plummet and so, was not in shareholders' best interests. These statements were also materially false and misleading because Defendants knew there would be no independent process to review their already made decision to execute numerous reverse stock splits.

179.   Seventh, in a May 30, 2017 press release announcing DryShips' new credit facility, filed as an exhibit to a DryShips Form 6-K, Defendant Economou is quoted as

commenting: "'*This will allow us to focus on further accretive vessel acquisitions **without the need to raise further equity.***'"   [Emphasis added in bold].

180.   The statements in ¶179 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because DryShips and Kalani were in the midst of a continuing dilutive share issuance and reverse stock split scheme to raise additional equity that they intended to continue for the foreseeable future (and which was, in fact, continued until Defendants learned that the SEC was investigating their scheme). DryShips announced additional sales of millions of common shares to Kalani on June 2, June 9, June 16, June 23, June 30, July 7, July 14, July 25, July 28, and August 4, 2017, and executed an additional reverse stock split on June 22, 2017.  These statements were also materially false and misleading because the ongoing stock issuances were not accretive to shareholder value, but, in fact, harmed shareholders for the benefit of Economou and Bistricer.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

181.   At all relevant times throughout the Class Period, Defendants knew and/or recklessly disregarded that, *inter alia*, Defendants were engaged in an ongoing financing scheme involving a series of reverse stock splits and share issuances, which were intended to, and did, in fact, manipulate the price of DryShips common stock in order to benefit Defendants at the expense of shareholders.  In addition to the allegations set forth herein, each of the following demonstrates Defendants' scienter:

### A.   Defendants Coordinated the Stock Issuances and Reverse Stock Splits

182.   At all relevant times, Defendants had direct access to information concerning DryShips' business, operations, and finances.  Through their ownership and/or control of DryShips and numerous related parties, Defendants Economou and Kandylidis also exerted their

influence over the Company's Board to perpetuate the fraudulent financing scheme as described herein.

183.    The timing, sequence, and sheer number of the share issuances, common stock conversions and sales, and reverse stock splits in a matter of months are highly suspicious and indicative of a coordinated and ongoing effort among Defendants to manipulate DryShips' stock price and deceive investors.

184.    Further, the stock issuances and subsequent dilutive reverse stock splits were all perfectly timed to coincide with intervening increases in the number of shares outstanding and subsequent stock price declines, as Kalani converted its securities and sold common shares into an artificially inflated market.  This toxic cycle could not have occurred except with Defendants' knowledge of, and participation in, a deliberate fraudulent scheme.

### B.    Defendant Economou Personally Profited from the Fraudulent Scheme

185.    As discussed more fully in §IV.D, Defendant Economou, entities he owns and/or controls, and other related parties derived substantial profits from the financing scheme, while preserving Economou's position of power and control over DryShips, both during and continuing after the Class Period.

186.    Specifically, DryShips paid hundreds of millions of dollars to Economou-controlled entities over the course of the Class Period for the following purported services: vessel sales, vessel management fees, and financing.

187.    Defendant Economou also profited as a result of his control over DryShips as its largest shareholder and largest creditor.  Utilizing his power and influence, Economou caused DryShips to issue him preferred stock with "super-voting" rights, which enabled him to secure voting control and approve the reverse stock splits that were critical to Defendants' scheme.  At the same time, Economou insulated himself from the stock price drop over the course of the

scheme, only to recoup control after the scheme ended in a cashless transaction and share buy-backs financed by the fraudulent scheme after the Company became significantly wealthier at existing shareholders' expense.

### C. Defendants Kalani and Bistricer Personally Profited from the Fraudulent Scheme

188.    Kalani also profited as a direct result of its knowledge and participation in Defendants' fraud, earning millions of dollars in commitment fees and perfectly timed conversions and sales of discounted securities to align with the DryShips Defendants' planned reverse stock splits.

189.    In addition, at the same time as the scheme with the DryShips Defendants, Kalani executed nearly identical schemes with two other Greek shipping companies, Diana Containerships and TOP Ships.

190.    The pattern with DryShips, Diana Containerships and TOP Ships was the same: (i) enter into agreements to sell securities convertible to common stock at a discount to Kalani; (ii) dump that stock into the market; (iii) cause the company's stock price to decline; (iv) execute reverse stock splits; (v) thereby raise the stock price; and (vi) repeat – all the while profiting while selling discounted shares into an artificially propped up market.

191.    Upon information and belief, Kalani funneled approximately $700 million in "financing" to DryShips in exchange for various convertible securities, which it then resold at a profit.   Likewise, Kalani engaged in similar "financing" arrangements with TOP Ships, for approximately $40 million, and Diana Containerships, for approximately $150 million. Moreover, like here, the SEC is investigating Kalani's transactions with TOP Ships.

192.    Kalani's repeated use of the same financing scheme to target three companies in the Greek shipping industry, at the same time, is indicative of Defendants' knowledge and intent to mislead investors and fraudulently manipulate DryShips' stock price.

## VII.    LOSS CAUSATION

193.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

194.    Throughout the Class Period, the price of DryShips' common stock was artificially inflated and/or maintained at an artificially high level, as a result of Defendants' fraudulent scheme to manipulate DryShips' stock price for the purpose of diverting Company assets and/or profits from sales of DryShips securities to Defendants, at the expense of investors and as a result of Defendants' materially false and misleading statements and omissions identified herein.

195.    As the true facts became known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of DryShips common stock declined, as the artificial inflation was removed from the market price of the stock, causing damage to Plaintiffs and members of the Class.

196.    The risks of Defendants' fraudulent financing scheme began to materialize following DryShips' announcements that the Company entered into the first of five common stock purchase agreements with Kalani.  Subsequently, as Defendants planned, the Kalani Defendants began converting these securities into common shares and dumping them onto the secondary market, driving the price of DryShips' common stock down and extracting value from shareholders.

197.    The seven reverse stock splits resulted in temporary increases in the unadjusted share price of DryShips' common stock.

198.    The value of DryShips' common stock continued to dissipate everyday thereafter as Defendants began to flood the market with excess shares, driving the price down and further damaging Plaintiffs and the other Class members.

199.    The value of DryShips' common stock continued to dissipate and shareholders continued to suffer damages everyday thereafter as Kalani continued to flood the market with newly converted shares, driving DryShips' share price down.

200.    By August 29, 2017, as a result of Defendants' ongoing fraudulent and manipulative conduct, the price of DryShips' common stock had declined to close at $3.50 per share on an unadjusted basis.  At this share price, DryShips had a market capitalization of approximately $238 million, despite having raised $700 millions of dollars from investors since June 8, 2016.  This shocking erosion in shareholder value was the direct result of Defendants' fraudulent scheme to manipulate the price of DryShips common stock and to induce purchases through the series of dilutive and manipulative stock offerings and reverse stock splits detailed herein.

201.    As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of the DryShips' securities, which are now virtually worthless, Plaintiffs and the other Class members have suffered significant losses and damages.

## VIII.   CLASS ACTION ALLEGATIONS

202.    Plaintiffs bring this action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that purchased, or otherwise acquired, the securities of DryShips during the Class Period, and who were damaged thereby, seeking to pursue remedies under the Exchange Act.  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times;

members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have, or had, a controlling interest.

203.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DryShips common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of DryShips shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by DryShips or its transfer agent and may be notified of the pendency of this action by U.S. mail, using the form of notice similar to that customarily used in securities class actions.

204.    Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws, which is complained of herein.  Further, Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

205.    Common questions of law and fact exist, as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.    whether the federal securities laws were violated by Defendants' conduct alleged herein;

b.     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of DryShips;

c.     whether the Individual Defendants caused DryShips to issue false and misleading financial statements during the Class Period;

d.     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.     whether the prices of DryShips securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;

f.     the extent to which Class members have sustained damages and the proper measure of damages; and

g.     whether Defendants' manipulative conduct negatively impacted the price of DryShips stock.

206.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

207.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.    the omissions and misrepresentations were material;

c.    DryShips securities are traded in an efficient market;

d.    the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.    the Company traded on the NASDAQ and was covered by multiple analysts;

f.    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.    Plaintiffs and members of the Class purchased, acquired, and/or sold DryShips securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

## IX.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

208.    The market for DryShips common stock was open, well developed, and efficient at all relevant times.  As a result of Defendants' materially false or misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period.  On November 15, 2016, the Company's stock closed at a Class Period high of $73.00 per share.  Plaintiffs and other members of the Class purchased, or otherwise acquired, the Company's common stock, relying on the integrity of the market price of such securities and on publicly available market information relating to DryShips.  Plaintiffs and Class members have been damaged thereby.

209.    During the Class Period, the artificial inflation of the value of DryShips common stock was caused by the material misrepresentations and omissions alleged in this Amended

Complaint, thereby causing the damages sustained by Plaintiffs and the other Class members. As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times.  When the truth was disclosed, it drove down the value of the Company's common stock, causing Plaintiffs and the other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

210.    At all relevant times, the market for DryShips common stock was efficient for the following reasons, among others:

a.    DryShips stock met the requirements for listing and it was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.    as a regulated issuer, DryShips filed periodic public reports with the SEC and/or the NASDAQ;

c.    DryShips regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.    DryShips was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available; and

     e.    DryShips common stock traded at a high weekly volume.

211.    Based on the foregoing, during the Class Period, the market for DryShips common stock promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of DryShips stock.   Under these circumstances, the market for DryShips common stock was efficient during the Class Period and, therefore, investors' purchases of DryShips common stock at artificially inflated market prices gave rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

212.    In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts, which concealed that DryShips had devised a scheme, along with Kalani, to deliberately manipulate the price of DryShips common stock through an illicit and dizzying series of dilutive issuances and reverse stock splits that resulted in shareholders losing more than 99.999% of the value of their shares in a matter of months – all while Defendants lined their pockets with $700 million of shareholders' money.

## X.    NO SAFE HARBOR

213.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein.   To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual

knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

**COUNT I**
**Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**<u>Against All Defendants</u>**

214.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

215.    During the Class Period, Defendants: (i) knowingly, or with deliberate recklessness, deceived the investing public, including Plaintiffs and Class members, as alleged herein; (ii) artificially inflated the market price of DryShips common stock; and (iii) caused Plaintiffs and Class members to purchase, or otherwise acquire, DryShips common stock at artificially inflated prices.

216.    Each of the Defendants, in violation of §10(b) of the Exchange Act and Rule 10b-5(b), made false statements of material facts and omitted to state material facts necessary to make the statements made by Defendants not misleading, which operated as a fraud and deceit upon Plaintiffs and the Class, in an effort to create or maintain an artificially inflated price of DryShips common stock during the Class Period. Defendants' material misrepresentations and omissions are alleged in §V, *supra*.

217.    As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

218.    As officers, directors, and controlling persons of a publicly held Company, whose common stock is registered with the SEC, pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual

59

Defendants each had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects and to correct any previously issued statements that had become materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

219.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the U.S. mails, made, or substantially participated in, the creation and/or dissemination of false or misleading statements of material fact, as set forth herein, or with deliberate recklessness failed to ascertain and disclose truthful facts, even though such facts were available to them.

220.    The facts alleged herein give rise to a strong inference that each of the Defendants acted with scienter. Each of the Defendants knew, or with deliberate recklessness disregarded, that the Class Period statements, set forth in §V, *supra*, contained material misrepresentations and omissions for the reasons set forth herein.

221.    By virtue of the Individual Defendants' positions of management and control within DryShips, they had access to undisclosed adverse information about the Company and its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through the Company's internal corporate documents; conversations and connections with each other and corporate officers and employees; attendance at sales, management, and Board meetings, including committees thereof; and reports and other information provided to them in connection with their roles and duties as DryShips officers and/or directors.

222.    The Individual Defendants were aware, or with deliberate recklessness disregarded, that material misrepresentations and omissions were being made regarding the Company and approved or ratified such statements in violation of the federal securities laws.

223.    As a result of Defendants' dissemination of the materially false or misleading information and their failure to disclose material facts, as alleged herein, the market price of DryShips common stock was artificially inflated throughout the Class Period.  Unaware that the market price of DryShips common stock was artificially inflated; relying directly or indirectly on the false or misleading statements made by Defendants, at the times such statements were made, or relying upon the integrity of the markets in which DryShips common stock traded; and in the absence of material adverse information that was known, or with deliberate recklessness disregarded, by Defendants, but not disclosed to the public, Plaintiffs and Class members purchased, or otherwise acquired, DryShips common stock at artificially inflated prices.

224.    Had Plaintiffs and the other Class members known the truth regarding the problems that DryShips was experiencing, which was not disclosed by Defendants, Plaintiffs and the other Class members would not have purchased, or otherwise acquired, DryShips common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

225.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases and sales of DryShips common stock during the Class Period, when the artificial inflation in the price of such securities dissipated, as the truth regarding Defendants' conduct was revealed, causing the price of DryShips common stock to decline, resulting in economic losses to Plaintiffs and the Class.

226.     By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and they are liable to Plaintiffs and the Class for damages suffered in connection with their transactions in DryShips common stock during the Class Period.

## COUNT II
### Violation of §9 of the Exchange Act
### <u>Against All Defendants</u>

227.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

228.     Defendants violated §9 of the Exchange Act in that they conspired to engage, and did engage, in a deceptive financing scheme to manipulate the price of DryShips common stock and induce the purchase of DryShips common stock by others in violation of §9(a)(2) of the Exchange Act.

229.     Further, to induce the purchase of DryShips common stock, through their dissemination of false statements during the Class Period, Defendants   misled   investors concerning the nature of their actions and their effect on DryShips common stock in violation of §9(a)(4) of the Exchange Act.

230.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and members of the Class suffered damages in connection with their respective purchases and sales of DryShips common stock during the Class Period

## COUNT III
### Violation of §20(a) of the Exchange Act
### <u>Against the Individual Defendants</u>

231.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is asserted against the Individual Defendants.

232.   DryShips is a primary violator of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

233.   The Individual Defendants acted as controlling persons of DryShips within the meaning of §20(a) of the Exchange Act.   Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence, and, during the Class Period, did exercise their power to control and influence, the conduct giving rise to the violations of the federal securities laws alleged herein.   The Individual Defendants prepared, or were responsible for preparing, the Company's press releases and SEC filings and made statements to the market in SEC filings, annual reports, press releases, news articles, and conference calls.   The Individual Defendants controlled DryShips and each of its employees.

234.   The Individual Defendants were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.   The Individual Defendants were provided with copies of the documents, as alleged herein, to contain material misrepresentations and omissions prior to, or shortly after, their issuance and had the ability and/or opportunity to prevent the issuance of such documents or cause them to be corrected.   Accordingly, the Individual Defendants are responsible for the accuracy of the Company's public reports and releases.

235.   By virtue of their positions as controlling persons of DryShips, and by reason of the conduct described in this Count, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for controlling a primary violator of the federal securities laws.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other

Class members suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT IV
### Violation of §20A of the Exchange Act
### <u>Against All Defendants</u>

236.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

237.    As discussed herein, Defendants each committed underlying violations of §10(b) of the Exchange Act and Rule 10b-5 thereunder by selling DryShips common stock while in possession of material, nonpublic information concerning the manipulative scheme and, consequently, are liable to contemporaneous purchasers of that stock under §20A of the Exchange Act.  *See* 15 U.S.C. §78t-1(a).

238.    Throughout the Class Period, Defendants sold DryShips common stock they received from the Company at prices above that which those shares would trade shortly after the sale.  They are, therefore, liable under §20A of the Exchange Act to all Class members who purchased DryShips common stock at inflated prices contemporaneously with sales by Defendants, accounting for millions of dollars in losses.

239.    Similarly, Defendant Economou, who owns and controls DryShips, committed underlying violations of §10(b) of the Exchange Act and Rule 10b-5 thereunder by reducing his holdings of DryShips common stock and subsequently repurchasing while in possession of material, nonpublic information concerning the manipulative scheme and, consequently, is liable to contemporaneous purchasers of that stock under §20A of the Exchange Act.  *See* 15 U.S.C. §78t-1(a).

240.    Section 20A of the Exchange Act provides that "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security

while in possession of material, nonpublic information shall be liable in an action . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class."

241.    As set forth above, Defendants each committed underlying violations of §10(b) of the Exchange Act and Rule 10b-5 thereunder by their acts and omissions, as alleged in this Amended Complaint.   Specifically, Defendants sold DryShips common stock while in possession of material, nonpublic information about the manipulative scheme alleged herein. Consequently, they are liable pursuant to §20A of the Exchange Act to Plaintiffs and all other Class members who purchased common stock contemporaneously with Defendants' sales of DryShips common stock throughout the Class Period.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Fed. R. Civ. P. 23;

B.    Awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## XII.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:   September 21, 2018
New York, New York

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

  */s/ Thomas L. Laughlin, IV*
Thomas L. Laughlin, IV
Rhiana Swartz
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
tlaughlin@scott-scott.com
rswartz@scott-scott.com

Shannon L. Hopkins (SH-1887)
**LEVI & KORSINSKY, LLP**
733 Summer Street, Suite 304
Stamford, CT 06901
Telephone: (203) 992-4523
Facsimile:  (212) 363-7171
shopkins@zlk.com

*Counsel for Lead Plaintiff DRYS Investor Group*

66