## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERBERT SILVERBERG, Individually and on Behalf of All Others Similarly Situated, | Civil Action No.: 2:17-cv-04547-GRB-ARL |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| DRYSHIPS INC., GEORGE ECONOMOU, ANTHONY KANDYLIDIS, KALANI INVESTMENTS LIMITED, MURCHINSON LTD., and MARC BISTRICER, | |
| Defendants. | |

## CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.   SUMMARY OF THE ACTION ..................................................................................1

II.  JURISDICTION AND VENUE ................................................................................5

III. PARTIES ...................................................................................................................5

IV.  SUBSTANTIVE ALLEGATIONS ...........................................................................8

    A.   George Economou and DryShips...................................................................8

    B.   Marc Bistricer and Kalani .............................................................................9

    C.   Defendants' Fraudulent Scheme ..................................................................10

        1.   June-August 2016: Defendants Launch Their Scheme to Manipulate the Market for DryShips Common Stock ..................................................10

        2.   September-October 2016: Defendant Economou Locks Up Voting Control of the Company and Approves Additional Reverse Stock Splits to Further the Fraudulent Scheme.....................................................17

        3.   November 2016: The Scheme Continues with Another Reverse Stock Split and Second Agreement with Kalani.........................................18

        4.   December 2016-January 2017: The Scheme Continues with a Third Agreement with Kalani as Underwriter, More Dilutive Stock Sales, and a Fourth Reverse Stock Split...............................................................21

        5.   February-March 2017: The Scheme Continues with a Fourth Agreement with Kalani and More Dilutive Stock Sales...........................26

        6.   April-August 2017: The Scheme Escalates with a Fifth and Final Agreement with Kalani, Even More Dilutive Stock Sales, and Four More Reverse Stock Splits.....................................................................29

        7.   August 2017: The SEC Subpoenas DryShips and the Scheme Ends.........36

    D.   DryShips' and Kalani's Undisclosed Agreement Can Be Inferred from Their Conduct ..............................................................................................37

    E.   Defendants Diverted Money Raised in the Fraudulent Financing Scheme to Their Related Affiliates................................................................................43

        1.   Fabiana .................................................................................................44

        2.   TMS Entities ........................................................................................45

3.    Ocean Rig .................................................................................46

4.    Sifnos and Sierra .....................................................................46

5.    Vivid .........................................................................................47

6.    Basset Holdings .......................................................................48

7.    Cardiff Tankers and Cardiff Gas...........................................48

8.    Purchase and Sale Agreements for DryShips Vessels ...............48

F.    Economou Manipulated His Ownership of DryShips Stock and Debt to
Recoup Control of DryShips After the Scheme Ended Before Taking the
Company Private ..................................................................................50

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS DURING THE CLASS PERIOD ......................................52

VI.   ADDITIONAL SCIENTER ALLEGATIONS .................................................57

A.    Defendants Reached an Undisclosed Agreement to Coordinate the Stock
Issuances and Reverse Stock Splits ....................................................57

B.    Defendant Economou Personally Profited from the Fraudulent Scheme .............57

C.    Defendants Kalani and Bistricer Personally Profited from the Fraudulent
Scheme ..................................................................................................58

VII.  LOSS CAUSATION/MATERIALIZATION OF THE RISK...........................59

VIII. CLASS ACTION ALLEGATIONS .................................................................61

IX.   NO SAFE HARBOR .......................................................................................64

X.    PRAYER FOR RELIEF ...................................................................................67

XI.   JURY TRIAL DEMANDED ...........................................................................68

Lead Plaintiffs Robert Luke, Chayn Mousa, Mary Jane Silvey, Kamal Kheridden, and Konrad Wottge (collectively, the "DRYS Investor Group" or "Plaintiffs"), by and through their attorneys, and on behalf of all others similarly situated, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief are based on, among other things, their counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by DryShips Inc. ("DryShips" or the "Company"); (b) a review and analysis of press releases and media reports disseminated by the Company; and (c) a review of other publicly available information concerning Defendants.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

1.      This is a securities class action brought to pursue remedies under Sections 9(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against Defendants on behalf of all persons or entities that purchased, or otherwise acquired, DryShips common stock between June 8, 2016 and August 29, 2017, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

2.      This action arises from an undisclosed fraudulent agreement among Defendants DryShips, George Economou ("Economou"), Anthony Kandylidis ("Kandylidis" and, collectively with DryShips and Economou, the "DryShips Defendants"), and Kalani Investments Limited ("Kalani"), a hedge fund owned and controlled by Defendants Murchinson Ltd. ("Murchinson") and Marc Bistricer ("Bistricer" and, collectively with Kalani and Murchinson, the "Kalani Defendants") to manipulate the price of DryShips common stock for the benefit of Defendants and at the expense of investors who purchased DryShips common stock during the Class Period. Defendants' scheme, which enabled the DryShips Defendants to raise approximately $700 million

1

from unsuspecting investors, has rendered those investors' holdings of DryShips common stock virtually worthless.

3.      DryShips, which owns drybulk carriers and offshore support cargo shipping vessels operating worldwide, is headquartered in Athens, Greece, and is incorporated in the Marshall Islands.  Before it was taken private by Defendant Economou in October 2019, DryShips common stock traded on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "DRYS."  At the beginning of the Class Period, DryShips was financially troubled and had a market capitalization of only $60 million.  Economou himself admitted that the Company was "'practically bankrupt' back in 2016."[1]  Unable to access the U.S. securities markets to raise capital by conventional means, DryShips met with Kalani in early 2016 and together they reached the undisclosed agreement to manipulate DryShips share price alleged herein.

4.      Specifically, DryShips and Kalani agreed that:  (i) DryShips would issue common stock (or other securities convertible into its common stock) to Kalani on favorable terms in a series of highly unusual PIPEs (private investment in public equity) transactions; (ii) DryShips would manipulate its stock price to enable Kalani to profitably convert warrants and/or sell DryShips common stock acquired in these transactions by conducting reverse stock splits whenever DryShips' stock price fell below the floor price specified in the PIPEs transactions; and (iii) Kalani would convert the warrants and/or purchase the common stock in response to the price increases occasioned by the reverse stock splits, thereby injecting capital into DryShips that could be diverted to insiders and/or companies they controlled (the "Undisclosed Agreement" or "Agreement").  As explained herein, in the absence of DryShips' Undisclosed Agreement to execute reverse stock splits to raise the market price of DryShips common stock above the floor

---

[1]      Harry Papachristou, *Economou on the art of perseverance*, TRADEWINDS (May 31, 2018), http://www.trade windsnews.com/tankers/1493029/economou-on-the-art-of-perseverance.

price in the PIPEs transactions, Kalani would have had no incentive to continue converting the warrants or purchasing DryShips common stock as the conversion/purchase price would have substantially exceeded the market price of DryShips common stock. Accordingly, DryShips' Undisclosed Agreement to manipulate its share price through reverse stock splits was the lynchpin of the scheme.



5.     As detailed herein, the terms of the PIPEs transactions and pattern of reverse stock splits engaged in here were completely aberrational and strongly indicative of the Undisclosed Agreement among Defendants to manipulate the price of DryShips common stock for Defendants' benefit at the expense of investors. Indeed, the parties' interactions make no economic sense in the absence of such an Undisclosed Agreement among Defendants.

6.     Kalani, a hedge fund looking for short-term profits, had no legitimate incentive to invest hundreds of millions of dollars in DryShips, which was teetering on the brink of bankruptcy.

3

At the same time, DryShips would have had no motivation to engage in repeated costly reverse stock splits that inflicted significant harm on shareholders unless it could count on additional infusions of capital from Kalani. DryShips executed an unprecedented eight reverse stock splits within a period of 18 months, leading to a cumulative split factor of 11,760,000 for one. This many reverse stock splits, let alone this many in such a short period, is normally indicative of a company in dire financial straits. Yet, DryShips' binge of reverse stock splits coincided with Kalani's willing entry into five different PIPEs transactions for the purchase of hundreds of millions of dollars in DryShips common stock. As explained more fully herein, this unprecedented conduct gives rise to a more than plausible inference that Defendants agreed and intended from the outset that they would undertake the number and scope of transactions they ultimately did to the detriment of investors.

7.      In furtherance of their scheme, Defendants made numerous materially false and misleading statements and omissions, including (i) that the reverse stock splits were in the "best interests" of DryShips and shareholders and intended to bring the Company into compliance with NASDAQ listing requirements when, in fact, Defendants were engaged in a scheme to manipulate the price of DryShips common stock that was designed to enrich Defendants at the expense of shareholders, and (ii) that DryShips intended to use the proceeds from the sales of securities to Kalani "for general corporate purposes and/or to repay indebtedness" when, in fact, Defendants intended to siphon the vast majority of the proceeds from the Company for the benefit of Economou and Kandylidis.

8.      Defendants' fraud has devasted DryShips' investors. The DryShips shares purchased during the Class Period have been rendered virtually worthless by Defendants' fraud. In total, Defendants wiped out 99.999% of shareholder value in a matter of months.

9.     In contrast, hundreds of millions of dollars that DryShips received from Kalani as a result of the scheme was siphoned out of the Company by Individual Defendants Economou and Kandylidis through a series of transactions with related entities they controlled.  In short, Defendants treated the Company as nothing more than a vehicle to raise funds from unwitting investors and funnel money to themselves, while investors were left holding the bag — the quintessential type of manipulative scheme that the Exchange Act was designed to curb.

10.     Kalani also earned tens of millions of dollars in risk-free profits through its immediate resale of the discounted DryShips common stock to unsuspecting investors and receipt of millions of dollars in commitment fees from DryShips.

## II.     JURISDICTION AND VENUE

11.     The claims asserted herein arise from §§9(a), 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78i(a), 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

15.     Lead Plaintiff Robert Luke, as set forth in his certification (ECF No. 39-2), purchased DryShips common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

5

16.     Lead Plaintiff Chayn Mousa, as set forth in his certification (ECF No. 39-2), purchased DryShips common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

17.     Lead Plaintiff Mary Jane Silvey, as set forth in her certification (ECF No. 39-2), purchased DryShips common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

18.     Lead Plaintiff Kamal Kheridden, as set forth in his certification (ECF No. 39-2), purchased DryShips common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

19.     Lead Plaintiff Konrad Wottge, as set forth in his certification (ECF No. 39-2), purchased DryShips common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

20.     Defendant DryShips is a corporation incorporated under the laws of the Republic of the Marshall Islands with its principal executive offices located at 109 Kifissias Avenue and Sina Street, Marousi, 151 24, Athens, Greece.  During the Class Period, DryShips' common stock traded on the NASDAQ under the ticker symbol "DRYS."  On October 11, 2019, the Company was delisted from the NASDAQ after Economou took DryShips private through a merger with a subsidiary of a company he owns and controls.

21.     Defendant Economou was, at all relevant times, the founder, controlling shareholder, Chairman, and Chief Executive Officer ("CEO") of DryShips.  Throughout the Class Period, Economou engaged in the fraudulent scheme alleged herein, which included making materially false and misleading statements and omissions in the Company's press releases and

SEC filings.  At all relevant times, Economou made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading.

22.     Defendant Kandylidis was the Chief Financial Officer ("CFO") and President of DryShips during the Class Period.  Before December 2016, Kandylidis was DryShips' Executive Vice President.  On August 8, 2016, Defendant Kandylidis assumed the duties of interim CFO of DryShips.  On December 16, 2016, DryShips announced that Defendant Kandylidis was appointed President and CFO of the Company.  He was appointed to the Company's Board of Directors (the "Board") in July 2017.  He is the nephew of Defendant Economou.  Throughout the Class Period, Kandylidis engaged in the fraudulent scheme alleged herein which included making materially false and misleading statements and omissions in the Company's press releases and SEC filings. At all relevant times, Kandylidis made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading.

23.     Defendant Kalani is an entity organized under the laws of the British Virgin Islands. Kalani is an investment vehicle established by Defendants Bistricer and Murchinson for financial transactions with the shipping industry.

24.     Defendant Murchinson is, upon information and belief, a Toronto-based hedge fund controlled by Defendant Bistricer.  Murchinson is registered as a domestic for profit business entity in New Jersey, with the following address: 35 Laurel Ave, Clifton, NJ 07012.  Together with Defendant Bistricer, Murchinson controls Kalani.

25.     Defendant Bistricer is, upon information and belief, the head of Murchinson and therefore controls Kalani.  Upon information and belief, Bistricer resides at 4611 12th Avenue, Suite 1L, Brooklyn, New York 11219-2514, and additionally maintains properties at the following New Jersey addresses: (i) 119 3rd St, Lakewood, NJ 08701-3218; and (ii) 419 3rd St, Lakewood,

NJ 08701-2529.   Upon information and belief, Bistricer met with representatives of Diana, DryShips, and Top Ships in New York in early 2016 to negotiate Kalani's fraudulent agreement with each.

26.     The Defendants referenced above in ¶¶21-22, 25 are sometimes collectively referred to herein as the "Individual Defendants."

27.     The Defendants referenced above in ¶¶20-25 are collectively referred to herein as the "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS[2]

### A.     George Economou and DryShips

28.     Defendant Economou is a Greek billionaire ship owner. Economou was number 707 on the 2008 Forbes Magazine list of the world's billionaires, with an estimated net worth of $1.7 billion.

29.     DryShips operates primarily as an owner of vessels, the management and operation of which are contracted out to other entities, most of which are under the control of Economou.

30.     Economou has served as DryShips' founder, Chairman, and CEO since its incorporation in 2004.  He also owns, controls, and serves as a director and/or officer of numerous other companies operating in the shipping industry, many of which enter into complex transactions with each other.   Since the Company's initial public offering ("IPO"), DryShips has been completely dominated by Economou, which has earned DryShips the bottom spot on a Wells Fargo Securities scorecard ranking publicly owned shipping companies on their corporate governance, taking into account factors such as board independence and related party transactions. Economou's nephew, Defendant Kandylidis, is a member of the Board.

---

[2]      Further detail on the agreements, sales, and reverse stock splits is summarized in the chart annexed hereto as Exhibit A.  In addition, *see* Exhibit B for a table detailing DryShips' stock price and VWAP across the Class Period.

31.     Economou has a history of underhanded transactions that have enriched him at the expense of investors.  As an article in the *Seatrade Maritime News* commented: "For going on two decades, non-shipping investors typically of the retail variety, have been on the losing side of one deal after another, when it comes to Dryships (sic) or predecessor companies."[3]   For example, Economou raised $175 million for Alpha Shipping Plc ("Alpha") in 1998 by selling junk bonds, which were defaulted within one year of issuance leaving a number of Wall Street institutions with large losses. Economou then acquired most of Alpha's fleet by paying $0.37 on the dollar to owners of its defaulted debt.

32.     Economou has stated that he views Americans as "***the dumbest investors around*[.]**"[4]

33.     In DryShips, Economou, with the aid of Kalani, saw the opportunity to again enrich himself at the expense of investors.

**B.     Marc Bistricer and Kalani**

34.     Prior to its dealings with DryShips and two other Greek shipping companies, Diana Containerships, Inc. ("Diana") and Top Ships, Inc. ("Top Ships"), Kalani was unknown to the public, organized in an offshore jurisdiction known for its secrecy, the British Virgin Islands.

35.     Similarly, little is known about Bistricer or Murchinson, who control Kalani. Murchinson is, upon information and belief, a Toronto-based hedge fund controlled by Defendant Bistricer.

---

[3]     Barry Parker, *DryShips' George Economou - The smartest guy in the room*, SEATRADE MARITIME NEWS (Aug. 15, 2017), http://www.seatrade-maritime.com/news/americas/dryships-george-economou-the-smartest-guy-in-the-room.html.

[4]     Kathryn M. Welling, *The Golden Fleece?: DryShips' Debut Shows Speculation, Liquidity Trumping Experience*, WELLING@WEEDEN (Feb. 28, 2005), https://www.wellingonwallst.com/files/DDF/0704_SB_DRYS_LI_Klein.pdf.

36.     According to the *Wall Street Journal*, based on interviews with three Greek shipping executives, including Defendant Kandylidis, Kalani began approaching shipping companies in early 2016 to pitch the fraudulent scheme alleged herein.  "Kalani's idea was that it would buy newly issued shares directly from the shipping companies at a discount to the stock-market price, thus injecting cash into the companies."[5]

37.     DryShips was not the only company to avail itself of Kalani's fraudulent scheme followings its advances in early 2016.  At least two other shipping companies, Diana and Top Ships, engaged in a similar, though not nearly as extensive, series of fraudulent transactions with Kalani as alleged herein.

38.     Shareholder lawsuits were filed against Kalani in connection with these schemes as well.  And, as is the case with respect to DryShips, Top Ships' scheme also triggered an SEC investigation, which is ongoing.

C.      **Defendants' Fraudulent Scheme**

1.      **June-August 2016: Defendants Launch Their Scheme to Manipulate the Market for DryShips Common Stock**

39.     In early 2016, Defendant Kandylidis, acting on behalf of DryShips, met with Defendant Bistricer, acting on behalf of Kalani, in New York "about helping DryShips raise capital."[6]  The meeting resulted in the Undisclosed Agreement pursuant to which Kalani, through a series of PIPEs transactions, would receive significant quantities of DryShips common stock (or

---

[5]     Spencer Jakab, *A Shipping Company's Bizarre Stock Maneuvers Create High Seas Intrigue*, WALL ST. J. (July 13, 2017, 12:21 PM ET), https://www.wsj.com/articles/a-shipping-companys-bizarre-stock-maneuvers-create-high-seas-intrigue-1499960367 (attached hereto as Exhibit C).

[6]     *Id.*  As described by the WSJ, Kalani successfully pitched a substantially similar scheme to Diana and Top Ships.  Diana consummated its agreement to Kalani's scheme in March 2017, when it entered its own PIPEs transaction with Kalani, having conducted its first of four reverse stock splits in June 2016.  Top Ships likewise disclosed in February 2017 that it had also consummated a PIPEs transaction with Kalani.  Top Ships conducted five reverse stock splits between May 2017 and March 2018.

other securities convertible into its common stock) at a discount, thereby injecting cash into the Company. In return, DryShips and its insiders promised that they would use reverse stock splits as necessary to artificially and repeatedly raise the price of DryShips stock above the floor price specified in the PIPEs transactions to allow Kalani to immediately recoup its "investment" and generate trading profits by unloading its newly acquired shares into the market. Pursuant to this Undisclosed Agreement, the DryShips Defendants raised hundreds of millions of dollars from unwitting investors that was then funneled to Defendants and other DryShips-related parties while Kalani earned tens of millions of dollars in profits from selling DryShips common stock.

40.    The DryShips Defendants arranged and executed the first step in their Agreement with Kalani on March 11, 2016, when DryShips announced that it had executed a 25-for-one reverse stock split, reducing the number of outstanding common shares from approximately 672 million to approximately 26.9 million.[7] The reverse stock split raised the price of DryShips' shares from just $0.10 to $2.15. In addition, to ensure they were able to execute additional reverse stock splits as necessary to carry out their Undisclosed Agreement with Kalani, the DryShips Defendants made plans to seize voting control of the Company. As a first step, on March 24, 2016, DryShips announced that, pursuant to a financing agreement with Sifnos Shareholders Inc. ("Sifnos"), a financing company controlled by Economou, Sifnos would exchange all of its DryShips Series B Preferred Shares for $8.75 million of debt. Although DryShips' only outstanding class of stock following this transaction was common stock, under the terms of the financing agreement, DryShips had the right to convert the $8.75 million in debt to Sifnos into 3.5 million "new" DryShips preferred shares, having five times the voting power of a common share, although it was

---

[7]        *See* DryShips Inc., Form 6-K (March 11, 2016).

stated that these new preferred shares would be converted into common stock on a 1:1 basis within three months after such conversion.

41.     Thereafter, the DryShips Defendants took the necessary steps to get the Company's shares into Kalani's hands.   On June 8, 2016, DryShips entered into the first of five PIPES transactions with Kalani (the "June 8 SPA").  Pursuant to the June 8 SPA, Kalani purchased: (a) 5,000 newly designated Series C Convertible Preferred Shares; (b) warrants to purchase 5,000 additional Series C Convertible Preferred Shares, and 148,998 common shares for immediate proceeds of approximately $5 million, or up to $10 million in total if all warrants were exercised. The securities were issued pursuant to a Registration Statement, filed with the SEC on May 7, 2015 (the "2015 Registration Statement").  DryShips also filed a Prospectus Supplement with the SEC on June 8, 2016, which became part of the 2015 Registration Statement.

42.     At its option, Kalani could convert each Series C warrant into the Series C Convertible Preferred Shares at an exercise price of $1,000 per preferred share.[8]  The June 8 SPA contained provisions that adjusted the exercise price to protect Kalani against reverse stock splits impacting the Series C Convertible Preferred Shares.[9]

43.     The Series C Preferred Shares were convertible into DryShips common stock at *any* time at Kalani's option.[10]  There was no lock-up period or other meaningful restriction on Kalani's ability to dispose of the shares immediately upon conversion.  More importantly, Kalani was able to convert its preferred stock into common stock at discounted prices.  The numbers of shares of common stock issuable upon conversion of each preferred share was equivalent to its stated value

---

[8]      *See* June 8, 2016 Prospectus Supplement at S-28.

[9]      *See* June 8, 2016 Form of Series C Warrant, §2.

[10]      *See* June 8, 2016 Statement of Designations §4(a) (attached hereto as Exhibit D).

($1,000) divided by the conversion or strike price, which was set at $2.75[11] unless the volume-weighted average price ("VWAP") of DryShips' common stock as reported by Bloomberg was less.[12]  In that event, Kalani was able to elect to reduce the conversion or strike price to "the higher of (x) 75% of the lowest VWAP of the Common Stock for any Trading Day during the twenty-one (21) consecutive Trading Day period ending on, and including, the Trading Day immediately prior to such date of determination [or] (y) the Floor Price" of $0.37.[13]  If the market price of DryShips stock fell to or below the Floor Price, Kalani had no incentive to exercise its conversion right as it had no means of immediately profiting from the common shares it would receive at an above market price and it had no intention of holding them.

44.     Importantly, the terms of the June 8 SPA were unusual in the context of PIPEs transactions, as Kalani was effectively insulated from any risk, and was not restricted from trading the common shares it would ultimately obtain in a dilutive manner.  In particular, Kalani was only required to establish a very limited upfront long position of $5 million for the initial batch of 5,000 Series C Convertible Preferred Shares it acquired under the June 8 SPA.  It also received 148,998 shares of DryShips common stock and warrants to purchase an additional 5,000 Series C Convertible Preferred Shares for which Kalani paid no upfront consideration.  While warrants are often granted to the investor in PIPEs transactions, they typically are provided for consideration and a more significant upfront financing commitment, even in a distressed situation.  Moreover, the floor price established for the conversion of the preferred stock was not market standard, and encouraged the dilution of common stock.  Typically, issuers completing a private placement of

---

[11]     *Id*. at §§4(b), 30(rr).

[12]     *Id*. at §4(f)(i).

[13]     *Id*.

convertible securities will establish a floor price of 50-75% of their prevailing share price at the time of closing.[14]   Bucking this, the floor at which Kalani agreed to buy DryShips was approximately 30% of the price of its common stock, then trading at about $1.19.

45.     While the terms of the June 8 SPA do not make sense in the context of a typical arm's length commercial transaction, they do when considered in the context of the Defendants' wider, Undisclosed Agreement.  In fact, in the June 8 SPA, Defendants created the perfect vehicle to implement their Undisclosed Agreement and bind the participants to its execution.  Kalani could — but was not obliged to — convert their securities to common stock.  They would, therefore, only do so when they could take advantage of a price spike, thereby shielding them from any risk of loss.  If no such price spike was forthcoming, they were not obliged to outlay any further funds than the initial $5 million, the recoupment of which had already been ensured through the March 11, 2016 reverse stock split.  The DryShips Defendants, for their part, desirous of the injections of funds that each conversion would bring, were deliberately incentivized to induce the agreed-upon price rises via reverse stock splits and thereby facilitate Kalani's trading profits, despite the injury necessarily caused to DryShips' shareholders.  Thereby, the June 8 SPA (and the subsequent PIPEs transactions between DryShips and Kalani) solved any would-be conspiracy's number one problem — how to self-police the parties' obligations and reduce both the possibility and harm of "cheating."

46.     Neither DryShips nor Kalani disclosed that DryShips would necessarily have to conduct multiple reverse stock splits for Kalani to exercise the Series C Warrants and inject capital

---

[14]     Dresner, Steven, E. Kim. *PIPEs: A Guide to Private Investments in Public Equity*, 2nd Edition. Wiley Professional, Reference & Trade, 20100520, Chapter 9 ("To negate the potentially unlimited dilution of a [floating or variable conversion price], recent transactions have included minimum conversion prices, or 'floors.' Floors are typically set between 50 percent and 75 percent of the market price at closing of the transaction.  Floors serve to control the ultimate dilution of an issuance yet still provide some risk mitigation for the investor.")

into the company, nor that DryShips had previously agreed to do so. They also did not disclose that Kalani intended, with the DryShips Defendants' knowledge and consent, to immediately sell any securities that it converted into the secondary market. These omissions left investors with the misleading impression that Kalani was a sophisticated independent investor willing to invest in DryShips' future.

47.     Immediately following the execution of the June 8 SPA, Kalani began converting the Series C Preferred Shares into DryShips common stock and selling the common stock into the market. In this regard, in its Form 6-K containing its financial results for the second quarter of 2016, DryShips disclosed that, as of August 7, 2016, 4,635 of the 5,000 Series C Convertible Preferred shares had been converted to 12,719,431 common shares.[15] As Kalani never filed a Form 13D recording its ownership of more than 5% of DryShips' common stock despite the large volumes of DryShips common stock it received,[16] it is clear that Kalani sold the common stock it received upon conversion into the market. Indeed, between June 8, 2016 and August 12, 2016, DryShips' total outstanding common stock rose from approximately 26.9 million shares to 39.75 million. During this period, the price fell precipitously from approximately $1.19 to approximately $0.32 under the weight of Kalani's selling, a decline of 73%. The decline in DryShips' stock price was the inevitable result of Kalani's receipt and sale of 12.7 million shares of DryShips common stock in the immediate aftermath of the June 8 SPA's announcement. The issuance of these 12.7 million shares during this period constituted an increase of almost 50% in the number of DryShips shares outstanding at the time of the June 8 SPA.

---

[15]     *See* DryShips Inc., Form 6-K (August 9, 2016).

[16]     Given the volume of common stock it received across 2016 and 2017, and the limited size of DryShips' float as a result of the reverse stock split, Kalani could only have avoided holding a 5% stake in DryShips if it immediately sold down all the common stock it received pursuant to the PIPEs transactions.

48.     In view of the foregoing, on August 1, 2016, DryShips announced its intention to conduct another reverse stock split to raise its stock price.[17]  Although the purported reason for the reverse stock split was to regain compliance with the Nasdaq Capital Market minimum bid price requirement, in fact, its true purpose was to raise DryShips' stock price above the floor price in the June 8 SPA and incentivize Kalani to continue exercising the warrants for Series C Preferred Shares issued in the June 8 SPA.  Days later, on August 10, 2016, Kalani exercised the warrants and DryShips issued an additional 5,000 Series C Convertible Preferred Shares to Kalani.  DryShips executed the previously announced four-for one reverse stock split on August 15, 2016, reducing the number of outstanding common shares from 39,750,275 shares to approximately 9.9 million shares.  The reverse stock split lifted the share price from $0.32 to $1.05.  However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined over 19% on a split-adjusted basis.  Moreover, the increase in DryShips stock price was short-lived.   DryShips stock price remained above $1.00 for only a few days before it began to fall again due to Kalani's selling.

49.     As intended, with DryShips common stock trading back above the floor price of $0.37, Kalani could continue to convert its preferred shares into common shares and then immediately dump these into the market.  Indeed, between August 15, 2016 and October 31, 2016, DryShips' total shares outstanding rose approximately 72% from approximately 9.9 million shares to 17 million.  During the same period, the price of DryShips' common stock collapsed again under the weight of Kalani's selling, and by the end of October, the price of DryShips common stock had fallen back to approximately $0.31 per share.  This price was 70% below the closing price of

---

[17]        *See* DryShips Inc., Form 6-K (August 1, 2016).

the Company's shares on August 15, 2016, after the Company's previously announced four-for-one stock split took effect.

> ### 2. September-October 2016: Defendant Economou Locks Up Voting Control of the Company and Approves Additional Reverse Stock Splits to Further the Fraudulent Scheme

50. To prevent the financing scheme from running its course before Defendants could maximize their own returns, Defendant Economou sought to lock up voting control of the Company, so additional reverse stock split proposals were guaranteed approval.

51. Accordingly, on September 9, 2016, DryShips and the Economou-controlled Sifnos entered into an agreement to convert DryShips' $8.75 million debt to Sifnos into 3.5 million new DryShips Class D Preferred Shares. However, although their earlier agreement of March 24, 2016 had provided that the new preferred shares issued upon conversion would have a voting power of 5:1 (vis-à-vis common stock) and would be mandatorily converted into common stock on a 1:1 basis within 3 months after such conversion, without explanation and seemingly for no consideration, the Series D Preferred Shares issued to Sifnos had **100,000** times the voting power of a common share, and the previously agreed mandatory conversion provision was removed, allowing Sifnos and Economou to retain their voting control indefinitely.[18]

52. A few weeks later, Economou announced his intention to exercise his voting control to approve additional reverse stock splits in furtherance of the scheme. On September 23, 2016, DryShips filed a Form 6-K that included the Company's Notice of Annual General Meeting and Proxy Statement for the Company's Annual General Meeting of Shareholders to be held on October 26, 2016. The Proxy Statement for the Annual General Meeting, signed by Economou, informed shareholders that the Board was soliciting shareholder approval of an amendment to the

---

[18]     Diana Containerships also granted super voting right shares to its affiliate Diana Shipping, Inc. in May 2017 to secure approval of a shareholder resolution seeking approval for further reverse stock splits.

Company's Amended and Restated Articles of Incorporation, which would allow the Board to effect one or more reverse stock splits of the Company's common shares at the extreme ratio of up to *1,000-for-one* in the aggregate without further shareholder approval.

53.     The DryShips Defendants assured investors that "[t]he Board of Directors intends to effect one or more reverse stock splits . . . only if it believes that a decrease in the number of Common Shares outstanding is likely to improve the trading price for the Company's Common Shares, and only if the implementation of a reverse stock split is determined by the Board of Directors to be in the best interests of the Company and its shareholders."[19]  These statements were materially false and misleading because, (i) the reverse stock splits did not — and could not — "improve the trading price" for any sustained period given that they were being conducted to permit Kalani to flood the market with its discounted common shares pursuant to the Defendants' Undisclosed Agreement, and (ii) in fact, Defendants were conducting reverse stock splits to manipulate DryShips' stock price and benefit themselves at the expense of investors.

54.     On October 27, 2016, the DryShips Defendants announced the foregone conclusion that the reverse stock split proposal was approved at the adjourned Annual General Meeting.[20]

### 3.     November 2016: The Scheme Continues with Another Reverse Stock Split and Second Agreement with Kalani

55.     With shareholders' voting rights effectively eliminated, Defendants were free to execute their fraudulent scheme at will.  Mere days later, on November 1, 2016, the DryShips Defendants executed a 15-for-one reverse stock split, reducing the number of common shares outstanding from 17,025,140 shares to approximately 1.1 million and raising the stock price from

---

[19]     *See* DryShips Inc., Form 6-K (September 23, 2016).

[20]     *See* DryShips Inc., Form 6-K (October 27, 2016).

$0.31 to $4.35.[21]   However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined over 6% on a split-adjusted basis.   With the conversion price comfortably above the floor price, Kalani resumed converting the Series C Convertible Preferred Shares and, by November 18, 2016, all 10,000 of the Series C Convertible Preferred Shares Kalani had acquired pursuant to the June 8 SPA had been converted into common shares.

56.     Following an inexplicable price spike for a few weeks in the middle of November that prompted NASDAQ to temporarily halt trading for a day, DryShips stock price returned to its prior $4.00-$5.00 range by November 28.[22]

57.     On November 17, 2016, the same day NASDAQ allowed DryShips stock to resume trading, DryShips issued a press release[23] announcing a second PIPEs transaction with Kalani (the "November 16 SPA").   Pursuant to the November 16 SPA, Kalani purchased:  (a) 20,000 newly designated Series E-1 Convertible Preferred Shares; (b) preferred warrants to purchase 30,000 Series E-1 Convertible Preferred Shares ("E-1 Warrants"); (c) preferred warrants to purchase 50,000 newly designated Series E-2 Convertible Preferred Shares ("E-2 Warrants"); (d) prepaid warrants to initially purchase an aggregate 372,874 common shares; and (e) 100 common shares, for immediate proceeds of approximately $20 million, or up to $100 million in total if all warrants were exercised.   The securities were issued pursuant to the 2015 Registration Statement.   DryShips

---

[21]     *See* DryShips Inc., Form 6-K (November 1, 2016).

[22]     Diana and Top Ships also experienced unexplained spikes in their stock prices during the same period.   These movements were highly suspicious as they were completely aberrational compared to the stock price movements of other shipping companies.   For example, from November 7 to November 16, 2016, the stock prices of DryShips, Diana, and Top Ships increased by 1486%, 469%, and 175%, respectively, whereas other shipping companies experienced only modest price movements during this period.   For example, Scorpio Tankers Inc. was up 15%, Nordic American Tankers Ltd. was up 17%, Teekay Tankers Ltd. was up 10%, and Maersk was down 10%.

[23]     *See* DryShips Inc., Form 6-K (November 17, 2016).

also filed a Prospectus Supplement with the SEC on November 17, 2016, which became part of the 2015 Registration Statement.

58.     At its option, Kalani could convert each E-1 and E-2 Warrant into the E-1 and E-2 Convertible Preferred Shares, at an exercise price of $1,000 per preferred share.[24]  The Defendants' agreement contained provisions that adjusted the exercise price to protect Kalani against reverse stock splits impacting the E-1 and E-2 Convertible Preferred Shares.[25]

59.     As was the case with the Series C Convertible Preferred Shares, the Series E-1 Convertible Preferred Shares were convertible at ***any*** time at Kalani's option.[26]  There was no lock-up period or other meaningful restriction on Kalani's ability to dispose of the shares immediately upon conversion.  Additionally, Kalani was once again able to convert the preferred shares into common stock at discounted prices.  The number of shares of common stock issuable upon conversion of each preferred share was equivalent to its stated value ($1,000) divided by the conversion or strike price, which was set at $30[27] unless the VWAP of DryShips' common stock as reported by Bloomberg was less.[28]  In that event, Kalani was able to elect to reduce the conversion or strike price to "the higher of (x) 77.5% of the lowest [daily volume weighted average price] of the Common Stock for any Trading Day during the fourteen (14) consecutive Trading Day period ending on, and including, the Trading Day immediately prior to [the conversion date]

---

[24]     *See* November 16, 2016 E-1 Statement of Designations, at §30(vv) (attached hereto as Exhibit E); November 16, 2016 E-2 Statement of Designations, at §30(vv) (attached hereto as Exhibit F).

[25]     *Id.* at §8(a).

[26]     *Id.* at §4(a).

[27]     *Id.* at §§4(b), 30(vv).

[28]     *Id.* at §4(f)(1).

and (y) the Floor Price of [$1.50]."[29]   As before, if the market price of DryShips stock fell to or below the Floor Price, Kalani had no incentive to exercise its conversion right as it had no means of immediately profiting from the common shares it would receive at an above market price and it had no intention of holding them.

60.     The terms of the Series E-2 shares were substantially similar to the terms of the Series E-1 shares, except the reduced conversion or strike price Kalani could elect was equal to "the higher of (x) 85% of the lowest [daily volume weighted average price] of the Common Stock for any Trading Day during the twenty-one (21) consecutive Trading Day period ending on, and including, the Trading Day immediately prior to [the conversion date] and (y) the Floor Price of [$1.50]."[30]

61.     Once again, the terms of the E-1 and E-2 Convertible Preferred Shares represented a significant departure from traditional PIPEs transactions because Kalani bore no risk and was not restricted from immediately trading the shares in a dilutive manner.  Further, the $1.50 Floor Price was approximately 15% of DryShips' share price at closing (when it is 50-75% in a typical PIPEs transaction).

### 4.     December 2016-January 2017: The Scheme Continues with a Third Agreement with Kalani as Underwriter, More Dilutive Stock Sales, and a Fourth Reverse Stock Split

62.     On December 12, 2016, DryShips announced that the initial 20,000 Series E-1 Convertible Preferred Shares, the E-1 and E-2 Convertible Preferred Shares issued due to the exercise of the preferred warrants and the prepaid warrants had been converted and/or exercised into 31,932,629 common shares, with approximately $100 million of gross proceeds raised.  As

---

[29]     *Id.* at §§4(f)(1), 30(e).

[30]     Ex. F at §§4(f)(1), 30(e).

before, Kalani immediately sold the common stock it received upon conversion into the market once again driving down DryShips' share price. Indeed, between November 1, 2016 and December 12, 2016, DryShips' total shares outstanding rose from 1.1 million shares to 33.8 million, an increase of 2972%.

63.     A few weeks later, on December 27, 2016, DryShips announced that it had entered into a third PIPEs transaction with Kalani for the sale of up to $200 million of shares of DryShips common stock (the "December 27 Agreement"). In addition, pursuant to the agreement, DryShips "agreed to issue up to $1.5 million of its common stock to Kalani as a commitment fee."[31] The securities were issued pursuant to the 2015 Registration Statement. DryShips also filed a Prospectus Supplement with the SEC on December 27, 2016, which became part of the 2015 Registration Statement.

64.     Although the December 27 Agreement differed from the prior two agreements in that it did not involve convertible preferred shares, it still ensured Kalani risk-free profits unlike a typical PIPEs transaction. Again, Kalani was not restricted from immediately trading the shares in a dilutive manner. In addition, Kalani again purchased the shares at a discounted price "equal to the product of (i) 0.94; and (ii) the lowest daily VWAP that equals or exceeds the applicable Floor Price [of $1.00 per share subject to adjustments] during the applicable Pricing Period."[32] This represented a significant discount to DryShips' publicly traded market price and immediate, substantial profits for Kalani. Additionally, the $1.00 Floor Price was 25% of DryShips' share price of $4.00 on December 27 rather than the 50-75% in a typical PIPEs transaction.

---

[31]     *See* DryShips Inc., Form 6-K (December 27, 2016).

[32]     *See* Common Stock Purchase Agreement dated as of December 23, 2016 at §2.2 (attached hereto as Exhibit G).

65.     Moreover, although purchases of common stock pursuant to the December 27 Agreement appeared to occur at DryShips' option rather than Kalani's, in fact, Kalani was still in the driver's seat.  In this regard, although the agreement provided that DryShips could issue a Fixed Request Notice to Kalani requesting that Kalani purchase common stock under the agreement, the agreement placed volume, pricing, and timing limits on these Fixed Requests that protected Kalani and ensured its ability to profit from any shares it purchased under the agreement.  First, the total Fixed Amount Kalani was obligated to purchase would be reduced proportionately for every day during the Pricing Period (a period of eight consecutive trading days) that the VWAP of DryShips' common stock was lower than the floor price.[33]  Second, the Fixed Request could not exceed $1 million.[34]  Third, DryShips could submit only one Fixed Request to Kalani in any Pricing Period.[35] And fourth, five days were required to elapse between Pricing Periods.[36]

66.     In view of these restrictions, the only way DryShips could receive a meaningful influx of capital pursuant to the December 27 Agreement was if Kalani exercised *its options* to (a) waive one or more of the foregoing protections in connection with a Fixed Request, and/or (b) purchase additional shares offered by DryShips over and above the Fixed Amount in the Fixed Request Notice (the "Optional Amount").[37]  Of course, Kalani would not agree to do any of these things unless it could guarantee itself a profit.

---

[33]     *Id.* at §2.6.  Pursuant to the agreement, 12.5% of the Fixed Request shares were issued each trading day during the pricing period.  Therefore, for each trading day during the pricing period that the VWAP was below the floor price, the Fixed Request amount was reduced by 12.5% unless Kalani agreed otherwise.

[34]     *Id.* at §2.1; *see also id.* at Annex A, p. 59 (Definition of "Maximum Fixed Amount Requested").

[35]     *Id.* at §2.4.

[36]     *Id.*

[37]     Kalani had the option to waive the $1 million limit of the Fixed Request Amount (*see id.* at §2.2) and to shorten the Pricing Period (*see id.* at §2.3 & Annex A).  Additionally, under the terms of the agreement, each Fixed Request Notice to Kalani also offered Kalani the option to purchase additional shares of DryShips common stock at a

67.     This is precisely what occurred.   During the pendency of the December 27 Agreement, which closed on January 31, 2017 (a period of 35 days), given the eight-day Pricing Period, requirement of five days between Pricing Periods, and limit of one Fixed Request per Pricing Period, the maximum number of Fixed Requests DryShips could have made was three for a total of $3 million, meaning that, at least, $197 million in common shares issued pursuant to the December 27 Agreement were purchased at Kalani's option.   Specifically, notwithstanding the January Agreement's cap on the amount and frequency of Fixed Request Notices, Kalani agreed to waive those protections and purchase $167.5 million in shares pursuant to six Fixed Request Notices during a roughly 30 day period from December 27, 2016 through January 30, 2017, but only after receiving additional price concessions that resulted in it receiving nearly four million more shares than it would have received using the contract price.[38]   In addition, Kalani agreed to purchase $32.5 million in Optional Amount shares.

68.     As before, Kalani immediately sold the DryShips common stock it acquired pursuant to the December 27 Agreement into the market and DryShips' share price once again collapsed:

a.   On January 9, 2017, DryShips filed a Prospectus Supplement and announced that the Company had sold 14,090,507 common shares to Kalani at an average price of $3.05 per share, increasing the number of outstanding common shares to 48,003,563.

b.   On January 13, 2017, DryShips filed a Prospectus Supplement and announced that the Company had sold an additional 21,150,054 shares to Kalani at an average price of

---

discount to a specified floor price.  *Id.* at §2.9.  Kalani was free to exercise all or a portion of the Optional Amount. *Id.*

[38]   *See* DryShips Inc., Form 6-K (January 9, 2017); DryShips Inc., Form 6-K (January 13, 2017); DryShips Inc., Form 6-K (January 20, 2017); DryShips Inc., Form 6-K (January 30, 2017).

approximately $2.04 per share, increasing the number of outstanding common shares to 69,333,763.

c.  On January 20, 2017, DryShips filed a Prospectus Supplement and announced the Company had sold an additional 38,600,767 shares to Kalani at an average price of approximately $1.15 per share, increasing the number of outstanding common shares to 107,934,530.

69.     Thus, in less than two weeks, DryShips' reported that the number of shares of DryShips' common stock outstanding had risen 218% from 33,913,056 to 107,934,530.  Not surprisingly, the price of DryShips common stock plummeted in response to Kalani's selling. Indeed, since the Company's previously announced reverse stock split on November 1, 2016, DryShips' stock price had fallen nearly 77%, from $4.35 at the close on November 1, 2016 to $1.01 on January 20, 2017.

70.     With the market price of DryShips common stock approaching the $1.00 Floor Price in the December 27 Agreement due to Kalani's heavy selling, on January 23, 2017, DryShips executed an eight-for one reverse stock split, reducing the number of outstanding common shares from 107,934,530 shares to approximately 13.5 million shares and raising the stock price from $1.01 to $5.40.[39]  However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined over 33% on a split-adjusted basis.

71.     With the share price again comfortably over the Floor Price, Kalani resumed its purchases of common stock under the December 27 Agreement and its sales of those shares into the market.  On January 30, 2017, DryShips filed a Prospectus Supplement and announced the

---

[39]     *See* January 30, 2017 Prospectus Supplement.

Company had sold an additional 22,539,773 shares to Kalani at an average price of $3.08 per share, nearly tripling the number of outstanding common shares to 36,253,870.

72.     The following day, DryShips announced that it had completed the sale of $200 million in DryShips shares to Kalani, pursuant to the December 27 Agreement, raising net proceeds for the Company of $198 million.  Following the completion of those sales, 36,253,870 common shares were outstanding.  Based on information and belief, Kalani made at least $30 million from the December 27 Agreement (including: (i) the $1.5 million commitment fee; (ii) a conservative estimate of Kalani's profit from buying and reselling shares at a discount equal to 6% of $200 million, or $12 million); and (iii) approximately $17 million in profits from selling into the market the roughly four million additional shares it received as a result of pricing concessions it received from DryShips in return for accepting larger and more frequent Fixed Request Notices than permitted by the January Agreement)..

### 5.     February-March 2017: The Scheme Continues with a Fourth Agreement with Kalani and More Dilutive Stock Sales

73.     With the scheme practically minting money for Defendants by this point, Defendants lost no time announcing another PIPEs transaction with Kalani for the sale of an additional $200 million of shares of common stock to Kalani (the "February 17 Agreement"). Once again, pursuant to the agreement, DryShips agreed to issue $1.5 million in common stock to Kalani as a commitment fee.  The securities were issued pursuant to the 2015 Registration Statement. DryShips also filed a Prospectus Supplement with the SEC on February 17, 2017, which became part of the 2015 Registration Statement.

74.     The February 17 Agreement operated in the identical manner as the December 27 agreement and contained the same volume, pricing, and timing protections for Kalani that ensured

it a risk-free profit.[40]  As a result, once again, the overwhelming majority of shares issued and sold under the February 17 Agreement were at Kalani's option.  During the pendency of the February 17 Agreement, which closed on March 17, 2017 (a period of 28 days), given the eight-day Pricing Period, requirement of five days between Pricing Periods, and limit of one Fixed Request per Pricing Period, the maximum number of Fixed Requests DryShips could have made was two for a total of $2 million, meaning that, at least, $198 million in common shares issued pursuant to the February 17 Agreement were purchased at Kalani's option.  Specifically, notwithstanding the February Agreement's cap on the amount and frequency of Fixed Request Notices, Kalani agreed to waive those protections and purchase $185 million in shares pursuant to three Fixed Request Notices during a roughly three-week period from February 21, 2017 through March 16, 2017, but only after receiving additional price concessions that resulted in it receiving approximately 2.6 million more shares than it would have received using the contract price.[41]  In addition, Kalani agreed to purchase $15 million in Optional Amount shares.

75.     As before, Kalani's heavy selling of the shares acquired pursuant to the February 17 Agreement flooded the market and drove down DryShips share price:

a. On February 24, 2017, DryShips announced that the Company had sold 22,482,371 shares to Kalani at an average price of $2.45 per share, increasing the number of outstanding common shares to 58,836,362.[42]

---

[40]      *See* Common Stock Purchase Agreement dated as of February 17, 2017 (attached hereto as Exhibit H).

[41]      *See* DryShips Inc., Form 6-K (February 24, 2017); DryShips Inc., Form 6-K (March 3, 2017); DryShips Inc., Form 6-K (March 17, 2017).

[42]      *See* DryShips Inc., Form 6-K (February 24, 2017).

b.  On March 3, 2017, DryShips announced that the Company had sold an additional 44,958,830 shares to Kalani at an average price of $1.67 per share, increasing the number of outstanding common shares to 103,974,393.[43]

c.  On March 17, 2017, DryShips announced that the Company sold an additional 45,505,878 shares to Kalani at an average price of approximately $1.47 per share, increasing the number of outstanding shares to 152,055,576.[44]

76.     Thus, in a period of only three weeks, DryShips reported that the number of outstanding shares of DryShips common stock had increased 318%.  Moreover, as a result of Kalani's sales, by March 17, 2017, DryShips' stock price had declined 69% since the Company's previously announced eight-for-one reverse stock split on January 23, 2017.

77.     On March 17, 2017, DryShips announced that it had completed the previously announced $200 million share offering with Kalani, pursuant to the February 17 Agreement, raising net proceeds for the Company of $198 million.[45]  Following the completion of those sales, 152,055,576 common shares were outstanding.  Based on information and belief, Kalani made at least $18.5 million from the February 17 Agreement (including: (i) the $1.5 million commitment fee; (ii) a conservative estimate of Kalani's profit from buying and reselling shares at a discount equal to 6% of $200 million, or $12 million; and (iii) approximately $5 million in profits from selling into the market the roughly 2.6 million additional shares it received as a result of pricing concessions it received from DryShips in return for accepting larger and more frequent Fixed Request Notices than permitted by the February Agreement).

---

[43]     *See* DryShips Inc., Form 6-K (March 3, 2017).

[44]     *See* DryShips Inc., Form 6-K (March 17, 2017).

[45]     *Id.*

78.     On March 20, 2017, DryShips filed a Registration Statement on Form F-3 with the SEC to register up to $2 billion worth of additional common stock and other securities.

> **6.     April-August 2017: The Scheme Escalates with a Fifth and Final Agreement with Kalani, Even More Dilutive Stock Sales, and Four More Reverse Stock Splits**

79.     With their scheme in high gear, on April 3, 2017, DryShips announced that it had entered into a fifth PIPEs transaction with Kalani, this time for the sale of up to $226.4 million in DryShips common stock (the "April 3 Agreement").[46]

80.     The terms of the April 3 Agreement were substantively the same as the December 27 and February 17 Agreements and provided the same opportunity for Kalani to purchase DryShips shares at a significant discount and to receive a $1.5 million commitment fee.[47]   The shares were to be issued pursuant to the 2015 Registration Statement.   DryShips also filed a Prospectus Supplement with the SEC on April 3, 2017, which became part of the 2015 Registration Statement.

81.     The April 3 Agreement operated in an identical manner as the December 27 and February 17 Agreements and contained the same volume, pricing, and timing protections for Kalani that ensured it a risk-free profit.   As a result, once again, the overwhelming majority of the shares issued and sold under the February 17 Agreement were at Kalani's option.[48]

82.     Although DryShips still had room for an additional stock split of eight-for-one under the previously approved 1,000-for-one limit, given the increased volume of shares for

---

[46]     *See* DryShips Inc., Form 6-K (April 3, 2017).

[47]     *See* Common Stock Purchase Agreement dated as of April 3, 2017 (attached hereto as Exhibit I).

[48]     During the pendency of the April 3 Agreement, which was terminated on August 11, 2017 (a period of 130 days), given the eight-day Pricing Period, requirement of five days between Pricing Periods, and limit of one Fixed Request per Pricing Period, the maximum number of Fixed Requests DryShips could have made was ten for a total of $10 million, meaning that, at least, $184 million in common shares issued pursuant to the April 3 Agreement were purchased at Kalani's option.

purchase in the April 3 Agreement, DryShips knew that it would need even more reverse stock split approval to escalate the fraud over the next several months. Accordingly, on April 3, 2017, DryShips filed a Form 6-K that included the Company's Notice of Annual General Meeting and Proxy Statement for the Company's Annual General Meeting of Shareholders to be held on May 2, 2017. The Proxy Statement was signed by Economou and dated April 3, 2017. It sought shareholder approval to amend DryShips' Articles of Incorporation to allow for one or more reverse stock splits at ratios of up to 1,000-for-one. As before, the April 3 Proxy Statement falsely represented that: "The Board believes that" the reverse split proposal "is in the best interest of the Company and the shareholders," and that "a reverse stock split will only be effected, if at all, upon a determination by the Board of Directors that a reverse stock split is in the Company's and the shareholders' best interests."[49]

83.    On May 2, 2017, DryShips announced the foregone results from the shareholders meeting that took place that day: the proposal to allow additional reverse splits of up to *1,000-for-one* was approved.[50]

84.    As before, Kalani's sales into the market of DryShips common stock obtained pursuant to the April 3 Agreement steadily depressed DryShips' stock price, necessitating additional reverse stock splits to raise it above the $1.00 Floor Price in the April 3 Agreement and incentivize Kalani to purchase additional shares:

   a.    On April 6, 2017, with DryShips' stock price trading just above the $1.00 Floor Price, DryShips announced a four-for-one reverse stock split.[51]

---

[49]    *See* DryShips Inc., Form 6-K at 6 (April 3, 2017).

[50]    *See* DryShips Inc., Form 6-K (May 2, 2017).

[51]    *See* DryShips Inc., Form 6-K (April 6, 2017).

b.  On April 7, 2017, DryShips announced that the Company had sold an additional 35,692,576 shares to Kalani at an average price of $1.08 per share, swelling the number of outstanding common shares to 188,043,945, an increase of approximately 1293% since the previous reverse stock split on January 23, 2017.[52]  At the same time, Kalani's selling had driven DryShips stock price down 88%, from $5.40 on the date the prior reverse stock split was executed to $0.62 on April 10, 2017.

c.  On April 11, 2017, DryShips executed the four-for-one reverse stock split, reducing the number of outstanding common shares from approximately 177 million to approximately 44 million and raising the closing stock price from $0.62 to $1.74.[53] However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined over 30% on a split-adjusted basis.

d.  On April 17, 2017, DryShips announced that the Company had sold an additional 7,912,449 shares to Kalani at an average price of $1.84 per share, increasing the number of outstanding common shares to 54,923,434.[54]

e.  On April 28, 2017, DryShips announced that the Company had sold an additional 10,425,258 shares to Kalani at an average price of $1.37 per share, increasing the number of outstanding common shares to 65,564,556.[55]  Thus, in a period of two short

---

[52]     *See* DryShips Inc., Form 6-K (April 7, 2017).

[53]     *See* DryShips Inc., Form 6-K (April 11, 2017).

[54]     *See* DryShips Inc., Form 6-K (April 17, 2017).

[55]     *See* DryShips Inc., Form 6-K (April 28, 2017).

weeks since the prior reverse stock split on April 11, 2017, the number of outstanding shares of DryShips common stock had increased 39%.

f.   On May 2, 2017, with DryShips' common stock again trading at just over the $1.00 Floor Price,[56] DryShips announced a seven-for-one reverse stock split.[57]

g.   On May 11, 2017, DryShips executed the seven-for-one reverse stock split, reducing the number of outstanding common shares from 67,402,716 shares to approximately 9.6 million shares and raising the closing stock price from $0.96 to $5.33.[58] However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined over 21% on a split-adjusted basis.

h.   On May 19, 2017, DryShips announced that the Company had sold an additional 2,697,742 shares to Kalani at an average price of $4.42 per share, increasing the number of outstanding common shares to 12,064,107.[59]

i.   On May 26, 2017, DryShips announced that the Company had sold an additional 1,616,737 shares to Kalani at an average price of $2.96 per share, increasing the number of outstanding common shares to 13,778,247.[60]

---

[56]   By May 10, 2017, the day before the reverse stock split was executed, DryShips' stock price had fallen 44%, from $1.74 immediately following the prior reverse stock split, to $0.96.  *See* Exhibit B.

[57]   *See* DryShips Inc., Form 6-K (May 2, 2017).

[58]   *See* DryShips Inc., Form 6-K (May 11, 2017).

[59]   *See* DryShips Inc., Form 6-K (May 19, 2017).

[60]   *See* DryShips Inc., Form 6-K (May 26, 2017).

32

j.   On June 2, 2017, DryShips announced that the Company had sold an additional

2,021,157 shares to Kalani at an average price of $2.37 per share, increasing the number

of outstanding common shares to 15,799,404.[61]

k.   On June 9, 2017, DryShips announced that the Company had sold an additional

4,766,831 shares to Kalani at an average price of $1.82 per share, increasing the number

of outstanding common shares to 20,566,235.[62]

l.   On June 16, 2017, DryShips announced that the Company had sold an additional

5,195,050 shares to Kalani at an average price of $1.77 per share, increasing the number

of outstanding common shares to 25,761,285, an increase of 168% since the prior stock

split just one month earlier.[63]

m.  On June 19, 2017, with the price of DryShips common stock again approaching the

$1.00 Floor Price,[64] DryShips announced a five-for-one reverse stock split.[65]

n.   On June 22, 2017, DryShips executed a five-for-one reverse stock split, reducing the

number of outstanding common shares from approximately 24.1 million shares to

approximately 4.8 million shares and raising the closing stock price from $0.85 to

$2.83.   However, this increase did not offset the loss in value to shareholders from

---

[61]     *See* DryShips Inc., Form 6-K (June 2, 2017).

[62]     *See* DryShips Inc., Form 6-K (June 9, 2017).

[63]     *See* DryShips Inc., Form 6-K (June 16, 2017).

[64]     By June 21, 2017, the day before the reverse stock split was executed, DryShips' stock price had fallen 84%, from $5.33 immediately following the prior reverse stock split, to $0.85.  *See* Exhibit B.

[65]     *See* DryShips Inc., Form 6-K (June 19, 2017).

having their shares merged, and the price of the shares actually declined over 33% on a split-adjusted basis.[66]

o. On June 23, 2017, DryShips announced that the Company had sold an additional 3,868,393 shares to Kalani at an average price of $3.23 per share, increasing the number of outstanding common shares to 9,020,650.[67]

p. On June 30, 2017, DryShips announced that the Company had sold an additional 6,904,566 shares to Kalani at an average price of $1.93 per share, increasing the number of outstanding common shares to 15,925,216.[68]

q. On July 7, 2017, DryShips announced that the Company had sold an additional 10,413,514 shares to Kalani at an average price of $1.07 per share, increasing the number of outstanding common shares to 26,609,379.[69]

r. On July 14, 2017, DryShips announced that the Company had sold an additional 9,089,888 shares to Kalani at an average price of $0.90 per share, increasing the number of outstanding common shares to 35,699,267, an increase of approximately 644%.[70]

s. On July 18, 2017, with DryShips common stock trading at just $0.83,[71] DryShips announced a seven-for-one stock split.[72]

---

[66]   *See* DryShips Inc., Form 6-K (June 22, 2017).

[67]   *See* DryShips Inc., Form 6-K (June 23, 2017).

[68]   *See* DryShips Inc., Form 6-K (June 30, 2017).

[69]   *See* DryShips Inc., Form 6-K (July 7, 2017).

[70]   *See* DryShips Inc., Form 6-K (July 14, 2017).

[71]   By July 20, 2017, the day before the reverse stock split was executed, DryShips' stock price had fallen approximately 85%, from $2.83 immediately following the prior reverse stock split, to $0.43.  *See* Exhibit B.

[72]   *See* DryShips Inc., Form 6-K (July 18, 2017).

t.  On July 21, 2017, DryShips executed the seven-for-one reverse stock split, reducing the number of outstanding common shares from approximately 36.3 million shares to approximately 5.2 million shares and raising the closing share price from $0.43 to $2.17.  However, this increase did not offset the loss in value to shareholders from having their shares merged, and, on the first trading day after the split, the price of the shares actually declined over 22% on a split-adjusted basis.[73]

u.  On July 25, 2017, DryShips announced that the Company had sold an additional 596,806 shares to Kalani at an average price of $0.84 per share prior to the July 21 reverse split, and an additional 13,995,486 shares to Kalani at an average price of $1.88 per share after the July 21 reverse split, increasing the number of common outstanding common shares to 19,180,639.[74]

v.  On July 28, 2017, DryShips announced that the Company had sold an additional 5,898,364 shares to Kalani at an average price of $1.11 per share, increasing the number of outstanding common shares to 25,079,003.[75]

w.  On August 4, 2017, DryShips announced that the Company had sold an additional 6,468,435 shares to Kalani at an average price of $1.31 per share, increasing the number of outstanding common shares to 31,547,436.[76]

85.  Although two of the announced sales to Kalani pursuant to the April 3 Agreement were at an average price below the $1.00 Floor Price, since Kalani had the right to reject Fixed Requests below the Floor Price, Kalani's purchases at these levels give rise to a strong inference

---

[73]  *See* DryShips Inc., Form 6-K (July 21, 2017).

[74]  *See* DryShips Inc., Form 6-K (July 25, 2017).

[75]  *See* DryShips Inc., Form 6-K (July 28, 2017).

[76]  *See* DryShips Inc., Form 6-K (August 4, 2017).

that DryShips agreed to sell Optional Amount shares to Kalani below the Floor Price in order to guarantee Kalani a profit and incentivize it to purchase additional shares.

### 7.   August 2017: The SEC Subpoenas DryShips and the Scheme Ends

86.     On August 11, 2017, DryShips abruptly announced: (i) the termination of the April 3 Agreement with Kalani; and (ii) that DryShips agreed not to conduct any equity offerings until after December 31, 2017, unless approved by a majority of unaffiliated stockholders.

87.     The termination of the April 3 Agreement with Kalani was unexpected since the agreement had not been fully utilized.  As of August 11, 2017, DryShips had sold to Kalani approximately $194 million worth of common shares out of the $226.4 million permitted by the April 3 Agreement.

88.     Based on information and belief, the April 3 Agreement was terminated prior to its full utilization because DryShips had received a subpoena from the SEC inquiring about its financing transactions with Kalani.

89.     However, DryShips did not disclose that it had received a subpoena from the SEC until August 30, 2017, when it announced that the SEC was "requesting certain documents and information from the Company in connection with offerings made by the Company between June 2016 and July 2017."[77]  The date that the subpoena was received has never been specified in DryShips' public disclosures, though Top Ships disclosed it had received a similar subpoena from the SEC on August 1, 2017.  Based on information and belief, the SEC investigation remains ongoing.

90.     By the end of the Class Period, as a result of Defendants' manipulative conduct, DryShips had a market capitalization of approximately $238 million, despite having raised over

---

[77]     *See* DryShips Inc., Form 6-K (August 30, 2017).

$700 million from investors since June 8, 2016.  The decimation of shareholder value was entirely attributable to the undisclosed agreement between DryShips and Kalani, through which Defendants manipulated the price of DryShips common stock through manipulative and deceptive stock offerings and reverse stock splits.

91.     While shareholders lost hundreds of millions of dollars, Defendants reaped the benefits of their fraudulent scheme.  Economou has earned millions of dollars through self-dealing, as monies have been funneled to companies he owns and controls, as detailed below.  Similarly, Kalani made tens of millions of dollars in commissions, fees, and profits from its resale of the discounted DryShips common stock to unsuspecting investors in the secondary market.

### D.     DryShips' and Kalani's Undisclosed Agreement Can Be Inferred from Their Conduct

92.     DryShips' conduct in authorizing eight reverse stock splits in the immediate aftermath of its agreements with Kalani is inexplicable but for the existence of the alleged Undisclosed Agreement.  No company board would conduct so many reverse stock splits but for its insiders having some personal profit motive.

93.     There is a large body of research regarding when reverse stock splits are conducted, for what reasons, with what effect, and at what cost.  That research shows that the number, frequency, and cumulative value of the splits deployed by DryShips were a complete outlier and utterly inconsistent with DryShips' claims that reverse stock splits were conducted in the "best interest" of the company, to raise its stock price and to meet NASDAQ's minimum listing price.

94.     For example, a 2015 study of all reverse splits between 1980 and 2010 executed by public companies trading in the U.S. across all stock exchanges found that just five companies during this 30-year period had performed as many as five reverse stock splits, with the most extreme case (which led to an SEC investigation for fraud) having reverse split the stock five times

within four years.  *See* Claire E. Crutchley & Steven Swidler, *Multiple Reverse Stock Splits (Investors Beware!)*, 39 JOURNAL OF ECONOMICS AND FINANCE 357, 359 (2015) ("Crutchley").[78] Indeed, only 2.2% of the 1,807 companies who conducted a reverse stock split during this entire 30-year period conducted three or more reverse splits.  *Id.*  In addition, 85% of the reverse stock splits identified in the study utilized a split factor (the number of old shares exchanged for one new share) of 10 or less, and the median years between individual company's reverse stock splits fell between two and three years.  *Id.* at 360-62.

95.     Further, reverse stock splits are costly to implement — attorney's fees alone can run into the many hundred thousands of dollars — and have adverse consequences in terms of investor sentiment and stock price performance.[79]  As such, they are usually engaged in by financially distressed companies as a last resort.  And even then, a reverse stock split is typically a one and done proposition.

96.     This research suggests that DryShips' eight reverse stock splits between March 11, 2016, and July 21, 2017, five of which were conducted between January 23, 2017, and July 21, 2017, were completely out of the ordinary.  This conclusion is buttressed by Plaintiffs' own analysis of the 3,212 private placement (or PIPEs) transactions reported as having been conducted by 1,864 issuers listed on U.S. exchanges across 2016 and 2017.[80]  As shown in Table 1 below,

---

[78]     *See also* Elnahas, Ahmed, Jain, Pankaj K. & McInish, Thomas H., *Stock Splits, Accounting Manipulation, and Unwarranted CEO Compensation* (May 11, 2016) at 9. Available at SSRN: https://ssrn.com/abstract=2800765 or http://dx.doi.org/10.2139/ssrn.2800765 (discussing literature of reasons why reverse splits take place, noting "Bacon, Salandro, and Shin (1993), and Peterson and Peterson (1992) document that corporate managers mention image improvement, marketability, increased ability to attract different segments of investors, and meeting stock market listing requirements as the main reasons for reverse splits. Many empirical studies . . . find that those stated objectives are not really achieved with reverse splits. Our analysis shows that, for many firms, ***a reverse split results from prior misdeeds in corporate gamesmanship***."  (Emphasis added).

[79]     *See* Crutchley at 357, 361.

[80]     Included in this analysis are private placement offerings of Common Stock; Convertible Preferred Stock; non-Convertible Preferred Stock (with Warrants); Convertible Debt; non-Convertible Debt (with Warrants); other Convertible Securities; Prepaid Warrants; Equity Lines; and At-the-Market Offerings.

of the 1,864 companies responsible for these PIPEs transactions, only 21% have ever conducted a reverse stock split, and only 0.54% had performed four or more reverse stock splits in their lifetime. DryShips, Diana, and Top Ships were the only three issuers in this sample to have conducted six or more reverse splits in their lifetime.

**Table 1: Number of reverse stock splits conducted by 2016 and 2016 PIPEs issuers across their lifetime**

| Reverse Stock Splits Across History | Number of Issuers | Percentage of Total Issuers |
|:---:|:---:|:---:|
| 0 | 1472 | 78.97% |
| 1 | 269 | 14.43% |
| 2 | 81 | 4.35% |
| 3 | 32 | 1.72% |
| 4 | 6 | 0.32% |
| 5 | 1 | 0.05% |
| 6 | 1 | 0.05% |
| 7 | 0 | 0.00% |
| 8 | 1 | 0.05% |
| 9 | 1 | 0.05% |

97.    More importantly, as shown in Table 2 below, only 8.58% of the issuers who conducted PIPEs transactions in 2016 and 2017 also conducted a reverse stock split during those same years. Indeed, only three of these issuers conducted more than two reverse stock splits across 2016 and 2017: DryShips, Diana, and Top Ships. Aside from these three companies, only 10 of the companies who closed PIPEs transactions in 2016 and 2017 also conducted two reverse stock splits in those years.

39

**Table 2: Number of reverse stock splits conducted in 2016 and 2017 by 2016 and 2017 PIPEs issuers**

| Reverse Stock Splits Across 2016 and 2017 | Number of Issuers | Percentage of Total Issuers |
|:---:|:---:|:---:|
| 0 | 1704 | 91.42% |
| 1 | 147 | 7.89% |
| 2 | 10 | 0.54% |
| 3 | 0 | 0.00% |
| 4 | 0 | 0.00% |
| 5 | 1 | 0.05% |
| 6 | 1 | 0.05% |
| 7 | 0 | 0.00% |
| 8 | 1 | 0.05% |

98.     Plaintiffs' research demonstrates that conducting multiple reverse stock splits over a short period of time is not a necessary corollary of conducting PIPEs transactions, even where the transaction is conducted by a financially distressed company such as DryShips.  Even when the analysis is limited to the 326 PIPEs transactions across 2016 to 2017 where the issuance amount, excluding warrant coverage, exceeded 50% of the issuers' market capitalization, the results still suggest DryShips' conduct is an outlier.  Of the 267 companies responsible for these 326 PIPEs transactions, only 21.7% also conducted at least one reverse stock split in 2016 or 2017, and no issuer dealing with an investor other than Kalani conducted more than two reverse stock splits in those years:[81]

---

[81]     The two issuers who conducted 5 and 8 splits across 2016 and 2017 as shown in Table 3 are Top Ships and DryShips, respectively.  Diana does not appear in this table, as its issuance of preferred stock to Kalani did not exceed 50% of its market capitalization and as Plaintiffs have excluded warrants from this analysis.

**Table 3: Number of reverse stock splits conducted in 2016 and 2017 by 2016 and 2016 PIPEs issuers whose issuance exceeded 50% of their market capitalization**

| Reverse Stock Splits Across 2016 and 2017 | Number of Issuers | Percentage of Total Issuers |
|:---:|:---:|:---:|
| 0 | 209 | 78.28% |
| 1 | 49 | 18.35% |
| 2 | 7 | 2.62% |
| 3 | 0 | 0.00% |
| 4 | 0 | 0.00% |
| 5 | 1 | 0.37% |
| 6 | 0 | 0.00% |
| 7 | 0 | 0.00% |
| 8 | 1 | 0.37% |

99.     Furthermore, the fact that DryShips conducted each of its reverse stock splits only after its stock price fell below the price floor in its PIPEs transactions with Kalani,[82] strongly suggests that these splits were performed to facilitate Kalani's conversion of further convertible securities or purchases of common stock in the PIPEs transactions.  In addition, at least for the August 15, 2016 reverse stock split, had DryShips intended the split to help it maintain its listing on NASDAQ by keeping its stock price above $1.00, as DryShips suggested in its public announcements, one would have expected it to have conducted the stock split as soon as its stock price dropped below $1.00, rather than wait for a prolonged period of trading below that price.

---

[82]     *See* Exhibit B for a table detailing the DryShips' stock price and trading volume across the Class Period. Note, that while DryShips shares closed at $1.01 on January 20, 2017 (before the January 23, 2017 reverse stock split), the stock traded below $1.00 during intraday trading.

100.     Additionally, if only one company who dealt with Kalani had conducted multiple reverse stocks splits in the manner that DryShips did, one might be able to attribute those splits to a misguided desire on the Company's part to keep its stock price above $1.00 and maintain its NASDAQ listing.  But the fact that Kalani reached strikingly similar PIPEs deals with two other companies in 2016 and 2017, Diana and Top Ships, and both of these companies also performed multiple reverse stock splits after their share price fell below the exercise price of the convertible securities issued by them, suggests this pattern of behavior was by design.[83]   In particular, it suggests that DryShips', Diana's, and Top Ships' repeated use of reverse stock splits to prop up their respective share prices above the price floors applicable to the convertible securities granted to Kalani was a part and parcel of their wider agreement with Kalani.

101.     But for the existence of the alleged Undisclosed Agreement, DryShips would not have authorized any further reverse stock splits after the August 15, 2016 split, as it would have recognized that any further splits would not be in the best interest of shareholders and would not achieve the stated objectives of maintaining stable, higher prices.  Had any reasonable board not known of Kalani's intentions in advance, it would have torn up the first June 8 SPA with Kalani after Kalani's trading activity pummeled DryShips' share price below $0.37 in short order after the first reverse stock split.  The fact that DryShips and Economou failed to walk away from the June 8 SPA, entered into four more agreements with Kalani, and continued to conduct reverse stock splits to facilitate Kalani's continued conversion and sale of its convertible securities under the June 8 and November 16 SPAs, and purchases of common stock pursuant to the December 23,

---

[83]     There is no record of Kalani having conducted any private placements with an issuer listed on a U.S. exchange outside of DryShips, Diana, and Top Ships.  In both cases, the evidence suggests that, like here, Kalani immediately sold its common stock in Diana and Top Ships upon converting its convertible securities, causing these issuers' respective stock prices to drop.

February 17, and April 3 Agreements, strongly suggests that they had made a prior commitment to do so.

> ### E.  Defendants Diverted Money Raised in the Fraudulent Financing Scheme to Their Related Affiliates

102.    Throughout the Class Period, the DryShips Defendants diverted hundreds of millions of dollars received through its fraudulent scheme with Kalani to affiliated entities.

103.    At all relevant times, DryShips has operated as an owner of vessels, the management and operation of which are contracted out to other entities, many or most of which are under the control of Defendants Economou and/or Kandylidis.  Through their affiliated entities, Economou and Kandylidis were motivated to, and did, derive substantial financial benefits prior to and throughout the Class Period that were dependent on the perpetration of Defendants' fraudulent scheme.

104.    The related party transactions, which benefitted Economou and Kandylidis, came at a substantial cost to DryShips and its investors.  For example, for the years ended December 31, 2017 and 2016, DryShips recorded general and administrative expenses for related-party transactions of approximately $23.9 million and $32.4 million, respectively.  The payments made by DryShips to related entities in 2017 would not have been possible but for the capital injections received from Kalani as a result of DryShips' participation in the Undisclosed Agreement.

105.    The relationship between Economou- and Kandylidis-controlled entities and DryShips are numerous and intertwined, often with several overlapping connections.  These relationships are explained more fully below, but can be summarized as follows:

> a.  DryShips entered into consulting or services agreements with the following entities, all of which are controlled and/or beneficially owned by Economou and/or Kandylidis: (i) Fabiana Services S.A. ("Fabiana"); (ii) TMS Offshore Services Ltd. ("TMS Offshore"),

TMS Tankers Ltd. ("TMS Tankers"), and TMS Bulkers Ltd. ("TMS Bulkers") (collectively, "TMS"); (iii) Vivid Finance Limited ("Vivid"); (iv) Basset Holdings Inc. ("Basset Holdings"); and (v) Cardiff Tankers Inc. ("Cardiff Tankers") and Cardiff Gas Ltd. ("Cardiff Gas");

b.  DryShips entered into a promissory note with the following entity, which is controlled and/or beneficially owned by Economou and Kandylidis: (i) Ocean Rig UDW, Inc. ("Ocean Rig"), a former subsidiary of DryShips where Economou remains CEO and Chairman and Kandylidis remains President and CFO, both of whom maintain substantial holdings in Ocean Rig; and

c.  DryShips entered into credit facility agreements or rights offerings with the following entities, all of which are controlled and/or beneficially owned by Economou: (i) Sifnos; (ii) Sierra Investments Inc. ("Sierra"); (iii) Mountain Investments Inc. ("Mountain"); and (iv) SPII Holdings ("SPII").

106.    Additionally, DryShips entered into numerous agreements with undisclosed companies controlled and/or beneficially owned by Economou.

### 1.    Fabiana

107.    Economou owns and controls Fabiana, a Marshall Islands entity, and provided services as its CEO from 2008 until December 31, 2016.  Pursuant to the terms of their consulting agreement, DryShips was obligated to pay Fabiana annual remuneration and had discretion to award Fabiana a cash or equity-based bonus compensation for services provided at the end of the year.

108.    Over the course of the consulting agreement, which was terminated at no cost on December 31, 2016, Fabiana received a total of 13.3 million shares of DryShips common stock and $1 million in cash.

## 2.     TMS Entities

109.     TMS, another Economou-controlled entity, also acted as a DryShips consultant. Economou controls and beneficially owns TMS Offshore, TMS Tankers, and TMS Bulkers, which have managed DryShips' vessels since January 1, 2011.  According to DryShips' March 13, 2017 Form 20-F, DryShips "*depend[s] entirely on the TMS Entities to manage and charter [its] drybulk, tanker, LPG, and offshore support fleet*."[84]

110.     Specifically, TMS Bulkers provides comprehensive drybulk ship management services, including technical supervision, such as repairs, maintenance, and inspections, safety and quality, and crewing and training, as well as supply provisioning to DryShips.

111.     As reported in the Company's April 4, 2018 Form 20-F, during the years ended December 31, 2017 and 2016, total charges from TMS Bulkers under the management agreements amounted to $11.8 million and $19 million, respectively.[85]

112.     TMS Offshore is responsible for providing overall technical and crew management of the Company's platform supply and oil spill recovery vessels.

113.     For the years ended December 31, 2017 and 2016, total charges from TMS Offshore Services amounted to $4.7 million and $4.6 million, respectively.[86]

114.     TMS Tankers provides the commercial and technical management functions of DryShips' tankers, including while tankers are under construction.

115.     For the year ended December 31, 2017, total charges from TMS Tankers amounted to $1.4 million.[87]

---

[84]     DryShips Inc., Form 20-F (March 13, 2017).

[85]     DryShips Inc., Form 20-F (April 4, 2018).

[86]     *Id.*

[87]     *Id.*

### 3. Ocean Rig

116.     Prior to and throughout the Class Period, DryShips and Ocean Rig engaged in a series of financial agreements.  Ocean Rig is an international drilling contractor and former subsidiary of DryShips, of which Economou is the CEO and Chairman.  DryShips purchased 30% of Ocean Rig for $405 million in 2007, paying a $4 million brokerage free to Cardiff Marine, another Economou-owned company.  Kandylidis served as the President and CFO of Ocean Rig until January 2018, at which point he was appointed Executive Vice Chairman.

117.     On April 5, 2016, however, DryShips sold its stake in Ocean Rig to an Ocean Rig subsidiary for approximately $50 million.  The sale's proceeds were then partly used to reduce the outstanding amount under the revolving credit facility provided to the Company by Sifnos, an entity beneficially owned by Economou.

### 4. Sifnos and Sierra

118.     On October 21, 2015, as amended on November 11, 2015, DryShips entered into an Initial Revolving Credit Facility of up to $60 million for general working purposes with Sifnos, an entity that is controlled and beneficially owned by Economou.

119.     The 2015 Initial Revolving Credit Facility was secured by shares that DryShips held in Ocean Rig and Nautilus Offshore Services Inc. ("Nautilus"), a company acquired by DryShips in 2015 that was financed through an Economou-controlled entity, and by a first priority mortgage over one Panamax drybulk carrier.  The Initial Revolving Credit Facility was amended on March 24, April 5, September 9, and October 31, 2016.  As of December 2016, DryShips had repaid $33.5 million under this facility and wrote off approximately $1.6 million of overdue interest.

120.     Separately, on April 5, 2016, DryShips paid Sifnos an additional $45 million from the sale proceeds in connection with the sale of DryShips' ownership of Ocean Rig common stock.

121.     On December 30, 2016, Sifnos entered into a New Revolving Credit Facility of up to $200 million, which refinanced the majority of DryShips' outstanding debt, including that from the Initial Revolving Credit Facility.  The new agreement carried an interest rate of LIBOR plus 5.5%, was non-amortizing, had a tenor of three years, no financial covenants, and was arranged with a fee of 2.0%.   In addition, Sifnos had the ability to participate in realized-asset-value increases of the collateral base in a fixed percentage of 30%. As of December 31, 2016, there was $121 million outstanding under the New Revolving Credit Facility.

122.     On April 10, 2017, the credit facility was amended once again, resulting in an amendment fee of $2.0 million payable to Sifnos and an increased margin over LIBOR by 1% to 6.5%.

123.     On May 23, 2017, DryShips was released from all of its obligations and liabilities under the New Revolving Credit Facility from Sifnos and entered into a credit facility with Sierra (the "Sierra Credit Facility"), and a separate participation rights agreement with Mountain, an entity beneficially owned by Economou.

124.     The Sierra Credit Facility carried an interest rate of LIBOR plus 6.5%, was non-amortizing, had a tenor of five years, no financial covenants, and was arranged with a fee of 1%. Mountain also had the ability to participate in realized-asset-value increases of all of DryShips present and future assets, except the vessel Samsara, in a fixed percentage of 30% in the case of their sale.

### 5.     Vivid

125.     Vivid is controlled by Economou and has provided DryShips with financing-related services since 2010, including: (i) negotiating and arranging new loan and credit facilities, interest rate swap agreements, foreign currency contracts, and forward exchange contracts; (ii)

renegotiating existing loan facilities and other debt instruments; and (iii) raising equity or debt in the capital markets.

126.    In exchange for its services, Vivid is entitled to a fee equal to 0.20% on the total transaction amount.  DryShips has not disclosed the fees that it paid to Vivid.

### 6.    Basset Holdings

127.    Effective January 1, 2015, the Company entered into a consultancy agreement with Basset Holdings, a Marshall Islands company beneficially owned by Kandylidis. Basset Holdings provides the services of Kandylidis in his capacity as DryShips' Executive Vice President, President, and CFO.  Effective December 31, 2016, the consultancy agreement with Basset Holdings was terminated.  DryShips has not disclosed the fees that it paid to Basset Holdings.

### 7.    Cardiff Tankers and Cardiff Gas

128.    Cardiff Tankers and Cardiff Gas, two Marshall Islands identities, are beneficially owned by Economou and provide services to DryShips related to the sourcing, negotiation, and execution of charters.  Cardiff Tankers and Cardiff Gas are entitled to a 1.25% commission on the charter hire earned by those vessels.  DryShips has not disclosed the amount that it has paid to Cardiff Tankers and Cardiff Gas for their services.

### 8.    Purchase and Sale Agreements for DryShips Vessels

129.    DryShips has a history of engaging in purchase and sale agreements with entities controlled by Economou for the benefit of Economou, many of which involve DryShips *paying* entities for vessels the entities purchased.

130.    This pattern began long before the Class Period and has continued to this day.

131.    For example, on March 24, 2016, DryShips executed a sales agreement with undisclosed entities controlled by Economou for the sale of DryShips' Capesize vessels (Rangiroa, Negonego, and Fakarava) for an aggregate price of $70 million, along with the associated debt of

48

$102.1 million.  Since the debt associated with these vessels exceeded the purchase price, DryShips was obligated to pay the purchaser the difference between the purchase price and the outstanding balance of the debt.  DryShips made a prepayment of $15 million in this regard on March 30, 2016 and, on March 31, 2016, delivered the shares of the vessel-owning companies to their new owners, *i.e.*, Economou.

132.    Similarly, on September 16, 2016, DryShips entered into a sale agreement with an undisclosed entity beneficially owned by Economou for the sale of shares of the owning company of the Panamax vessel, Oregon, including the associated bank debt, for a gross price of $4.675 million. As part of the transaction, DryShips ***paid*** $7.83 million, the difference between the purchase price and the outstanding balance of the respective debt facility, to Economou.

133.    Likewise, on October 26, 2016, the Company entered into a sales agreement with undisclosed entities beneficially owned by Economou for the sale of the owning companies of three Panamax vessels (Amalfi, Galveston (the vessel Galveston was sold and delivered to its owners on November 30, 2015), and Samatan), along with the associated bank debt for an aggregate gross price of $15 million.  As part of the transaction, the Company also ***paid*** the amount of $58.7 million, being the difference between the purchase price and the outstanding balance of the respective debt facility, to the new owners, *i.e.*, Economou.

134.    On January 5, 2017, DryShips announced that it had entered into a "zero cost" LPG Option Agreement with undisclosed companies controlled by Economou to purchase up to four very large gas carriers ("VLGCs").  On January 19 and March 10, 2017, the first and second VLGCs were acquired, respectively, for a purchase price of $83.5 million each. In connection with this acquisition, DryShips entered into new service agreements with TMS and Cardiff Gas amounting to total charges of $0.5 million for the year ended December 31, 2017.

135.     The third and fourth VLGCs were acquired on April 6, 2017 for $83.5 million each. For year ended December 31, 2017, DryShips reported operating expenses amounting to $5.7 million for three of the four VLGC vessels acquired.  The Company also reported general and administrative expenses related to three of the four VLGC vessels as amounting to $1.8 million.

136.     On May 15, 2017, DryShips entered into a purchase agreement with a company beneficially owned by Economou for the purchase of shares of the owning company of the Suezmax newbuilding vessel, Samsara, for a purchase price of $64 million.

**F.     Economou Manipulated His Ownership of DryShips Stock and Debt to Recoup Control of DryShips After the Scheme Ended Before Taking the Company Private**

137.     In addition to the transactions described above, Defendant Economou personally profited through his control over DryShips' stock and its debt and ultimately by taking the newly prosperous Company private after it had raised over $700 million from unsuspecting investors by means of the fraudulent scheme detailed above.

138.     Prior to the scheme, on March 31, 2016, Economou owned 17.6% of the total outstanding common shares of DryShips stock.

139.     However, on August 11, 2017, the day DryShips announced that its relationship with Kalani was terminated, the Company also announced that Economou would return ownership to himself and recoup a majority interest in DryShips' common stock in a cashless transaction ostensibly valued at $100 million, after having made the Company much wealthier while investors' holdings were effectively rendered worthless.

140.     Under the terms of the transaction, DryShips agreed to sell Economou $100 million worth of common shares for $2.75 per share.  However, Economou would pay no cash to the Company. Rather, the consideration for the deal consisted of a number of arrangements with Economou-affiliated entities: (i) a 49% interest in a tanker operator, Economou-controlled

50

Heidmar; (ii) the termination of participation rights owned by another Economou-affiliated investment company; (iii) forfeiture by Economou-controlled Sifnos of the super-voting Series D preferred shares beneficially owned by Economou; and (iv) cancellation of $27 million in debt owed by DryShips to an Economou-affiliated investment company.

141.    Unsurprisingly, the shipping industry quickly questioned the value of this deal, noting that the Series D preferred shares were not convertible to common stock and casting doubt on whether the consideration was, in fact, worth $100 million.[88]  However, according to a Schedule 13D filed by Economou on September 5, 2017, the transaction, which closed on August 29, 2017, left Economou holding a majority ownership stake in DryShips — *i.e.*, 36,363,639 of the 67,911,072 outstanding as of September 1, 2017 or 53%.

142.    Also on August 11, 2017, DryShips announced that it would conduct a rights offering to allow public shareholders to purchase up to $100 million worth of DryShips common shares for $2.75 per share (an over 10% discount to the $3.10 price at which DryShips closed on that date), with any remaining shares to be purchased by an Economou-affiliated entity.

143.    On October 4, 2017, DryShips announced that the previously announced rights offering had closed.  Public shareholders predictably had elected to purchase only $0.8 million worth of shares, and the Economou-affiliated entity had therefore purchased the remaining $99.2 million in shares.  This further increased Economou's ownership interest to 69.5% of the 104,274,708 million common shares outstanding.

---

[88]        Michael Angell, *Other DryShips concessions could be worth around $48m*, TRADEWINDS (Aug. 15, 2017), http://www.tradewindsnews.com/finance/1327507/other-dryships-concessions-could-be-worth-around-usd-48m; Joe Brady, *Did DryShips shareholders pay fair price for Heidmar?*, TRADEWINDS (Aug. 16, 2017) http://www.tradewindsnews.com/weekly/1327505/did-dryships-shareholders-pay-fair-price-for-heidmar.

144.    Having secured a clear majority interest, Economou then took steps towards taking the now financially sound Company private.  Two stock buy-back programs left Economou with a more than 80% interest by the end of February 2018.

145.    Then, on August 19, 2019, DryShips announced that it had entered into a merger agreement with SPII Holdings, a company controlled by Economou, under which SPII would acquire outstanding shares of the Company that it did not already own for $5.25 per share.

146.    On October 9, 2019, DryShips announced that shareholders had voted in favor of the merger at a special meeting held on that date.  On October 11, 2019, the Company announced the completion of its acquisition by SPII Holdings and its delisting from the NASDAQ.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

147.    In furtherance of their scheme, Defendants made numerous materially false and misleading statements and omissions.

148.    First and foremost, neither the 2015 Registration Statement nor the Prospectus Supplements, filed on June 8, November 17, and December 27, 2016 and February 17 and April 3, 2017 (collectively, the "SPA Prospectus Supplements"), in connection with the securities issuances to Kalani and incorporated into the 2015 Registration Statement, disclosed the parties' Undisclosed Agreement to manipulate the price of DryShips common stock to enrich themselves at the expense of investors.

149.    Instead, the 2015 Registration Statement and the SPA Prospectus Supplements contained certain boilerplate disclosures about the potential for purportedly hypothetical dilution from purportedly hypothetical future share issuances, including that, *inter alia*:

a.    "The market price of our common shares *could* decline due to sales, or the announcements of proposed sales, of a large number of common shares in the market,

including sales of common shares by our large shareholders, or the perception that these sales could occur."  [Emphasis added];

b. "We *may* issue such additional equity or convertible securities to raise additional capital. The issuance of any additional shares of common or preferred stock or convertible securities *could be substantially dilutive* to our shareholders.  Moreover, to the extent that we issue restricted stock units, stock appreciation rights, options or warrants to purchase our common shares in the future and those stock appreciation rights, options or warrants are exercised or as the restricted stock units vest, our shareholders *may experience further dilution*.  Holders of shares of our common shares have no preemptive rights that entitle such holders to purchase their pro rata share of any offering of shares of any class or series and, therefore, such sales or offerings *could* result in increased dilution to our shareholders."  [Emphasis added]; and

c. "[O]ur existing shareholders' proportionate ownership interest in us will decrease; . . . the relative voting strength of each previously outstanding common share *may* be diminished; and . . . the market price of shares of our common stock *may* decline."  [Emphasis added].

150.    These misstatements were repeated in DryShips' Form 20-F filed on March 13, 2017, which was signed by Defendant Kandylidis (the "2016 Annual Report").  The report stated:

> ***Future sales of our common shares could cause the market price of our common shares to decline.***
>
> The market price of our common shares ***could*** decline due to sales, or the announcements of proposed sales, of a large number of common shares in the market, including sales of common shares by our large shareholders, or the perception that these sales could occur. . . .

We *may* issue such additional equity or convertible securities to raise additional capital. The issuance of any additional shares of common or preferred stock or convertible securities *could be* substantially dilutive to our shareholders. Moreover, *to the extent that we issue* restricted stock units, stock appreciation rights, options or *warrants to purchase our common shares* in the future *and those* stock appreciation rights, options or *warrants are exercised* or as the restricted stock units vest, our shareholders *may* experience further dilution. [Emphasis added].

151.    The statements and omissions in ¶¶148-50 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because at the time of these statements, Defendants were adhering to the Undisclosed Agreement, which entailed both the issuance of securities to Kalani, and their subsequent sale in a manner that would necessarily depress DryShips share value.

152.    In failing to disclose the existence of the Undisclosed Agreement and its likely impact, the Registration Statement also omitted known trends and demands required to be disclosed under Item 303 of SEC Regulation S-K, which requires the disclosure of "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."   Additionally, the Undisclosed Agreement was a significant risk factor required to be disclosed under Item 105 of SEC Regulation S-K.

153.    Second, the 2015 Registration Statement and SPA Prospectus Supplements falsely stated: "We intend to use the net proceeds [from the sale of the offered securities] for general corporate purposes" and/or "to repay indebtedness under one or more of our existing credit facilities . . ., although we have no present agreements to do so."

154.    The statements in ¶¶153 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because: (i) DryShips and Kalani had reached the Undisclosed Agreement to manipulate DryShips' stock price, which

involved continuing dilutive share issuances and reverse stock splits, which they intended to continue for the foreseeable future (and which was, in fact, continued until Defendants learned that the SEC was investigating their scheme); (ii) the ongoing stock issuances were not accretive to shareholder value, but, in fact, harmed shareholders for the benefit of Defendants; and (iii) the proceeds were not used "for general corporate purposes" and/or "to repay indebtedness," but instead were misappropriated to personally enrich the DryShips Defendants.  These facts were also required to be disclosed under Items 105 and 303 for the reasons stated in ¶152 above.

155.    Third, the Form 6-Ks dated June 8, 2016, November 17, 2016, December 27, 2016, February 2, 2017, and April 3, 2017, which Defendant Economou signed, announced the June 8 SPA, the November 16 SPA, the December 27 Agreement, the February 2 Agreement, and the April 3 Agreement, respectively, and annexed them as an exhibit.  The June 8 SPA and the November 16 SPA each stated the following regarding manipulation of the price of DryShips' securities, without limitation:

> Neither the Company nor any of its Subsidiaries has, and, to the knowledge of the Company, no Person acting on their behalf has, directly or indirectly, (i) taken any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company or any of its Subsidiaries to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities (other than the Financial Advisor), or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company or any of its Subsidiaries.

156.    The December 27 Agreement, February 2 Agreement and April 3 Agreement each stated the following regarding manipulation of the price of DryShips' securities, without limitation:

> Neither the Company nor any of its officers, directors or Affiliates has, and, to the Knowledge of the Company, no Person acting on their behalf has, (i) taken, directly or indirectly, any action designed or intended to cause or to result in the stabilization or manipulation of the price of any security of the Company, or which caused or resulted in, or which would in the future reasonably be expected to cause or result

in, the stabilization or manipulation of the price of any security of the Company, in each case to facilitate the sale or resale of any of the Securities, or (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities.

157.   The June 8 SPA and November 16 SPA further represented: "The Company does not have any agreement or understanding with any Buyer with respect to the transactions contemplated by the Transaction Documents other than as specified in the Transaction Documents."

158.   The statements in ¶¶155-57 were materially false and misleading because they failed to disclose and, in fact, concealed, the existence of the Undisclosed Agreement.

159.   Fifth, in two DryShips shareholder proxies, signed by Economou and dated September 20, 2016 and April 3, 2017, both of which sought shareholder approval to amend DryShips' Articles of Incorporation to allow for one or more reverse stock splits at ratios of up to 1,000-for-one, Economou and DryShips stated that (i) "[t]he purpose for seeking approval to effect the reverse stock split is to increase the market price of each Common Share," (ii) the DryShips "Board believes that" the reverse split proposal "is in the best interest of the Company and the shareholders" and "will help maintain compliance with the minimum bid price of $1.00 per share listing that is a requirement to maintain the listing on (sic) the Company's Common Shares on the NASDAQ Capital Market," and (iii) "a reverse stock split will only be effected, if at all, upon a determination by the Board of Directors that a reverse stock split is in the Company's and the shareholders' best interests."

160.   The statements in ¶159 were materially false and misleading because the true purpose of the proposal was to enable DryShips to comply with its obligations under the Undisclosed Agreement to execute additional reverse stock splits whenever the price of its common stock fell below the Floor Price in its PIPEs transactions with Kalani.

## VI.     ADDITIONAL SCIENTER ALLEGATIONS

161.    At all relevant times throughout the Class Period, Defendants knew and/or recklessly disregarded that, *inter alia*, Defendants were engaged in an ongoing financing scheme involving a series of reverse stock splits and share issuances, which were intended to, and did, in fact, manipulate the price of DryShips common stock in order to benefit Defendants at the expense of shareholders.  In addition to the allegations set forth herein, each of the following demonstrates Defendants' scienter:

### A.     Defendants Reached an Undisclosed Agreement to Coordinate the Stock Issuances and Reverse Stock Splits

162.    At all relevant times, Defendants had direct access to information concerning DryShips' business, operations, and finances.  Through their ownership and/or control of DryShips and numerous related parties, Defendants Economou and Kandylidis also exerted their influence over the Company's Board to perpetuate the fraudulent financing scheme as described herein.

163.    The timing, sequence, and sheer number of the share issuances, common stock conversions and sales, and reverse stock splits in a matter of months are highly suspicious and indicative of a pre-planned and ongoing joint effort among Defendants to manipulate DryShips' stock price and deceive investors.

164.    Further, the multiple reverse stock splits executed by DryShips were all perfectly timed to raise the market price of DryShips' common stock above the floor prices in the PIPEs transactions with Kalani.  This was no coincidence and could only have occurred with Defendants' agreement to, knowledge of, and participation in, a deliberate fraudulent scheme.

### B.     Defendant Economou Personally Profited from the Fraudulent Scheme

165.    As discussed more fully in §IV.D, Defendant Economou, entities he owns and/or controls, and other related parties derived substantial profits from the financing scheme, while

preserving Economou's position of power and control over DryShips, both during and continuing after the Class Period.

166.    Specifically, DryShips paid substantial sums to Economou-controlled entities over the course of the Class Period for the following purported services: vessel sales, vessel management fees, and financing.

167.    Defendant Economou also profited as a result of his control over DryShips as its largest shareholder and largest creditor.  Utilizing his power and influence, Economou caused DryShips to issue him preferred stock with "super-voting" rights, which enabled him to secure voting control and approve the reverse stock splits that were critical to Defendants' scheme.  Then, after the scheme ended, Economou recouped control of DryShips via a cashless transaction, share buy-backs financed by the fraudulent scheme, and a rights offering before ultimately taking the Company private in a merger with yet another Economou-controlled entity.

### C.    Defendants Kalani and Bistricer Personally Profited from the Fraudulent Scheme

168.    Kalani also profited as a direct result of its knowledge and participation in Defendants' fraudulent scheme, earning tens of millions of dollars in commitment fees and profits from riskless purchases and sales of discounted DryShips common stock facilitated by the DryShips Defendants' timely reverse stock splits.

169.    In addition, simultaneously, Kalani executed nearly identical schemes with two other Greek shipping companies, Diana Containerships and Top Ships.

170.    Kalani's repeated use of the same financing scheme to defraud investors in three different companies is indicative of Defendants' knowledge and intent to mislead investors and fraudulently manipulate DryShips' stock price.

## VII.    LOSS CAUSATION/MATERIALIZATION OF THE RISK

171.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

172.    Throughout the Class Period, the price of DryShips' common stock was artificially inflated and/or maintained at an artificially high level, as a result of Defendants' fraudulent scheme to manipulate DryShips' stock price for the purpose of diverting Company assets and/or profits from sales of DryShips securities to Defendants, at the expense of investors and as a result of Defendants' materially false and misleading statements and omissions identified herein.

173.    As the true facts became known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of DryShips common stock declined, as the artificial inflation was removed from the market price of the stock, causing damage to Plaintiffs and members of the Class.

174.    The risks of Defendants' fraudulent Undisclosed Agreement began to materialize following DryShips' announcement on June 8, 2016 that the Company had entered into the first of five PIPEs transactions with Kalani.  Subsequently, as Defendants planned, the Kalani Defendants began converting the convertible preferred securities it received in the transaction into common shares and dumping them on the secondary market, driving the price of DryShips' common stock down and extracting value from shareholders.

175.    As detailed above, each time DryShips' share price declined below the floor price in the June 8 SPA and Kalani could no longer profitably convert its preferred stock into DryShips common stock, DryShips announced and procured further reverse stock splits to raise the price above the floor.  These reverse stock splits facilitated Kalani's further conversion and sale of the securities granted to it under the June 8 SPA, further depressing the price of DryShips' stock, thereby allowing the risks of Defendants' fraudulent Undisclosed Agreement and false statements

and omissions to continue to materialize. Further, as also noted above, while the reverse stock splits temporarily increased the share price of DryShips' common stock, these increases never offset, even temporarily, the loss in value to shareholders from having their shares merged. Consequently, on the first trading day of each reverse stock split, the price of DryShips' shares actually declined on a split-adjusted basis.

176.  The foregoing pattern was repeated following each of the other PIPEs transactions between DryShips and Kalani during the Class Period.

177.  By August 29, 2017, as a result of Defendants' ongoing fraudulent and manipulative conduct, the price of DryShips' common stock had declined to close at $3.50 per share on an unadjusted basis. At this share price, DryShips had a market capitalization of approximately $238 million, despite having raised $700 million dollars from Kalani since June 8, 2016. On an adjusted basis, taking into account the stock splits, the price of DryShips stock had declined to a fraction of a cent since June 8, 2016, a decline of over 99.999%. The value of 100,000 shares purchased on June 8, 2016 at $1.19 for $119,000 would have dwindled to just *$1.05* by the end of 2017.

178.  This shocking erosion in shareholder value was the direct result of Defendants' fraudulent scheme, which manipulated the price of DryShips common stock and induced purchases through the series of dilutive and manipulative stock offerings and reverse stock splits detailed herein.

179.  While reverse stock splits are not inherently manipulative, Defendants rendered those conducted by DryShips in this case manipulative through their failure to disclose that the splits were being conducted pursuant to the Undisclosed Agreement, which required DryShips to execute reverse stock splits each time the price of its common stock fell below the floor prices in

the PIPEs transactions.  This omission, as well as the affirmative misrepresentations detailed above, sent a false pricing signal to the market, namely that: (a) the price floor within the PIPEs transactions placed a restriction on Kalani's ability to convert its preferred stock should its prior conversions result in a decline in DryShips' stock price; and (b) the value of DryShips stock should rise in relative proportion to the ratios of the reverse stock splits deployed.

180.    Had Defendants, prior to the reverse stock splits, disclosed the Undisclosed Agreement and their shared intent to embark upon a course of conduct that would render DryShips common stock completely worthless, the market would have valued the shares as such and no amount of reverse stock splits would have changed that (as any multiple of zero is zero).

181.    As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of the DryShips' securities, which are now virtually worthless, Plaintiffs and the other Class members have suffered significant losses and damages.

## VIII.   CLASS ACTION ALLEGATIONS

182.    Plaintiffs bring this action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that purchased, or otherwise acquired, the securities of DryShips during the Class Period, and who were damaged thereby, seeking to pursue remedies under the Exchange Act.  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have, or had, a controlling interest.

183.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DryShips common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds

or thousands of members in the proposed Class.  Millions of DryShips shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by DryShips or its transfer agent and may be notified of the pendency of this action by U.S. mail, using the form of notice similar to that customarily used in securities class actions.

184.    Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws, which is complained of herein.  Further, Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

185.    Common questions of law and fact exist, as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' conduct alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, operations, and management of DryShips;

c.    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

d.    whether the prices of DryShips securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;

> e.    whether Class members have sustained damages and, if so, the proper
>        measure of damages; and
>
> f.    whether Defendants' manipulative conduct negatively impacted the price of
>        DryShips stock.

186.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

187.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

> a.    Defendants made public misrepresentations or failed to disclose material facts
>        during the Class Period;
>
> b.    the omissions and misrepresentations were material;
>
> c.    DryShips securities are traded in an efficient market;
>
> d.    the Company's shares were liquid and traded with moderate to heavy volume
>        during the Class Period;
>
> e.    the Company traded on the NASDAQ and was covered by multiple analysts;
>
> f.    the misrepresentations and omissions alleged would tend to induce a
>        reasonable investor to misjudge the value of the Company's securities; and
>
> g.    Plaintiffs and members of the Class had no knowledge of the omitted or
>        misrepresented facts.

188.    Alternatively, Plaintiffs and members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.    NO SAFE HARBOR

189.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein.  To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.  Moreover, the safe harbor does not apply to material omissions.

## COUNT I
### Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
#### Against All Defendants

190.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

191.    Defendants, by their conduct alleged herein, violated Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 (a), (b), and (c), promulgated thereunder by the SEC.

192.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct, which was intended to, and throughout the Class Period did, (a) deceive the investing public, including Plaintiffs and the Class, as alleged herein; and (b) cause Plaintiffs and other

members of the Class to purchase DryShips' common stock at artificially inflated and distorted prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants made the materially false and misleading statements alleged herein.

193.    Each of the Defendants (a) employed devices, schemes, and artifices to defraud; (b) made, or participated in making, false statements of material facts and omitted to state material facts necessary to make the statements made by Defendants not misleading; and (c) engaged in acts, practices, and courses of conduct which operated as fraud and deceit upon the Class in connection with the purchase of DryShips common stock in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a), (b), and (c).  Defendants are sued as primary participants in the wrongful and illegal conduct alleged herein.

194.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to manipulate the price of DryShips' common stock and conceal their scheme, including through the creation and/or dissemination of false or misleading statements of material fact, as set forth herein.

195.    Defendants' liability arises from the fact that they developed and engaged in this scheme, and were privy to, participated in, and were otherwise aware of the dissemination of information to the investing public, which they knew, or recklessly disregarded that the nature of which, was materially false and misleading.

196.    Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless disregard for the truth.  Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public and manipulating the price of DryShips' common stock.

197.    Had Plaintiffs and the other Class members known the truth, which was not disclosed by Defendants, Plaintiffs and the other Class members would not have purchased, or otherwise acquired, DryShips common stock or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated and distorted prices which they paid.

198.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages.

199.    By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c) promulgated thereunder, and they are liable to Plaintiffs and the Class for damages suffered in connection with their transactions in DryShips common stock during the Class Period.

**COUNT II**
**Violation of §9 of the Exchange Act**
**Against All Defendants**

200.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

201.    Defendants violated §9 of the Exchange Act in that they conspired to engage and did engage in a deceptive financing scheme to manipulate the price of DryShips common stock and induce the purchase of DryShips common stock by others, in violation of §9(a)(2) of the Exchange Act.

202.    Further, to induce the purchase of DryShips common stock, through their dissemination of false statements during the Class Period, Defendants misled investors concerning the nature of their actions and its effect on DryShips common stock in violation of §9(a)(4) of the Exchange Act.

203.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of DryShips common stock during the Class Period.

## COUNT III
### Violation of §20(a) of the Exchange Act
### <u>Against the Individual Defendants</u>

204.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

205.     DryShips is a primary violator of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as alleged herein.

206.     The Individual Defendants acted as controlling persons of DryShips within the meaning of §20(a) of the Exchange Act.  Each of the Individual Defendants participated in the day-to-day operations and management of the Company and, therefore, is presumed to have had the power to control or influence, and, during the Class Period, did exercise their power to control and influence, DryShips' conduct giving rise to the violations of the federal securities laws alleged herein.  In addition, the Individual Defendants were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.

207.     By virtue of their positions as controlling persons of DryShips, and by reason of the conduct described in this Count, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for the primary violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c), committed by DryShips.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Fed. R. Civ. P. 23;

B.      Awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## XI.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:   May 28, 2020
         New York, New York

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

  _/s/ Deborah Clark-Weintraub_
Deborah Clark-Weintraub
Thomas L. Laughlin, IV
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
dweintraub@scott-scott.com
tlaughlin@scott-scott.com

Shannon L. Hopkins (SH-1887)
**LEVI & KORSINSKY, LLP**
733 Summer Street, Suite 304
Stamford, CT 06901
Telephone: (203) 992-4523
Facsimile:  (212) 363-7171
shopkins@zlk.com

*Counsel for Lead Plaintiff DRYS Investor Group*

68