UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
HENRY SILVERBERG, individually and on   :
behalf of All Others Similarly Situated,      :   **MEMORANDUM DECISION AND**
                               :   **ORDER**
                  Plaintiff,    :
                               :   17-cv-4547 (BMC)
       - against -            :
                               :
                               :
DRYSHIPS, INC., GEORGE ECONOMOU,    :
ANTHONY KANDYLIDIS, KALANI          :
INVESTMENTS LIMTED, MURCHINSON,    :
LTD., and MARC BISTRICER,           :
                               :
                Defendants.    :
--------------------------------------------------------- X

**COGAN**, District Judge.

This is a securities fraud action under §§ 9, 10(b), and 20(a) of the Securities Exchange

Act. It involves a Greek shipping company, defendant DryShips, Inc., and several refinancing

agreements it undertook in 2016 and 2017. In essence, the third amended consolidated class

action complaint ("TAC") alleges that, in connection with the refinancings, DryShips – along

with defendants Economou, the president, CEO, and founder of DryShips, and his nephew

Kandylidis, the CFO of DryShips – (the "DryShips defendants") did not disclose a secret

agreement with its investors, defendants Kalani Investments Ltd.; defendant Murchinson, Ltd.,

Kalani's parent company; and defendant Bistricer, Murchinson's owner (the "Kalani

defendants"). The purpose of these willful misstatements and omissions, the TAC alleges, was

to make the investment risk free by manipulating the price of the issuer's common stock so that

Kalani could immediately recoup investments it made in DryShips by selling newly acquired

shares into the market at prices that were, as a result of the secret agreement, artificially inflated.

According to the TAC, the failure to disclose the agreement caused an artificial inflation of the price of the stock.

The TAC does not tread new ground.  Most of the same defendants who supplied the financing for the transactions at issue here (Kalani Investments, Murchinson Ltd., and Bistricer) undertook virtually identical financing transactions at about the same time with Top Ships, Inc., another distressed Greek shipping company, and those transactions also resulted in a class-action lawsuit.  See Brady v. Top Ships, Inc., No. 17-cv-4987, 2019 WL 3553999, at *1 (E.D.N.Y. Aug. 5, 2019), aff'd, 806 F. App'x 65 (2d Cir. 2020).  In Top Ships, this Court determined that the complaint failed to adequately allege market manipulation because Top Ship's public filings fully disclosed the transactions and there were no material misrepresentations or omissions.  The Second Circuit affirmed this Court's decision on the same grounds.

Armed with the Second Circuit's decision in Top Ships, plaintiff in the instant case has clearly attempted to plead into that decision and escape the result reached there.  The TAC, as a result, is modestly more detailed than the complaint dismissed in Top Ships.  But the problem remains the same: all the essential details of the transactions were disclosed in DryShips' public filings.  When that happens, there cannot be a claim of market manipulation or securities fraud, at least absent facts not alleged here.  Defendants' motions to dismiss the TAC are therefore granted.[1]

---

[1] There has been an unacceptable level of delay in resolving these motions.  Much of the delay is due to this Court's inability to reach them due to its criminal docket, and only minimally due to anything the parties did.  But in addition, the undersigned is the fourth district judge assigned to this matter.  Each prior judge required the parties to file a full set of motion papers at one time (the so-called "bundling rule"), and then after time passed, denied the motions without prejudice to renewal for various reasons.  Comparing the previously filed motions to the present set of motions was daunting.  And after years of the case being designated as a Central Islip case, the assigned judge there determined that it should have been assigned to a judge in the Brooklyn courthouse, which is how, after passing through another Brooklyn judge, it came to the undersigned.

## BACKGROUND

In 2015 and 2016, DryShips was in financial distress, along with the rest of the dry-bulk shipping industry.  Indeed, by the end of 2015, DryShips was essentially bankrupt, in breach of its financing agreements, and under a declaration of default from several of its lenders.  Its public auditors placed a going concern qualification on its financial statements.  Its fleet of 20 carriers was aged, generating high maintenance costs that it could not afford.  By December 2015, it had a capital shortfall of over $85 million.  It had suspended debt repayments both as to principal and interest and was unable to obtain additional financing from traditional banks.

Amidst this turmoil, DryShips filed a Registration Statement at the end of 2015, the year before DryShips is alleged to have met with the Kalani defendants about a potential investment, advising the investing public that it would seek to raise cash by issuing up to $1 billion of new shares of common stock.  Any investor would realize, based on the Registration Statement, that this recapitalization plan carried the risk of diluting the value of DryShips' outstanding shares – cutting the same size pie into more pieces just means that each piece is smaller; the hope is that DryShips' principals will use the additional investment to, at some point, make the pie bigger.  The risk of dilution, however, is sizeable when a company is as far underwater as was DryShips.

Pursuant to the Registration Statement, DryShips entered into five financing agreements with Kalani over the next two years.  Two of them were Securities Purchase Agreements ("SPAs") for the purchase of convertible preferred shares, and three were Common Stock Purchase Agreements ("CSPAs") for the purchase of DryShips common stock.  The SPAs occurred in June 2016 and November 2016, and the CSPAs occurred in December 2016, February 2017, and April 2017.  The terms of each agreement were disclosed in public filings with the SEC.  In addition to the public filings, DryShips advised current shareholders that the

transactions presented risks of dilution and decreased share value. It also filed prospectus supplements for each transaction that repeated this caution. Each supplement was filed before any sale of stock to Kalani, thereby giving public shareholders the opportunity to get out before the sale and avoid the risk of dilution and diminution of stock value.

By providing that Kalani had not "agreed … to desist from effecting any transactions … with respect to … any securities in the Company … or to hold any of the securities for any specified term," the disclosures made clear that, in exchange for its investment, Kalani had the option to sell its stock whenever it wished. In fact, under all five agreements, the only way Kalani could make any return on its investments was by selling the common stock it received, and it was restricted to holding a maximum of 4.99% of DryShips' common stock.

Specifically, as to the SPAs, Kalani could only profit by converting the preferred shares to common stock at the then-market price and reselling them on the open market. As to the CSPAs, each set forth a formula for how much Kalani had to pay DryShips to receive the common stock. And each agreement gave Kalani a credit for funding it had already provided and then, based on that, set a floor and a ceiling for the purchase of the next issue of stock. For example, under the June 2016 preferred stock purchase, Kalani paid 75% of the recent market price, but never more than $2.75 share and never less than $.37 per share. The other agreements had similar pricing mechanisms.

DryShips disclosed the progress of each agreement as it unfolded. It disclosed that by December 2016, Kalani had provided DryShips with the full $110 million in funding called for by the SPAs. Kalani had also extended credit lines totaling $626.4 million pursuant to the three CSPAs, and the public was informed that DryShips had drawn down $43 million at once.

In August 2017, DryShips could have drawn another $32.4 million from the Kalani credit line.  However, it explained to the public that it instead decided to offer additional common stock valued at $200 million because, by then, it had successfully updated its fleet, having used the Kalani funding to purchase 17 relatively new ships.

Prior to the Kalani financing, DryShips' stock price had fallen below $1.00, ostensibly because of its precarious financial position.  That created a risk that NASDAQ would delist it, and NASDAQ had threatened to do so unless the price rebounded above $1.00.  Delisting can be a death-knell for a public company, at least in terms of raising capital in public markets. DryShips was able to avoid delisting by undertaking eight reverse stock split transactions, *i.e.*, transactions that would combine a certain number of outstanding shares of common stock into one share, the goal being that the post-split shares would be valued higher than the value of the pre-split shares.[2]

The proxy statements for each of these reverse stock split transactions solicited shareholder approval, which DryShips obtained.  Each proxy statement warned that "[t]here can be no assurance that . . . the price per share of the Company's Common Shares immediately after any such reverse stock split, if implemented, will increase proportionately with any reverse stock split, *or that any increase will be sustained for any period of time*."  (Emphasis added).  Each stock split succeeded in raising DryShips' stock price above $1.00, at least for a time, and thus DryShips was able to avoid delisting.

---

[2] This is not an unusual strategy when a distressed, publicly traded company is facing delisting.  See generally, J.B. Maverick, Why Would a Company Perform a Reverse Stock Split?, Investopedia (last updated April 30, 2023) https://tinyurl.com/mv57aya2.

The reverse stock splits, alongside the Kalani financing agreements, form the gravamen of plaintiff's suit.  Plaintiff alleges in the TAC that there was a secret agreement between the DryShips defendants and the Kalani defendants from the get-go which ensured that Kalani's investment was risk free.  Specifically, the Kalani defendants entered the SPAs and CSPAs on the condition that, as the stock price neared the floor price in each agreement, DryShips would commence a reverse stock split, after which the Kalani defendants could immediately sell the newly acquired post-split shares before the market would realize that the reverse split had not in fact increased the total value of DryShips.  The Kalani stock purchases and accompanying reverse stock splits, according to plaintiff, sent a "false pricing signal" to the market that inflated the price of DryShips' common stock.

In support of this theory, the TAC includes price data indicating that DryShips initiated the reverse splits as its share price approached the floor of the SPAs, not necessarily when its share price approached the NASDAQ listing floor.  Plaintiff also emphasizes the extraordinary nature of these transactions; the terms of the SPAs and CSPAs were "completely aberrational," and only five other companies had performed five or more reverse stock splits in the past thirty years.

**DISCUSSION**

The Top Ships transactions, as explained by this Court and the Second Circuit, are virtually indistinguishable from the transactions at issue here.  Indeed, except for the fact that, in Top Ships, Bistricer split his investment between Kalani and another of his investment vehicles, one can look at the Second Circuit's summary of the Top Ships transactions and just substitute the name DryShips to understand the instant case:

> Plaintiffs' claims arise from a series of transactions undertaken by Top Ships during the class period: Top Ships entered into a number of share-purchase agreements with two affiliated hedge funds, defendants-appellees Kalani Investments Ltd. ("Kalani") and Xanthe Holdings Ltd. ("Xanthe"), which are alleged to be controlled by defendant-appellee Murchinson Ltd. ("Murchinson"), a Canadian hedge fund itself controlled by defendant-appellee Marc Bistricer. (We refer to Kalani, Xanthe, Murchinson, and Bistricer, collectively, as the "Kalani defendants"). In addition to the share purchase agreements with Kalani and Xanthe, Plaintiffs identify a number of "reverse stock splits," as well as certain other share issuances and purchase agreements with third parties, as collectively amounting to a "death spiral financing scheme" jointly undertaken by the Top Ships and Kalani defendants.

806 F. App'x at 65.

This Court's and the Second Circuit's holdings that there was no cognizable manipulation claim arising from the fully disclosed transactions rested on the same point: after stripping away the conclusory allegations, the complaint suggests only that Top Ships was responding to market conditions it faced at the time of each investment, and it was thus implausible that all the transactions were part of a grand plan at the outset to manipulate the stock.  As the Second Circuit stated:

> Unable to point to any nondisclosure related to a specific transaction within the alleged scheme, Plaintiffs argue that the Complaint alleges manipulation via the failure of the defendants to disclose the full nature or extent of the alleged scheme to investors at its outset.  As the district court correctly noted, however, such an allegation falls short of stating a claim for manipulation.  The Complaint does not allege any specific fact that would give rise to a plausible inference that the defendants knew or intended either that the parties would undertake the number and scope of transactions they ultimately did, or that the transactions would have the cumulative effect on Top Ships' value that they ultimately did.  Without more, Plaintiffs' claim is essentially that the defendants' failure to disclose at the outset that they were undertaking a manipulative scheme transformed their transactions into a manipulative scheme.  We agree with the district court that this version of Plaintiffs' claim amounts to circular reasoning, such that Plaintiffs' allegations of a manipulative act are fatally conclusory.

Id. at 67-68 (footnotes omitted).

There are no material distinctions between this case and Top Ships.  As here, Top Ships involved serial investments by Kalani under SPAs and CSPAs pursuant to a shelf Registration Statement during a (roughly) yearlong class period; the CSPAs provided a floor and ceiling price for Kalani's purchase of shares; the stock offerings were not subject to any time restriction on selling or conversion; and Top Ships used reverse stock splits – fully approved by shareholders each time they were undertaken – to keep its share price up above a delisting level.  Most importantly, just as here, all the particulars of the transactions and their possible effect on shareholders were disclosed repeatedly.  Other than plaintiff's use of the appellation "Undisclosed Agreement in the instant case," the plaintiffs' argument in Top Ships that all the financing transactions collectively constituted a "secret plan" to steal shareholder value is indistinguishable from the manipulation fraud alleged here.  Both cases alleged insider dealing between the shipowners and the Kalani defendants.  Both companies were under investigation by the SEC for the transactions at issue (neither investigation culminated in manipulation charges).  But as I commented in rejecting plaintiffs' argument in Top Ships:

> Plaintiffs agree that reverse stock splits are not in and of themselves manipulative; instead, they challenge as manipulative the purpose that the reverse stock splits served in the alleged overarching scheme. Namely, as mentioned above, plaintiffs argue that they were led to believe that the reverse stock splits were intended to maintain the increased price of Top Ships securities, rather than to allow Kalani and Xanthe to sell their shares at a profit. But the other issue with this allegation is, if plaintiffs did not agree with the conduct that they approved through the vote, they too could have sold their shares at a profit – just like Kalani and Xanthe. As holders of Top Ships common stock, these shareholders were all equally informed and similarly situated to Kalani and Xanthe in this instance. There is nothing about this alleged scheme that shows or suggests how defendants sent a "false pricing signal" to the market.

2019 WL 3553999 at *9.

It is hardly surprising that these cases are so similar.  Top Ships and DryShips faced the same industry-wide financial crisis, and Kalani undoubtedly had a major say in structuring the rescue transactions, since neither Tops Ships nor DryShips had many (if any) other options.

Plaintiff's attempt to distinguish the two cases is unconvincing.  First, plaintiff asserts that he has added 11 allegedly new factual allegations to the TAC that the Top Ships complaint didn't have.  As to the first seven, he is wrong.  The words may be different, but the substance is the same, as a comparison of the Top Ships operative complaint and the TAC here shows.  And as to the rest of the allegedly new factual allegations, they simply do not push the complaint over the line from possible to plausible for two reasons.

First, plaintiff alleges new facts suggesting that the "number, frequency and cumulative value" of the reverse stock splits made DryShips an outlier among companies that undertake reverse stock splits.  I think that is probably right.  The TAC includes a "study" of other companies conducted by plaintiff's counsel to demonstrate it which I accept as accurate for purposes of this motion.  But it seems of little importance given that finances of every company are different, and distressed companies like DryShips have few options if they want to play for survival.  Moreover, even assuming the accuracy of this study, it also concluded, as plaintiff's brief in opposition concedes, that Top Ships was just as much an outlier.

Second, the TAC also contains new facts related to the timing of the reverse stock splits, which plaintiff argues suggest the existence of some undisclosed agreement between defendants.  Yet the timing shows just the opposite of an intent to manipulate.  In five of the seven reverse split transactions, the stock was trading at the NASDAQ minimum of $1.00, so something had to be done to stop it from falling lower.  And all seven of the splits occurred when the price was either below or approaching the $1.00 floor.  This is perfectly in line with the most frequent

9

reason for the use of reverse stock splits – to prevent delisting.  Tellingly, plaintiff does not suggest another measure DryShips should have undertaken to stay above the delisting floor.

It would be one thing if DryShips' common stock had been trading at $5 or $6 per share before a reverse split transaction – then it might have to offer a justification for the reverse split other than the most frequent explanation of preventing delisting (and even then, for more financially sound companies, there are some).  But because, in each instance, the stock price was below, at, or at least flirting with the delisting level of $1.00 and NASDAQ had already threatened delisting, it is implausible to think that the splits were part of an "Undisclosed Agreement," a grand scheme rather than company and shareholder-protection transactions.

Sure, reverse stock splits can be seen as "manipulative" in that they raise the price of the shares, at least on a book value basis, without changing the value of the company.  But, so long as the reason for the split is disclosed and investors have the option of voting against or selling before (or probably right after) the split, no one is being fooled.  There is no false signal.  In the most frequent reverse split situation, investors know that the company is in deep, deep trouble and on the verge of being delisted, and the purpose of the reverse stock split is to buy time to get new financing or implement new business plans.  Armed with full disclosure, the investors can make the choice of either bailing before the split or riding it out to see if the company's refinancing plan works.  Cf. Wilson v. Merrill Lynch & Co., 671 F.3d 120, 130 (2d Cir. 2011) (holding that manipulation "must involve misrepresentation or nondisclosure").  That's exactly the choice that shareholders had here, and they had it anew each time DryShips undertook a reverse stock split.

Although plaintiff denies it, the failure of plaintiff's TAC arises from a distrust of the reverse stock split transaction and a branding of such transactions as inherently deceptive.  That

distrust ignores the commercial reality under which these transactions occur.  Such transactions can play a key role in salvaging troubled companies, even though they sometimes fail. DryShips, like Top Ships, was facing delisting and bankruptcy, as plaintiff's complaint alleges. What would have happened to the value of the common stock if the company would have had to liquidate?  And where was DryShips (or Top Ships) going to get fresh funding with their finances having fallen so far below lending standards?  The questions answer themselves. Common shareholders were already in a high-risk position because their shares were worth so little.  They were presented with the same choice any investor makes – take your losses or bet on an upside.  Plaintiff's conclusion that all the transactions cumulatively were part of a grand scheme cannot obscure that.  Because of the full disclosure of each transaction – which plaintiff concedes – each investor had a series of choices to make, not just one.

Plaintiff also endeavors distinguish this case from Top Ships by directing the Court to a case decided after the filing of the motions to dismiss here: Set Capital LLC v Credit Suisse Group AG, 996 F.3d 64 (2d Cir. 2021).  In Set Capital, the plaintiffs alleged that Credit Suisse flooded the market with exchange-traded notes to enhance the impact of its hedging trades and collapse the market for the notes.  Although Credit Suisse's trades appeared regular on their face, the Second Circuit held that the complaint stated a claim for market manipulation because Credit Suisse was able to predict, better than ordinary investors, the effect its hedging trades would have on the stock price, and it could capitalize on that price according to its prior trades.  This, the Circuit held, was enough to suggest manipulative intent.  Id.

Plaintiff claims in the instant case that, because DryShips went through seven stock splits, Kalani was similarly able to predict the pattern price increases (here, the reverse split price) and fall offs thereafter, just as Credit Suisse was able to predict what would happen in the

market after it hedged.  Thus, like Credit Suisse, Kalani could sell at the most opportune times.

Plaintiff further points out that Credit Suisse's hedged trades were also disclosed to the market,

and yet the Circuit found the pattern sufficient to state a plausible claim of manipulation.

Plaintiff therefore concludes that Set Capital is "on all fours" with the instant case.

      I think, however, that Set Capital is a different animal running with a herd of a different

species.  For one thing, Set Capital did not involve stock splits or short sales like those alleged

here.  It involved trading in derivative instruments that could only make Credit Suisse money.

The reverse stock splits here, by contrast, saved DryShips from delisting and bankruptcy.

Further, the plaintiffs in Set Capital alleged that Credit Suisse engaged in 15 minutes of after-

hours trading, not publicly disclosed, filed, and voted on agreements that plaintiff challenges

here.  Indeed, the Second Circuit acknowledged that, during many of the 15-minute intervals,

even traders closely watching the market would not have noticed Credit Suisse's trading because

the value of the notes updated only "sporadically."  Id. at 73.  What happened here is simply not

anything like a trading case and, for those reasons, does not plausibly constitute market

manipulation.

      In addition, the plaintiffs in Set Capital alleged specific misrepresentations and omissions

by Credit Suisse, as compared to the failure to disclose some amorphous "Undisclosed

Agreement."  Those misrepresentations were effectively the opposite of the strong warnings that

DryShips gave its investors.  Credit Suisse, for example, stated that it had "no reason to believe"

that its trading practices would be "material."  Id. at 79.  But, based on the allegations in the Set

Capital complaint, that was plainly false.  The bank's hedging strategy was so suspect as a

manipulation that an internal committee had recommended abandoning the hedging strategy out

of concern that it could cause a liquidity crisis for the company, but even after it publicly

announced that it was abandoning the strategy, Credit Suisse continued.  By contrast, DryShips repeatedly disclosed the terms of its financing agreements with Kalani, and those terms explicitly authorized and even incentivized Kalani to sell the shares it received.  If there is a case that is on all fours with this one, it is Top Ships, not Set Capital.

In addition to the new facts and the new case, plaintiff claims that new SEC proceedings against two of the Kalani defendants lend credence to his theory.  As detailed in its order initiating cease-and-desist proceedings, the SEC accused Murchinson Ltd. and Bistricer of violating various provisions of the Exchange Act through its dealings with an unnamed hedge fund.  The two defendants, the order details, caused the fund to engage in so-called "naked short selling" – shorting a stock without owning the stock – and provided erroneous order-marking information which led the fund to mark the short sales as long sales.  The SEC, Murchinson, and Bistricer eventually settled the case, but Murchinson and Bistricer did not admit to the alleged facts.

Plaintiff does little to explain why those proceedings make the existence of an undisclosed agreement between the DryShips and Kalani defendants here more plausible, nor could he have done more.  Even if the unnamed hedge fund was Kalani and the stocks at issue were DryShips common stock, as plaintiff contends, the enforcement proceedings merely show that Murchinson violated various technical regulations – it shorted stocks before it technically acquired them under the applicable regulations, and it made marking errors allowing it to avoid fees associated with the short sales.  However serious these infractions may have been, they would not have furthered the scheme that plaintiff alleges defendants undertook.

Finally, I note that, for the same reasons outlined in Top Ships, plaintiff's Rule 10b-5 claim fails with its market-manipulation claim.  The claim is premised on defendants' failure to

disclose the "Undisclosed Agreement"; yet he has not plausibly shown the existence of such an undisclosed agreement.  And it also follows that, with the two substantive claims having failed, plaintiff's § 20(a) claim cannot survive either.

**CONCLUSION**

Defendants' motions to dismiss are granted.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
       October 8, 2024

14
